# Exhibit A

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF WISCONSIN

---

JUELAINE MILLER, et al.,

        Plaintiffs,

-vs-             Case No. 15-CV-00506

THEDACARE, INC.,

        Defendant.

---

## DEPOSITION OF

## JUELAINE MILLER

Milwaukee, Wisconsin

October 29, 2015

10:08 a.m. to 1:34 p.m.

## PHYLLIS KAPARIS

## Registered Professional Reporter

Case 2:15-cv-00506-WCG  Filed 03/14/16  Page 2 of 56  Document 50-1

Page 2

1        A P P E A R A N C E S
2        THE PREVIANT LAW FIRM, S.C., 1555 North
3    RiverCenter Drive, Suite 201, Milwaukee, Wisconsin
4    53212, by MR. NATHAN D. EISENBERG (nde@previant.com) and
5    MS. ERIN F. MEDEIROS (efm@previant.com), appeared on
6    behalf of the Plaintiffs.
7        QUARLES & BRADY, 411 East Wisconsin
8    Avenue, Milwaukee, Wisconsin 53202, by MR. SEAN M.
9    SCULLEN (sean.scullen@quarles.com) and MR. CHRISTOPHER
10   L. NICKELS (christopher.nickels@quarles.com), appeared
11   on behalf of the Defendant
12       ALSO PRESENT: Jim Prosser
13
14            I N D E X
15
16   WITNESS     EXAMINATION        PAGE
17   JUELAINE MILLER
18   By Mr. Scullen...................................... 4
19   By Mr. Eisenberg...................................116
20   By Mr. Scullen.....................................117
21
22
23
24
25

Page 3

1          E X H I B I T S
2    EXHIBIT        DESCRIPTION        ID'D
3    Exhibit 1  Miller No Lunch Punches; 1/12-5/15........ 89
4    Exhibit 2  Policy & Procedure; Breaks and Lunches.... 92
5    Exhibit 3  Policy & Procedure; General Information
6            and Employee Responsibilities......... 94
7    Exhibit 4  Policy & Procedure; Paid Time off (PTO)... 98
8    Exhibit 5  Plaintiff's Answers to Defendant's First
9            Set of Interrogatories................104
10
11
12
13
14   (Original transcript sent to Attorney Scullen)
15   (Original exhibits attached to original transcript)
16
17
18
19
20
21
22
23
24
25

Page 4

1          P R O C E E D I N G S
2        JUELAINE MILLER, called as a witness
3    herein by the Defendant, after having been first
4    duly sworn, was examined and testified as
5    follows:
6          EXAMINATION
7    BY MR. SCULLEN:
8    Q    Can you state and spell your name for the record,
9    please?
10   A    It's Juelaine Miller, J-U-E-L-A-I-N-E, Miller,
11        common spelling, M-I-L-L-E-R.
12   Q    Ms. Miller, have you ever been deposed before?
13   A    Yes.
14   Q    Okay. And when was that?
15   A    I don't know the exact date.
16   Q    How long ago?
17   A    Several years.
18   Q    And what type of matter was that?
19   A    It had to do with an ambulance call.
20   Q    Were you a party in that matter?
21   A    Meaning?
22   Q    Were you either the person suing or being sued,
23   or were you just a witness?
24   A    Witness.
25   Q    Okay. Let me go over the rules of depositions

Page 5

1    since it's been several years. If you don't
2    understand a question that I've asked, just let
3    me know. I'll try to rephrase it or reask it.
4        If you would wait until I've finished
5    asking the question before you start giving your
6    answer; it's hard for the court reporter to
7    transcribe if we're speaking over each other.
8        If at any point you need a break,
9    don't hesitate to let me know. We can take a
10   break. I would ask that if there's a question
11   pending, that you finish providing your answer
12   before we --
13   A    Okay.
14   Q    -- before we break. If there is something that,
15   you know, either you don't understand or we need
16   to clarify, just let me know.
17        If at some point an answer of yours
18   is incomplete, I'll ask you to let me know that
19   you've either recalled more or you want to
20   correct your answer before the deposition is done
21   for the day.
22        Any questions about any of those
23   general rules?
24   A    No.
25   Q    Okay. Are you taking any medication or are you

2 (Pages 2 to 5)

Halma-Jilek Reporting, Inc.          414-271-4466          Experience Quality Service!

Case 2:15-cv-00506-WCG   Filed 03/14/16   Page 3 of 56   Document 50-1

Page 6

1    suffering any impairment today that would impair
2    your ability to understand and truthfully answer
3    my questions?
4    **A    No.**
5    Q    Okay.  Did you talk with anyone concerning your
6    deposition, other than your lawyers, in
7    preparation for your deposition today?
8    **A    No.**
9    Q    Did you review any documents in preparation for
10   your deposition?
11   **A    Only the document that we had put forth.**
12   Q    When you say the document that you had put forth,
13   you mean the Complaint in this matter?
14   **A    Correct.**
15   Q    Okay.  Any other documents that you reviewed?
16   **A    No.**
17   Q    Have you ever been sued in a lawsuit?
18         MR. EISENBERG:  Let me see if I can
19   correct that.
20         Do you mean the Complaint or the
21   interrogatories responses?
22         THE WITNESS:  Well, you'll have to
23   say that more in lay terms for me.
24   BY MR. NICKELS:
25   Q    Okay.  You understood at some point we had

Page 7

1    provided written requests that you were required
2    to answer --
3    **A    Uh-huh.**
4    Q    -- to provide written answers to, as well as
5    document requests?  Do you recall that?
6    **A    So written answers, yes.**
7    Q    Okay.  Those are called interrogatories.
8    **A    Correct.**
9    Q    And is that what you were referring to earlier as
10   having reviewed in preparation for your
11   deposition?
12   **A    Yes.**
13   Q    Okay.  Anything other than those interrogatory
14   responses that you reviewed?
15   **A    No.**
16   Q    Okay.  Have you ever been sued in a lawsuit
17   previously?
18   **A    No.**
19   Q    Have you ever previously brought an action
20   against another individual or entity either in a
21   lawsuit or an administrative complaint?
22   **A    No.**
23   Q    What is your current address?
24   **A    1216 North Main Street, Seymour, Wisconsin.**
25   Q    And how long have you lived at that address?

Page 8

1    **A    Thirty-nine years.**
2    Q    Okay.  If you would, tell me your education
3    beginning with high school, and the year you
4    graduated and any subsequent post high school
5    education, and the year you graduated and any
6    degrees you received.
7    **A    I don't have any degrees.  I have a paramedic**
8    **license that I received in 1989.**
9    Q    And where did you receive that license from?
10   **A    I went to school at NWTC, Green Bay.**
11   Q    Is that a -- is the acronym for NW, is that
12   Northwest Technical?
13   **A    College.**
14   Q    And how long was that program?
15   **A    At that time it was a number of hours that you**
16   **had to put in.**
17   Q    Do you recall how many hours?
18   **A    No.**
19   Q    Do you recall how long it took you to complete
20   the hours requirement?
21   **A    From August until May.**
22   Q    Of 1989 -- or was it 1988 to '89?
23   **A    I started in 1989, finished in 1990.**
24   Q    So other than -- I assume you graduated from high
25   school?

Page 9

1    **A    Correct.**
2    Q    Other than your high school graduation, any other
3    licenses or degrees other than your paramedic
4    license?
5    **A    No.**
6    Q    Any other -- any certifications?
7    **A    I have certification in ACLS, PALS, Critical Care**
8    **training certification.**
9    Q    All right.  I think the first one you said was
10   ACLS?
11   **A    Yes, Advanced Cardiac Life Support.  PALS is**
12   **Pediatric Advanced Life Support.**
13   Q    And when did you obtain the ACLS certification?
14   **A    That is a recertification every two years.  So my**
15   **last certification was last year in the fall.**
16   Q    When was your first certification in ACLS?
17   **A    Would have been 1990.**
18   Q    What about PALS?
19   **A    My last certification in PALS was a week ago.**
20   Q    And your initial certification?
21   **A    I don't recall.**
22   Q    What about the Critical Care certification?
23   **A    That was 1997.**
24   Q    And are all of those certifications,
25   certifications you received through your employer

3 (Pages 6 to 9)

Page 10

1    or through an outside entity?
2  A   PALS was offered -- PALS and ACLS is offered
3    currently through Theda.  The Critical Care was
4    not.  There's also CPR certification.
5  Q   And when did you obtain your CPR certification?
6  A   That's every two years, and that was last year in
7    the fall also.
8  Q   And your initial CPR certification, would that
9    have been around 1990?
10 A   Correct.  I take that back.  When I became an
11   EMT, so that would have been in 1983.
12 Q   You became an EMT in 1983?
13 A   Uh-huh.
14 Q   And EMT is Emergency Medical Technician?
15 A   Correct.
16 Q   And when did you -- how did you become an EMT?
17   Was that a certification or was that --
18 A   Correct.
19 Q   Okay.  And who was that certification through?
20 A   That was through Fox Valley Tech.
21 Q   Okay.  When was your first -- let's talk a little
22   bit about your employment background.  When was
23   your first job in a medical services role?
24 A   As a volunteer for Seymour Rescue.
25 Q   What is Seymour Rescue?

Page 11

1  A   It an ambulance service run by volunteers.
2  Q   And during what period did you volunteer and what
3    services did you provide to Seymour Rescue?
4  A   I volunteered from the time I had my license in
5    '83.  And I am not sure when I wasn't working for
6    Seymour Rescue anymore.  I would be guessing if I
7    told you the exact year, because it overlapped
8    with other.
9  Q   Okay.  And were you providing volunteer EMT
10   services?
11 A   Correct.
12 Q   Where is Seymour Rescue located?
13 A   In Seymour, Wisconsin.
14 Q   And you said that that was your first medical
15   services role, but it sounded like from your
16   testimony that at some point you obtained
17   employment that overlapped with your volunteer
18   work for Seymour?
19 A   I started working for County Rescue Services as a
20   helper on a paramedic service.
21 Q   And is that for a particular county?
22 A   Brown County.
23 Q   And what years did you hold that role?
24 A   I was a helper until I went on to paramedic
25   school, which they sponsored me to paramedic

Page 12

1    school.
2  Q   Okay.  And you previously testified that
3    paramedic school was '89, '90?
4  A   Uh-huh.
5  Q   Okay.  And where did you work after County Rescue
6    Services?
7  A   When I got my paramedic license, I started
8    full-time with Metro Ambulance, but still
9    continued to work for County Rescue part-time.
10 Q   So that would have been in 1990?
11 A   Correct.
12 Q   And how long did you work for them?
13 A   For who?
14 Q   For the entity that you started full-time once
15   you got your paramedic.
16 A   The Metro Ambulance?
17 Q   Metro Ambulance.
18 A   Metro ambulance was bought by County Rescue
19   Services in 1993.  I became a full-time paramedic
20   with County Rescue at that time.
21 Q   And when did you leave that employment?
22 A   County Rescue, I'm not sure of the exact date.
23 Q   Who was your next employer?
24 A   Well, at the same time that I was working County
25   Rescue, I was also working part-time for Gold

Page 13

1    Cross Ambulance.
2  Q   Okay.  And so at some time did you get -- were
3    you working part-time at both?
4  A   Full-time at County Rescue, part-time at Gold
5    Cross.
6  Q   Okay.  So when was your -- who was your next
7    employer after Metro, which turned into County
8    Rescue, right?
9  A   Correct.  I left County Rescue and went full-time
10   with Gold Cross.
11 Q   And that was in what year?
12 A   I'm not sure what year it was exactly.
13 Q   Who was your next employer after Gold Cross?
14 A   While working for Gold Cross, I started working
15   part-time at St. Mary's Hospital in Green Bay,
16   and then went full-time with them and part-time
17   with Gold Cross.
18 Q   And St. Mary's is part of what health system?
19 A   I don't remember.
20 Q   And were you a paramedic for them as well?
21 A   Correct.
22 Q   What years did you work there?
23 A   I worked there for five years, and I have been
24   gone from there six years in August.
25 Q   And who was your next employer after St. Mary's?

4 (Pages 10 to 13)

Page 14

| | | |
|---|---|---|
| 1 | A | Theda. |
| 2 | Q | And you left St. Mary's voluntarily? |
| 3 | A | Correct. |
| 4 | Q | So what month and year did you begin work at |
| 5 | | Theda-Clark Hospital, I started August 16th, |
| 6 | A | Theda-Clark Hospital, I started August 16th, |
| 7 | | six years ago. So 1999 (sic). |
| 8 | Q | In what role? |
| 9 | A | Paramedic. |
| 10 | Q | And is that the same role you're in today? |
| 11 | A | Correct. |
| 12 | Q | Describe for me your duties as a paramedic at |
| 13 | | Theda-Clark. |
| 14 | A | We are assistants to the nurses. We do a lot of |
| 15 | | the hands-on with the patients, vitals, |
| 16 | | medications, equipment. |
| 17 | Q | But are you -- I mean, there are lots of people |
| 18 | | who would do that. General duty as a paramedic, |
| 19 | | though, are you out in the ambulances -- |
| 20 | A | No. |
| 21 | Q | -- transporting? You never go out and transport |
| 22 | | patients? |
| 23 | A | That's correct. |
| 24 | Q | Is there a particular department in which you |
| 25 | | help the nurses? |

Page 15

| | | |
|---|---|---|
| 1 | A | Strictly in the ER. |
| 2 | Q | What's your current rate of pay? |
| 3 | A | $22 and some cents. |
| 4 | Q | What shift do you typically work in that role? |
| 5 | A | I work ten to ten. |
| 6 | Q | How long have you been on that schedule? |
| 7 | A | At least two years. |
| 8 | Q | How many days a week, or what days of the week? |
| 9 | A | I work three days one week and two days the next. |
| 10 | Q | And did those days typically change or are you |
| 11 | | typically working the same days on the |
| 12 | | alternating weeks? |
| 13 | A | Typically the same days. |
| 14 | Q | Which days are those? |
| 15 | A | Thursday through Monday. |
| 16 | Q | I'm not sure if I asked you to clarify this. |
| 17 | | When you say ten to ten, do you mean 10:00 a.m. |
| 18 | | to 10:00 p.m.? |
| 19 | A | Correct. |
| 20 | Q | And when you're working the three/two, is it |
| 21 | | typically Thursday, Friday, Saturday, or is it |
| 22 | | Friday, Saturday, Sunday, or Saturday, Sunday, |
| 23 | | Monday, or does it rotate? |
| 24 | A | It's always Thursday through Monday; Thursday, |
| 25 | | Friday, Saturday, Sunday, Monday. |

Page 16

| | | |
|---|---|---|
| 1 | Q | Okay. So when you say three days one week, two |
| 2 | | days another week, you're talking about five |
| 3 | | consecutive days covering -- |
| 4 | A | Right. |
| 5 | Q | -- two work weeks. |
| 6 | A | Correct. |
| 7 | Q | Okay. And I think you said that your |
| 8 | | recollection, best recollection is you've had |
| 9 | | that same schedule for at least the last two |
| 10 | | years? |
| 11 | A | Uh-huh. |
| 12 | Q | Yes? |
| 13 | A | Yes. |
| 14 | Q | Okay. Do you recall what your schedule was |
| 15 | | before that? |
| 16 | A | When I started, it was a lot of two to two. |
| 17 | Q | 2:00 p.m. to 2:00 a.m.? |
| 18 | A | Correct. |
| 19 | Q | Who is your current supervisor? |
| 20 | A | Supervisor is Audrey James. Manager is Jen |
| 21 | | Fredrickson. |
| 22 | Q | Okay. What is Audrey's title? |
| 23 | A | Supervisor. |
| 24 | Q | What about Jen Fredrickson? |
| 25 | A | Manager of the ER. |

Page 17

| | | |
|---|---|---|
| 1 | Q | Who does Audrey have supervisory responsibilities |
| 2 | | for, if you know? |
| 3 | A | I really don't know what her responsibilities |
| 4 | | are. She's new. |
| 5 | Q | When did she start? |
| 6 | A | I'm not sure. I'm not sure. It's less than a |
| 7 | | year. |
| 8 | Q | Okay. More than six months? |
| 9 | A | I would -- I'm thinking about six months. |
| 10 | Q | Now, did she replace someone who was in that role |
| 11 | | previously, or is this a new role? |
| 12 | A | She replaced someone. |
| 13 | Q | Who did she replace? |
| 14 | A | Mike Huntley. |
| 15 | Q | And how long had he been in that role? |
| 16 | A | I don't know. He was there when I started. |
| 17 | Q | Okay. So he was there when you started back in |
| 18 | | 1999? |
| 19 | A | Uh-huh. |
| 20 | Q | Yes? |
| 21 | A | Yes. |
| 22 | Q | Okay. And did he have the same title, as far as |
| 23 | | you know? |
| 24 | A | Yes. |
| 25 | Q | And that's supervisor? |

5 (Pages 14 to 17)

Halma-Jilek Reporting, Inc.          414-271-4466          Experience Quality Service!

Case 2:15-cv-00506-WCG   Filed 03/14/16   Page 6 of 56   Document 50-1

Page 18

| 1 | A | Correct. |
| 2 | Q | Okay. Did Audrey and Mike work the same shifts? |
| 3 | A | Audrey doesn't work the same hours that Mike |
| 4 | | worked. |
| 5 | Q | Okay. What hours does Audrey work? |
| 6 | A | I don't know what her exact schedule is. |
| 7 | Q | Well, how much does she overlap with your |
| 8 | | shift? |
| 9 | A | She's usually there when I come in at 10:00 in |
| 10 | | the morning. |
| 11 | Q | And what time does she usually leave? |
| 12 | A | Varies. |
| 13 | Q | Is she typically there until ten, until the end |
| 14 | | of your shift -- |
| 15 | A | Oh, no. |
| 16 | Q | -- or does she typically leave earlier? |
| 17 | A | No. Sometime in the mid to late afternoon. |
| 18 | Q | And did she work the same days that you work? |
| 19 | A | No. |
| 20 | Q | Okay. What days does she work typically? |
| 21 | A | Typically works weekdays. |
| 22 | Q | So you would only overlap with her on Thursday, |
| 23 | | Friday and Monday? |
| 24 | A | Uh-huh. |
| 25 | Q | Yes? |

Page 19

| 1 | A | Yes. I'm sorry. |
| 2 | Q | That's no problem. And you said that -- I think |
| 3 | | you said that Mike Huntley had a different |
| 4 | | schedule. |
| 5 | A | Yes. |
| 6 | Q | What was his schedule? |
| 7 | A | Well, he usually came in around 9 o'clock in the |
| 8 | | morning until late afternoon. |
| 9 | Q | Okay. So is the difference in your mind that he |
| 10 | | typically stayed later than she does? |
| 11 | A | No. She has some days where she comes in very |
| 12 | | early in the morning, so then she leaves earlier |
| 13 | | in the afternoon. What those days are, I'm not |
| 14 | | sure of. |
| 15 | Q | Okay. Did he also work weekdays? |
| 16 | A | Correct. |
| 17 | Q | And I think you said -- well, do all of the |
| 18 | | paramedics report to Audrey; do you know? |
| 19 | A | What exactly do you mean by, report to? |
| 20 | Q | Well, let me ask. You said she was your |
| 21 | | supervisor. So what's your understanding of -- |
| 22 | | how do you know that she's your supervisor, and |
| 23 | | in what ways does she supervise you? |
| 24 | A | I know she's my supervisor because that's her |
| 25 | | title. |

Page 20

| 1 | Q | Well, let me ask you about that. I mean, does |
| 2 | | she supervisor everyone in the ER or -- |
| 3 | A | I honestly don't know what her exact duties are. |
| 4 | Q | Okay. So maybe you can at least describe in what |
| 5 | | ways she supervises you in the performance of |
| 6 | | your job. |
| 7 | A | So far I feel there's not any indication that she |
| 8 | | actually -- there's not one specific area that I |
| 9 | | feel that she's overseeing as far as a paramedic |
| 10 | | goes. |
| 11 | Q | Meaning what, you haven't had any interaction |
| 12 | | with her related to your job duties? |
| 13 | A | Not really. The only was when she asks for |
| 14 | | anyone interested in critical incident stress |
| 15 | | management, I offered to be part of that team. |
| 16 | | Nothing has happened since then. |
| 17 | Q | Okay. Is she involved in setting your schedule |
| 18 | | or your hours in any way? |
| 19 | A | No. |
| 20 | Q | Was Mike Huntley more involved in directly |
| 21 | | supervising you? |
| 22 | A | He was when we didn't have a manager. |
| 23 | Q | Okay. Meaning when you didn't have Jen |
| 24 | | Fredrickson? |
| 25 | A | Correct. |

Page 21

| 1 | Q | Okay. When did Jen Fredrickson start as the |
| 2 | | manager? |
| 3 | A | It would be two years ago in the fall. |
| 4 | Q | So roughly fall of 2013? |
| 5 | A | Correct. |
| 6 | Q | And was there no one in a manager role prior to |
| 7 | | her being hired into that role? |
| 8 | A | Correct. |
| 9 | Q | So he was both a supervisor and manager of the |
| 10 | | department? |
| 11 | A | Correct. |
| 12 | Q | Okay. After she was hired, did he stop |
| 13 | | supervising you or, you know, having direct -- |
| 14 | A | Yeah, I would say more so. |
| 15 | Q | What schedule does Jen work? |
| 16 | A | Varies. |
| 17 | Q | Okay. To what extent does her schedule overlap |
| 18 | | with yours? |
| 19 | A | When she's there, it's during the day majority of |
| 20 | | the time, so until 4:00, 5:00 in the afternoon. |
| 21 | Q | Okay. And does she work weekends? |
| 22 | A | I've not known her to work weekends. |
| 23 | Q | So to the extent that you overlap, it would |
| 24 | | typically be on Thursday, Friday, and Mondays |
| 25 | | during the day. |

6 (Pages 18 to 21)

Page 22

1  A    Correct.
2  Q    Okay. So to the extent that you have questions
3       or concerns about your job, who do you go to as
4       your manager?
5  A    If I have questions or concerns, generally that
6       has to be an e-mail to Jen.
7  Q    Why do you say it generally has to be an e-mail?
8  A    Because of her availability.
9  Q    Okay. Isn't she overlapping with you on three of
10      the days that you work? Is there some reason you
11      couldn't approach her in person on Thursday,
12      Friday or Monday?
13 A    If she's in her office.
14 Q    Okay. But you would not have gone to, for
15      instance, Audrey or Mike Huntley, at least prior
16      to her being hired, with questions or concerns
17      about your job. You would have viewed Jen as the
18      person you would go to; is that correct?
19 A    You said prior to her being hired?
20 Q    Right. Because my understanding was you said
21      that Mike was really in the same role she was in
22      prior to her being hired.
23 A    Correct. So he would have been the one until she
24      was hired.
25 Q    Right. Is that right? She's the one you would

Page 23

1       go to?
2  A    Correct.
3  Q    Okay. Is Jen the one who sets schedules for you
4       and the other paramedics?
5  A    The current schedules that we are on were
6       schedules we were on before Jen was hired.
7  Q    Well, fair enough. What about when people have
8       days off or coverage is needed, who coordinates
9       those sorts of scheduling issues?
10 A    There's a nurse in the ER that oversees the
11      daily, weekly schedule.
12 Q    Who is that?
13 A    Chris.
14 Q    Is that with a K; do you know?
15 A    It's with a C. And her maiden name was Lawson.
16      I don't know what her new married name is.
17 Q    Okay. Is she a lead or --
18 A    Correct.
19 Q    She's a lead R.N. in the ED?
20 A    Correct.
21 Q    Okay. Have you ever worked in any other
22      positions within ThedaCare?
23 A    Any other position other than paramedic?
24 Q    Right, other than paramedic in the ER at
25      Theda-Clark?

Page 24

1  A    No.
2  Q    Okay. So you've never worked in any other
3       department or facility; is that correct?
4  A    At Theda-Clark, no.
5  Q    Well, any other facility outside Theda-Clark?
6  A    I did work from March 16th to August 16th at New
7       London, which was part of the ThedaCare system at
8       that time, in a part-time capacity. And that was
9       an ambulance -- as a paramedic on an ambulance.
10 Q    Okay. March 16th to August 16th of what year?
11 A    Of 1999; is it?
12 Q    Okay. And New London, was that -- for starters,
13      is that facility still in existence today?
14 A    Correct. And I think I have the year wrong on
15      that.
16 Q    Okay.
17 A    So I don't know what I was thinking.
18 Q    Well, you testified earlier that you started at
19      Theda-Clark --
20 A    Six years, that would be 2009. So 2009 --
21 Q    Yeah.
22 A    -- at New London, 2009 at Theda in August. So
23      it's 2009, not 1999.
24 Q    Yeah.
25 A    That was my mistake.

Page 25

1  Q    And did you start working there before you
2       started working at Theda-Clark or --
3  A    Correct.
4  Q    And so after you worked in this part-time role
5       then at the New London facility, you then
6       transferred to full-time employment at
7       Theda-Clark.
8  A    Yes, I applied for a job and was hired.
9  Q    Okay. And the New London facility, what type of
10      a facility is that?
11 A    New London Hospital, and it also has medical
12      offices.
13 Q    And during that time you said you were a
14      paramedic on an ambulance?
15 A    Uh-huh.
16 Q    Yes?
17 A    Yes.
18 Q    And what were your hours in that role?
19 A    I'm trying to remember if I worked a 24-hour
20      shift or a 12-hour shift. I think it would vary,
21      because I was on a part-time basis and filling in
22      for other medics. So sometimes it would be a
23      24-hour and sometimes it would be a 12-hour.
24 Q    And how were your -- did you get meal breaks?
25      Were they paid or unpaid? How was your meal

7 (Pages 22 to 25)

Page 26

1        break compensated, if you recall?
2    A   **We were paid straight hours. There wasn't time**
3        **taken off for.**
4    Q   Okay. And so just to confirm, since you
5        transferred to Theda-Clark and became a paramedic
6        in the ER there, you have worked exclusively in
7        that role --
8    A   **Correct.**
9    Q   -- since 2000 -- August or September of 2009.
10   A   **Correct.**
11   Q   Okay. And you haven't filled in, in any other
12       departments or any other facilities since that
13       time.
14   A   **No.**
15   Q   So let's talk about your typical shift in your
16       current paramedic role. You started to sort of
17       generally describe that you assist the nurses in
18       the ER. Sort of help me understand, walk me
19       through your typical day. You know, you come to
20       work, and who do you take direction from, and how
21       do you get assignments for the day, or are you,
22       you know, autonomous in that regard? So sort of
23       if you can, walk me through what typically
24       happens in your workday.
25   A   **Okay. What typically happens during a workday is**

Page 27

1        **you'll come in, and you'll be assigned an area in**
2        **the ER.**
3    Q   What are the different areas?
4    A   **There's Trauma, there's Acute, and there's**
5        **Specialty. And then there's a nurse assigned to**
6        **each one of those areas.**
7    Q   Just one nurse?
8    A   **Just one nurse to each area.**
9    Q   Okay.
10   A   **And --**
11   Q   And who does the assigning?
12   A   **That's done the night before by the lead nurse.**
13       **She sets up the board.**
14   Q   And do those assignments typically rotate?
15   A   **From day to day?**
16   Q   Yes.
17   A   **Yes.**
18   Q   So you're not the Trauma specialist, for
19       instance.
20   A   **Correct.**
21   Q   You could rotate through all three of those
22       areas --
23   A   **That is correct.**
24   Q   -- typically? Okay.
25   A   **Uh-huh.**

Page 28

1    Q   Sorry. I interrupted you. So you get assigned
2        to one of the areas on a rotating basis where
3        there's an RN already assigned as well. And then
4        do you sort of connect with the RN and you're
5        working in tandem with the RN?
6    A   **That's correct. It would be a team effort. And**
7        **I would be working with one or two nurses,**
8        **depending on how many paramedics were on at that**
9        **time. So when I start at ten, there's two of us,**
10       **which means I will be helping two different**
11       **nurses.**
12   Q   Okay. Because there's only two paramedics for
13       three departments.
14   A   **Correct.**
15   Q   And so would the assignment board, for instance,
16       say Juelaine, Trauma/Acute?
17   A   **My name would be in both positions until the**
18       **third medic comes in.**
19   Q   Okay. And when does that typically occur?
20   A   **Two o'clock.**
21   Q   And then for how long are there three paramedics?
22   A   **There would be three medics until I leave at**
23       **10:00 at night.**
24   Q   So as I understand it, from ten to two there
25       would be two paramedics. Are there always during

Page 29

1        your shift at least three RNs?
2    A   **I don't know exactly their schedule. There's an**
3        **RN that comes in eleven to eleven. And**
4        **Specialty, as I understand it, is covered by the**
5        **lead nurse until that time.**
6    Q   Until 11:00 a.m.?
7    A   **Correct.**
8    Q   And so for what period is that; do you know?
9    A   **Seven to eleven.**
10   Q   What is Specialty? What does Specialty mean?
11   A   **Specialty means the least acute patients. But**
12       **that's -- just because that section says**
13       **Specialty doesn't mean you won't get an acute**
14       **patient.**
15   Q   Okay.
16   A   **A critical patient, a seriously sick patient. It**
17       **can happen.**
18   Q   Okay. And so from that, I assume that that's
19       your definition of acute, somebody who is
20       critical, serious.
21   A   **Yes.**
22   Q   Okay. And then what's the distinction between
23       Acute and Trauma?
24   A   **Well, the Trauma section, that will -- there are**
25       **two dedicated rooms for Trauma. And so if a**

8 (Pages 26 to 29)

Halma-Jilek Reporting, Inc.            414-271-4466            Experience Quality Service!

Case 2:15-cv-00506-WCG   Filed 03/14/16   Page 9 of 56   Document 50-1

Page 30

1  trauma patient comes in -- not a minor trauma,
2  I'm not talking about -- a trauma patient comes
3  in, they will go into that section. That does
4  not mean that the people in that section won't
5  have other patients that are acute in their other
6  rooms. It's kind of a loose designation;
7  although, there is two dedicated Trauma rooms,
8  and one of those rooms is kept strictly open just
9  for the critical trauma that would come in.
10 Q  Okay. So the only thing I didn't understand
11    about your answer was when you said that just
12    because somebody has Trauma, it doesn't mean they
13    wouldn't have patients in the other rooms? Did I
14    understand that -- or hear you correctly?
15 A  Okay. I'll try to clarify that a little bit. As
16    an example, if a kid falls off a skateboard
17    and he gets banged up, he's not necessarily going
18    to go in the Trauma section.
19 Q  Sure. Would somebody like that even go in the
20    Acute section or --
21 A  Well, depending on the availability of rooms, but
22    more than likely into the Specialty.
23 Q  Okay. And is that your point? I mean, these
24    aren't strict distinctions. There is --
25 A  Yes.

Page 31

1  Q  People are sort of put where there's
2     availability.
3  A  Where there's a room sometimes.
4  Q  Okay. And I assume there are typically fewer
5     people -- are there shifts where there's never
6     anybody in the Trauma?
7  A  In the Trauma room, the designated Trauma room?
8  Q  Right.
9  A  Correct.
10 Q  Okay.
11 A  I wouldn't say a whole shift, but there's time,
12    might be a few hours where there's nobody in
13    there.
14 Q  Go ahead.
15 A  I was just going to say, I don't think we could
16    go a whole shift without having a trauma patient.
17 Q  Okay. And when people get -- I mean, people come
18    into Trauma, and then, I mean, you're trying to
19    stabilize them, right? Do they then get -- how
20    quickly do they get moved out of the ER?
21 A  That all depends on the other doctors involved
22    and --
23 Q  Do people ever get moved -- they wouldn't get
24    moved within the ER from Trauma to, for instance,
25    critical, would they, or might they?

Page 32

1  A  When a critical trauma patient comes in, once
2     they leave that room, they're either leaving to
3     the floor, to the OR, to someplace outside of
4     there.
5  Q  And is that true of -- well, you said for the
6     critical trauma patient. What about just the
7     critical patient, what's their typical
8     trajectory? Is it either again being stabilized
9     and moving on somewhere else or --
10 A  Yes, that's generally what the ER is supposed to
11    do, stabilize them, and then move them into
12    whatever appropriate unit, area that they will
13    need to go.
14 Q  Okay. This may be too general, but I'll ask it.
15    Is there sort of a general average time that
16    people -- that a patient will spend in the ER?
17 A  There's very many variables. How busy is the ER,
18    how sick is the patient, what's the availability
19    of beds on the floors. Sometimes they have to be
20    held for a while to wait for a bed.
21 Q  Okay. So I interrupted you in you helping me to
22    understand what you do on a daily basis. And I
23    think you've already testified that when you show
24    up, you know, you will have an area or areas
25    assigned on a rotating basis based on the three

Page 33

1  designated areas in the ER. There will be a
2  nurse assigned, and I think you testified, if
3  I -- correct me if I'm wrong -- that typically
4  there's one nurse assigned to each area;
5  although, there may be a brief period, at least
6  on your shift, where there is not somebody in
7  Specialty; is that right, from ten to eleven?
8  A  Correct.
9  Q  There might only be two RNs. And are there ever
10    more than three RNs in the ED?
11 A  Oh, yeah.
12 Q  Okay. So -- well, let me ask this. Is that
13    typical, or what is typically the staffing in
14    terms of RNs in the ED in which you work?
15 A  Well, we do have a lead nurse, and we have a
16    triage nurse. That's besides the nurses that are
17    assigned to rooms.
18 Q  Okay. How many nurses are typically assigned to
19    rooms on your shifts?
20 A  There's a nurse for four -- four rooms in
21    Specialty, four rooms in Acute, six rooms in
22    Trauma.
23 Q  Is that the total number of rooms in each area?
24 A  I mean, five rooms in Trauma. Yes, there are 13
25    rooms altogether.

9 (Pages 30 to 33)

Halma-Jilek Reporting, Inc.          414-271-4466          Experience Quality Service!

Case 2:15-cv-00506-WCG   Filed 03/14/16   Page 10 of 56   Document 50-1

Page 34

1  Q  So, again, that would go back to your earlier
2     testimony about there being typically one nurse
3     assigned to each of those -- the number of rooms
4     you just described in each of those areas, other
5     than the one-hour period where there's only two
6     of those types of nurses, and one or both of
7     them -- do they typically split Specialty?
8  A  **Before I come in, that period of time between**
9     **seven and eleven?**
10 Q  Right.
11 A  **It is usually handled by the lead nurse.  And if**
12    **possible then they keep those rooms open,**
13    **depending on what the patient flow is.**
14 Q  Okay.  So you come in, you find out which area,
15    meaning sort of which set of rooms -- and I think
16    you said there are 13 rooms total.  And did you
17    say it was two -- what's the breakdown between
18    the rooms in the area?
19 A  **There's four in Specialty, four in Acute, and**
20    **five rooms assigned to the Trauma area.**
21 Q  Okay.  So you get assigned to one of those areas.
22    So you're going to have -- you're going to be
23    assisting one of the nurses who's also got
24    responsibility for four or five rooms.  And then
25    tell me, you know, do you then connect with the

Page 35

1     RN who is assigned to those rooms?
2  A  **Uh-huh.**
3  Q  Okay.  And then how does your day go in terms of
4     how do you get work assignments, how do you
5     decide what tasks you're going to perform?
6  A  **Well, we work as a team.  So we decide as a team,**
7     **okay, if you go in and start the IV and draw labs**
8     **in this room, I'll go in this room and do this.**
9     **I mean, it's -- we work together.  Whatever I do,**
10    **I always update the nurse as far as the patient,**
11    **what is done, what needs to be done.  I also**
12    **document all my own skills that I complete.**
13        **Generally the paramedic takes the**
14    **patient to the CAT scan if they need to go.  And**
15    **generally the paramedic takes the patient**
16    **upstairs if they're being admitted.  So we do**
17    **most of the running around.**
18 Q  Okay.  When you arrive for work, how do you
19    record your time in?
20 A  **It's recorded on a computer system.**
21 Q  On a terminal that's in the ER?
22 A  **Correct.**
23 Q  And how do you record your time?  Do you have an
24    employee number that you punch in or type in?
25 A  **Right.**

Page 36

1  Q  And then it just records --
2  A  **And your password, of course.**
3  Q  And that just records the time that you're
4     signing in.
5  A  **You can put in, you know, what your -- I'm**
6     **assigned a number.  Actually I'm assigned two**
7     **different numbers.  One is for -- number**
8     **designates me as an every other weekend employee.**
9     **But I don't always work weekends.  I work**
10    **Thursday and Monday.  So then I punch in a**
11    **different number that's a paramedic tech number.**
12 Q  Okay.  What's the distinction in the system, as
13    far as you know?
14 A  **Pay.**
15 Q  Meaning you get paid more for working the
16    weekend?
17 A  **Correct.**
18 Q  So but when you punch in -- well, let me ask
19    this.  Do you get paid -- so I understood that
20    you work every week, Thursday through Monday.
21 A  **Every other week.**
22 Q  Okay.  So one week it's Thursday through Monday,
23    the next week it's Thursday, Monday?
24 A  **I work Thursday through Monday every other**
25    **weekend.  So it's five on, nine off, unless I**

Page 37

1     **pick up extra hours.**
2  Q  Got you.  And you get additional pay for the
3     days, weekend days that you work when you work
4     them?
5  A  **Correct.**
6  Q  Okay.  So you're punching in a different code
7     depending on whether you're clocking in on a
8     Thursday, Friday, Monday versus a Saturday,
9     Sunday; is that right?
10 A  **Correct.**
11 Q  Okay.  And that's this distinction between --
12 A  **And Friday is considered a weekend.**
13 Q  So you get additional pay for working on a Friday
14    as well.
15 A  **Correct.**
16 Q  And tell me again what the distinctions are.
17    What are the codes that you -- for weekdays
18    versus weekends?
19 A  **Yes.**
20 Q  Yeah.  What are those?
21 A  **Well, the code for every other weekend is 2240.**
22    **The code for weekdays is 3222.**
23 Q  Okay.  So 3222 is the code you use on Thursdays
24    and Mondays.
25 A  **Correct.**

10 (Pages 34 to 37)

Page 38

| | | |
|---|---|---|
| 1 | Q | And you use 2240 on Friday, Saturday, Sunday. |
| 2 | A | **Correct.** |
| 3 | Q | Okay. |
| 4 | A | **And then if I'm working PRN at AMC, then I have** |
| 5 | | **to punch in AMC as the hospital. Otherwise I** |
| 6 | | **automatically will be on Theda-Clark.** |
| 7 | Q | When you say PRN at AMC, what do you mean by |
| 8 | | that? |
| 9 | A | **Well, as needed.** |
| 10 | Q | Okay. So let's go back to that, because I |
| 11 | | thought I had asked you this question, and you |
| 12 | | said you never worked at any other facilities or |
| 13 | | any other department. |
| 14 | A | **Oh, I'm sorry.** |
| 15 | Q | That's okay. So now your -- |
| 16 | A | **Yes, I do work.** |
| 17 | Q | Okay. |
| 18 | A | **And that's -- I forgot about that. I apologize.** |
| 19 | | **I work there as I feel like picking up hours. I** |
| 20 | | **don't have a strict number of hours that I work** |
| 21 | | **there.** |
| 22 | Q | Okay. AMC stands for? |
| 23 | A | **Appleton Medical Center.** |
| 24 | Q | That's part of ThedaCare? |
| 25 | A | **Correct.** |

Page 39

| | | |
|---|---|---|
| 1 | Q | And during what period of time have you worked at |
| 2 | | AMC? |
| 3 | A | **Not very long. I would say maybe a little over a** |
| 4 | | **year.** |
| 5 | Q | And how did you start working at AMC or picking |
| 6 | | up hours at AMC? |
| 7 | A | **Well, they were in need of help. They had lost a** |
| 8 | | **lot of their employees, so I went over and** |
| 9 | | **applied.** |
| 10 | Q | When you have worked at AMC over the last year, |
| 11 | | what position has that been in? |
| 12 | A | **As a paramedic.** |
| 13 | Q | Okay. In the ER there? |
| 14 | A | **Correct.** |
| 15 | Q | Is that the only position and only department |
| 16 | | that you've worked in? |
| 17 | A | **Correct.** |
| 18 | Q | Now, is that the only position and only facility |
| 19 | | other than your current position or your main |
| 20 | | position? |
| 21 | A | **Yes. I'm sorry.** |
| 22 | Q | That's okay. Even though you didn't recall, I |
| 23 | | did, so we were going to get there. |
| 24 | A | **You were going to get there.** |
| 25 | Q | We were going to get there. We'll come back to |

Page 40

| | | |
|---|---|---|
| 1 | | that in a second. |
| 2 | | So I want to continue talking about |
| 3 | | your current role. So you've testified that when |
| 4 | | you sign in, you're signing in on the computer |
| 5 | | system. Is that -- is there a nurse's station in |
| 6 | | the middle of the ER? Is that where the computer |
| 7 | | terminal is that you would sign in? |
| 8 | A | **I would sign in on the computer that I'm going to** |
| 9 | | **be using for the day.** |
| 10 | Q | Are there multiple computers? |
| 11 | A | **Correct.** |
| 12 | Q | And you can sign in on any one of them? |
| 13 | A | **I can. Usually I'll go to the section I'll be** |
| 14 | | **working in.** |
| 15 | Q | Is there any other method for clocking in? I |
| 16 | | mean, are there time clocks, or is the computer |
| 17 | | the exclusive method by which you sign in your |
| 18 | | time? |
| 19 | A | **A computer is the exclusive method. When I** |
| 20 | | **started there, we had time clocks.** |
| 21 | Q | When did the computers replace the time clocks? |
| 22 | A | **I don't know the exact date.** |
| 23 | Q | More than three years ago? |
| 24 | A | **I really don't recall.** |
| 25 | Q | Are there other methods that you can clock in, |

Page 41

| | | |
|---|---|---|
| 1 | | like is there a phone number you can call and |
| 2 | | enter that code? |
| 3 | A | **No.** |
| 4 | Q | So those computers -- by the time you start your |
| 5 | | shift, those computers are already on, and then |
| 6 | | you go to them, and is it a program that you |
| 7 | | bring up to enter your number and the code? |
| 8 | A | **Correct.** |
| 9 | Q | And you don't enter the time. I assume the |
| 10 | | computer automatically logs the time; is that |
| 11 | | correct? |
| 12 | A | **Yes, when I punch in, then that time will come up** |
| 13 | | **showing when I punched in.** |
| 14 | Q | Okay. Are you issued a phone or a pager at the |
| 15 | | beginning of your shift? |
| 16 | A | **Not at Theda-Clark.** |
| 17 | Q | Okay. So in your role at Theda-Clark you're not |
| 18 | | required to carry a phone or a pager and have |
| 19 | | never been, correct? |
| 20 | A | **In the ER, no.** |
| 21 | Q | Have you been required to carry a phone or a |
| 22 | | pager at Theda-Clark outside the ER? |
| 23 | A | **On the rare occasions that somebody wants to** |
| 24 | | **leave, they have to have give the ER a phone** |
| 25 | | **number.** |

Page 42

1　Q　Okay. And that would be what? Do you have a
2　personal cell phone?
3　A　**Usually people would give -- I have never left,**
4　**but others have, and they use their own phone as**
5　**a contact.**
6　Q　And this would be other paramedics or nurses?
7　A　**Correct.**
8　Q　And do you have a personal cell phone?
9　A　**I do.**
10　Q　So if you wanted to leave, you could leave your
11　personal cell phone number?
12　A　**I would be required to, yes.**
13　Q　But I just want to go back and confirm my
14　understanding that you never were required to
15　carry a pager or a zone phone or any device like
16　that during your shifts in the ER at Theda-Clark,
17　correct?
18　A　**Correct.**
19　Q　Okay. So you described with regard to the
20　performance of your duties in your paramedic role
21　at Theda-Clark that you work in conjunction with
22　the nurse who you're assigned with as a team. In
23　terms of, do you just work collaboratively as to
24　who is going to do what with regard to given
25　patients?

Page 43

1　A　**We do not do patient assessments.**
2　Q　Okay.
3　A　**Other than that, we both can do pretty much**
4　**everything, except there's a couple of drugs that**
5　**medics are not allowed to give.**
6　Q　Well, for instance, if a patient needs some skill
7　to be performed, does the RN have the authority
8　to direct you to perform it? I mean, do you have
9　the authority -- do you have the ability to tell
10　the nurse, I'm not doing that right now. How
11　does that work out?
12　A　**Well, they can ask us if we'll do that while**
13　**they're doing something else.**
14　Q　And you have the ability to say, no, I can't do
15　that right now. I'm doing X, Y, or Z?
16　A　**I guess I would. I've never --**
17　Q　Okay. It's always been more collaborative than
18　that?
19　A　**Correct. I'm a team player, and so I very much**
20　**enjoy working as a team. So there really isn't**
21　**any confrontation or someone else telling someone**
22　**else. It's we work together.**
23　Q　Okay. And so that would hold true for
24　prioritization of tasks, you talk through
25　collaboratively who is going to do what in what

Page 44

1　sequence?
2　A　**Correct.**
3　Q　And in your experience that's not something,
4　because you've been able to work through those
5　issues, that you had to get supervisors involved
6　in deciding who is going to do what?
7　A　**No.**
8　Q　Okay. So you would agree, or you understand that
9　Theda-Clark's expectation is that you take a meal
10　break during your shift, correct?
11　A　**They would like us to, yes.**
12　Q　Okay. A 30-minute meal break, correct?
13　A　**Correct.**
14　Q　Okay. When you started working for ThedaCare --
15　and really I'm interested when you started
16　working in the ED as a paramedic, did you receive
17　any training related to ThedaCare's policies for
18　taking meal breaks?
19　A　**We didn't receive any training, no.**
20　Q　Okay. Since you began working in the ED, has
21　there been any follow-up training or
22　communications related to meal break issues?
23　A　**There have been some policy changes. No direct**
24　**communication.**
25　Q　Okay. What do you recall about any policy

Page 45

1　changes that were made?
2　A　**I -- I don't recall.**
3　Q　Okay. So nothing in your mind in the policy
4　changed in a way that was significant with regard
5　to the meal breaks, or you don't recall anything
6　in particular that changed?
7　A　**No.**
8　Q　Okay. And you understood that -- since you began
9　working in the ED that 30 minutes has
10　automatically been deducted from your pay for the
11　meal period, correct?
12　A　**No, I didn't understand that, because I thought I**
13　**was meeting my FTE all this time.**
14　Q　Okay. You didn't understand that you were only
15　being paid for nine-and-a-half hours per shift?
16　A　**Correct. No. I work 12 hours.**
17　Q　I'm sorry. Eleven-and-a-half hours.
18　A　**Right.**
19　Q　You didn't understand that you were only being
20　paid for eleven-and-a-half hours?
21　A　**That I was -- I understood that I was meeting my**
22　**FTE, which I found out I'm not because they're**
23　**taking out the meal time.**
24　Q　Well, but you understood you were only being paid
25　for eleven-and-a-half hours of a 12-hour shift,

12 (Pages 42 to 45)

Case 2:15-cv-00506-WCG　Filed 03/14/16　Page 13 of 56　Document 50-1

Page 46

1 correct?
2 A I guess I'm going to say, yes, I understood that,
3 but wasn't aware that they were taking PTO to
4 make up the FTE from me. They were taking a half
5 hour of my benefits from me to make up for that
6 FTE.
7 Q Okay. Let's just stick with this notion of, you
8 know, the hours that you were paid for.
9 A Uh-huh.
10 Q So, I mean, you understood that you were -- out
11 of a 12-hour shift, you understood you were being
12 paid for eleven-and-a-half of those hours,
13 correct?
14 A Correct.
15 Q And that the 30 minutes was being deducted for
16 meal periods, correct?
17 A Correct.
18 Q And we'll talk about this -- we'll come back to
19 this issue, but you also understood that in
20 connection with that automatic lunch deduction
21 that you could use a -- to the extent you didn't
22 get a 30-minute lunch period, you could use a "no
23 lunch" code to cancel the automatic deduction,
24 correct?
25 A That's what we were told.

Page 47

1 Q Okay. Well, in fact, you did that on numerous
2 occasions, correct?
3 A That's correct.
4 Q Okay. Well, let's talk a little bit about what a
5 typical meal break is in your role at the -- in
6 the ED. Are you told -- how do you take a break?
7 Do you have a designated time, that every day I'm
8 going to go at 2 o'clock, or how do your meal
9 breaks -- how are they scheduled, or are they
10 not?
11 A They're not scheduled.
12 Q Okay. Are you told when you can take a break, or
13 do you decide when you can take a break?
14 A Well, it depends. With my schedule, the normal
15 time for me to take a meal break would be between
16 3 and 5 in the afternoon. Unfortunately,
17 majority of the time that's when we're quite
18 busy, and that continues on through the evening.
19 Q Okay. Do you need to take -- do you need to
20 punch out when you take a break?
21 A No.
22 Q Okay. Do you need to tell anyone when you're
23 taking a meal break?
24 A Yes, I would tell the nurse that I'm working
25 with. And it would depend, if the lead would

Page 48

1 tell me that you can go now, which usually didn't
2 happen, because meal breaks were considered
3 noontime. When I come in at 10:00, my break
4 wouldn't be until between three and five.
5 Usually, most of the time didn't get.
6 Q Well, help me to understand that. Are you saying
7 that the lead would not tell you because --
8 A She would forget that I needed a break.
9 Q Would you then -- but my understanding is you
10 didn't have to have the lead tell you, right?
11 You were free to decide when you wanted to take
12 your break, correct?
13 A Well, you have to use common sense.
14 Q Sure.
15 A If the ER is busy, they don't want you taking a
16 break.
17 Q Well, okay. Let me ask you this. First of all,
18 you would agree that the lead nurse didn't have
19 to tell you that you were supposed to take a
20 break in order for you to initiate a break.
21 You're not claiming that, correct?
22 A Correct.
23 Q Okay. Because you already testified that you
24 were really free to decide when you wanted to
25 take your break, correct?

Page 49

1 A Sometimes.
2 Q Okay. On what times were you not free to decide
3 when you were going to take your break?
4 A When it was too busy.
5 Q Were there ever any times where you went to
6 someone and said, it's too busy. I want a break,
7 but I can't take a break?
8 A I've never said that, no.
9 Q Okay. You just decided in your own mind that it
10 was too busy and that you couldn't fit in a
11 break.
12 A We as a team, my nurse and I. Can't take a break
13 if people need you.
14 Q And you discussed that with your nurse, or you're
15 just saying it wasn't a conscious discussion, it
16 just -- you thought you were too busy to take a
17 break.
18 A I knew I was too busy to take a break. And I had
19 been told on numerous occasions by the lead, oh,
20 I forgot to give you a break. But that was
21 because it was busy.
22 Q Okay. And on those occasions did you punch, "no
23 lunch"?
24 A Not always.
25 Q Okay. Why not?

13 (Pages 46 to 49)

Case 2:15-cv-00506-WCG   Filed 03/14/16   Page 14 of 56   Document 50-1

Page 50

1  A    **When I first started there, our manager at that**
2      **time would take those away from you. If you**
3      **punched "no lunch," she'd take that half hour**
4      **away from you.**
5  Q    Who was your manager?
6  A    **Marianne.**
7  Q    What was her last name?
8  A    **I don't know.**
9  Q    And how long was she the manager?
10  A    **She quit early 2013.**
11  Q    So is it your testimony that you never took
12      another "no lunch" -- you never punched a "no
13      lunch" after she took your lunch away?
14  A    **No.**
15  Q    Okay. So why on some occasions would you punch
16      and others you didn't?
17  A    **We had to have the okay of the lead to say, yes,**
18      **she deserves -- she didn't get a lunch.**
19  Q    Okay. Was there ever a time when you didn't get
20      a lunch and the lead denied it?
21  A    **She -- I have had a couple occasions where she**
22      **forgot to put that down. So then, no, I didn't**
23      **get it.**
24  Q    And who was that lead?
25  A    **I don't know the lead specifically.**

Page 51

1  Q    Don't you have the ability to go into the system
2      and cancel your lunches?
3  A    **I do.**
4  Q    So you didn't need the lead, though, to authorize
5      it on those occasions, right?
6  A    **With Marianne, yes, you did need the lead to say,**
7      **yes, she did not get a lunch. She didn't**
8      **apparently believe that to be the case. So you**
9      **were very, very cautious about when -- how often**
10      **you would punch "no lunch," whether you deserved**
11      **to punch "no lunch" or not, didn't want to go**
12      **through the confrontation with the manager who in**
13      **the end would still take it away from you.**
14  Q    So is your testimony -- so I heard you say a
15      couple of things. I thought you testified that
16      under Marianne she required the lead to confirm
17      that you didn't get the lunch in order for the
18      "no lunch" to go through.
19  A    **If you punch, "no lunch." Didn't always punch**
20      **"no lunch" when I deserved it.**
21  Q    Okay. And that's because you just wanted to
22      avoid any confrontation about whether you
23      deserved the "no lunch"?
24  A    **Correct. Knowing that other employees had**
25      **previously and had it taken away from them**

Page 52

1      anyway. So as a new employee there, I didn't
2      want to go through that harassment.
3  Q    Okay. Well, let's back up a little bit. Was
4      there ever an occasion where you didn't get a
5      lunch, you went to the lead, the lead approved
6      it, and Marianne reversed it?
7  A    **I can't say that for sure as far as my paychecks**
8      **are concerned.**
9  Q    After Marianne left, did things change?
10  A    **I would say I punched "no lunch" more often when**
11      **I deserved it after she left, yes.**
12  Q    Do you remember what part of the year in 2013
13      Marianne left?
14  A    **I believe it was February.**
15  Q    Now, what was Marianne's role? Because when you
16      previously described the managers, you know, we
17      talked about Jen and the two supervisors. So
18      what was Marianne's role?
19  A    **She was the manager.**
20  Q    So help me understand. You didn't previously
21      identify her when we talked through who the --
22      you said that Jen is the current manager.
23  A    **Correct.**
24  Q    And that prior to Jen, Mike Hanley was filling
25      that role.

Page 53

1  A    **Filling that role between Marianne and Jen.**
2  Q    Okay. I understood your testimony to be that it
3      was Mike that entire time. So you're saying that
4      there was -- he was only the manager during the
5      interim period --
6  A    **Correct.**
7  Q    -- between Jen and Marianne.
8  A    **Correct. Prior to that he was the supervisor for**
9      **Marianne.**
10  Q    In other words he reported to Marianne?
11  A    **Correct.**
12  Q    Was Marianne there when you were hired?
13  A    **Yes.**
14  Q    So following Marianne's departure, you've
15      testified that you punched the "no lunch" more
16      frequently?
17  A    **Correct.**
18  Q    Okay. Has there ever been an occasion where you
19      punched "no lunch" that it was reversed since
20      Marianne left?
21  A    **No.**
22  Q    Has there ever been an occasion where anyone in
23      management has discouraged you from punching no
24      lunches since Marianne left?
25  A    **Not that I recall.**

14 (Pages 50 to 53)

Halma-Jilek Reporting, Inc.      414-271-4466      Experience Quality Service!

Case 2:15-cv-00506-WCG   Filed 03/14/16   Page 15 of 56   Document 50-1

Page 54

1  Q    That's something you would recall, right?
2  A    I would think so.
3  Q    When you work a shift -- let me ask this. I
4       mean, do you assume you're going to take a lunch
5       or a meal period at some point during your shift
6       when you show up for work?
7  A    I don't assume that.
8  Q    Okay. Does that mean you don't eat for 12 hours
9       or --
10 A    No. What I do is I make myself smoothies, and
11      that's something that I can have in the ER with a
12      cover on, so that I can get something -- eat
13      something and not have to worry that I'm not
14      going to get a break.
15 Q    So when you do take a -- let me ask this. Is the
16      meal break the only break that you would take
17      during the day? I mean, do you get other breaks?
18 A    We don't get designated breaks. I know that's
19      part of the policy but, no.
20 Q    So you don't take other 10 or 15-minute breaks?
21 A    No.
22 Q    So to the extent you take a break, it's typically
23      a meal period.
24 A    Correct.
25 Q    And I think you've testified already that you

Page 55

1       have the discretion to decide when you're going
2       to take your break, to the extent that you
3       believe that the volume of work allows you to
4       take a break.
5  A    Correct.
6  Q    Okay. And that you don't have to wait for the
7       lead to tell you to take your break. Correct?
8  A    Correct. They will say to me, take your break
9       when you can. So that to me tells me I can do it
10      when -- at my discretion.
11 Q    Right. That's consistent with what you just
12      described about your discretion to decide when
13      you can take your break.
14 A    Right. But it's not that they're not aware of
15      that, you know.
16 Q    That they're not aware --
17 A    That I would be taking a break when it was
18      appropriate.
19 Q    Sure.
20 A    Okay.
21 Q    But you don't have to tell them. You would
22      typically just talk to the nurse you're working
23      with.
24 A    As long as it was good with our section and my
25      nurse and doctor, yeah.

Page 56

1  Q    You don't have to first find the lead and tell
2       her, I'm taking my break.
3  A    That's correct.
4  Q    Okay. When you take a break, where do you
5       typically take your break?
6  A    In the break room.
7  Q    Okay. Where is the break room in relation to the
8       ER?
9  A    The ER has double doors that open up that would
10      lead you into the rest of the hospital. Right
11      there is the door to the break room.
12 Q    Before or after the double doors?
13 A    After the double doors open.
14 Q    Okay. And describe the break room for me.
15 A    Meaning --
16 Q    Well, what's in the break room?
17 A    There's a refrigerator, there's shelves, there's
18      postings, cupboards. And there's also a call
19      light. So in those 13 rooms if a patient pushes
20      a call light, it rings in the break room.
21 Q    Okay. Is it a color coded call light or just a
22      light that goes off indicating that somebody in
23      one of the rooms is --
24 A    Light and a very loud noise.
25 Q    Okay. Is there a TV in the room?

Page 57

1  A    Yes.
2  Q    Okay. So there is also a cafeteria in the
3       hospital, right?
4  A    There is.
5  Q    Do you ever go to the cafeteria for your meal
6       break?
7  A    I don't.
8  Q    Okay. Are there vending machines in the break
9       room?
10 A    No.
11 Q    And you said that you typically bring smoothies
12      to work?
13 A    Correct.
14 Q    Okay. Do you keep those in the refrigerator in
15      the break room?
16 A    Well, until I bring them out.
17 Q    Yeah. And so you would typically drink your
18      smoothie in the break room during your meal
19      period; is that right?
20 A    I would typically drink my smoothie in the ER
21      while working.
22 Q    Okay. You don't typically take your break in the
23      break room.
24 A    Well, I would have something else to eat if I get
25      that break. So the smoothies is basically when I

15 (Pages 54 to 57)

Halma-Jilek Reporting, Inc.                414-271-4466                Experience Quality Service!

Page 58

1  don't get a break, I know at least I have
2  something to sustain me.
3  Q  Okay. So when you're -- I thought -- I
4  misunderstood your prior answer then. So when
5  you're getting a break and you're taking a break
6  in the break room, where do you go to -- what do
7  you do for food?
8  A  I bring my own food.
9  Q  Okay. So every day you bring both a smoothie and
10  food?
11  A  Correct.
12  Q  Okay. And it's your testimony that if you're
13  working through your lunch, you just consume the
14  smoothie and leave the food?
15  A  Correct.
16  Q  Okay. Do you -- you don't record when you come
17  and go from breaks in any way; do you?
18  A  No.
19  Q  Okay. Do you cover for other employees when they
20  go on break?
21  A  Well, if one of the other medics is going on
22  break, which is shortly after I come in, like the
23  day one that starts at 6:00 in the morning, they
24  let me know that they're leaving. So, yes, I
25  will be covering the entire ER as a medic helping

Page 59

1  all of the nurses for whatever they need during
2  that time.
3  Q  Okay. Do they similarly cover for you when you
4  go on breaks?
5  A  That's the thinking.
6  Q  Well, do other -- are you saying that you cover
7  for over people, but they don't cover for you?
8  A  No. You know, that's how it's supposed to be.
9  Q  Okay.
10  A  So it depends if my nurse asks this other medic
11  to do something, yes, then they would go do it,
12  if I got that break.
13  Q  Okay. Otherwise, what, you would come back and
14  that task would be waiting for you?
15  A  Yes.
16  Q  Okay. Do other people go to the cafeteria for
17  their breaks?
18  A  I believe some of them do, yes, to get their food
19  and come back.
20  Q  Okay. And come back to where?
21  A  The break room.
22  Q  Okay. Are there food options nearby, meaning
23  outside the facility?
24  A  Not that I'm aware of.
25  Q  Okay. I don't know the facility at all, so I

Page 60

1  don't know if there's a fast food place anywhere
2  nearby.
3  A  I don't know. There may be. But because I don't
4  use any of that, I -- I would only be guessing
5  how close the nearest fast food place would be.
6  Q  Okay. Have you observed others going out and
7  bringing back food from outside the facility?
8  A  No.
9  Q  Okay. So when you do get a break -- and this
10  would be, as I understand your testimony, when
11  you're in the break room, you would eat your --
12  typically you would eat the meal that you
13  brought?
14  A  Correct.
15  Q  Okay. You'd watch -- did you watch TV?
16  A  Sometimes.
17  Q  Okay. Talk with other employees? Are there
18  other employees typically in the break room?
19  A  On occasion, yeah.
20  Q  Okay. Did you ever -- do you ever read magazines
21  or --
22  A  No.
23  Q  Okay. Is that a time when you would engage in
24  personal calls?
25  A  Not myself personally, but other people have.

Page 61

1  Q  Do you do other personal -- you know, some
2  people -- I mean, if I get a break, sometimes I'm
3  doing other personal stuff, if it's not calling
4  people, maybe I have got personal paperwork to
5  do. Are there things that you would do on your
6  break, attend to other personal --
7  A  No, not really time.
8  Q  Okay. Thirty minutes is relatively short?
9  A  I think so.
10  Q  I do, too. Okay. Let's talk a little bit about
11  the -- you said that there's a light in the break
12  room?
13  A  Correct.
14  Q  Okay. And where in the break room is the light?
15  A  It's a light and it's an alarm both, and it's
16  right by the door.
17  Q  Okay. On a vertical wall?
18  A  Correct.
19  Q  Okay. And when it goes off, it's -- there's a
20  light and then there's also a sound alarm?
21  A  Correct.
22  Q  Okay. And you said that that occurs when a
23  patient in the ER presses their call button; is
24  that right?
25  A  Correct.

16 (Pages 58 to 61)

Halma-Jilek Reporting, Inc.          414-271-4466          Experience Quality Service!

Case 2:15-cv-00506-WCG   Filed 03/14/16   Page 17 of 56   Document 50-1

| | Page 62 |
|---|---|
| 1 | Q   Okay.  And does that happen every time -- does |
| 2 | that light go off every time a patient in the ER |
| 3 | presses their call button? |
| 4 | A   Correct. |
| 5 | Q   What is your understanding about what you're |
| 6 | supposed to do if you're on break and that light |
| 7 | goes off? |
| 8 | A   Well, my understanding is if that light and sound |
| 9 | doesn't stop, then nobody has gone in that room. |
| 10 | So then somebody needs to -- myself, go out there |
| 11 | and see what the problem is with that patient. |
| 12 | They want something or need something.  That's |
| 13 | why they pushed the light. |
| 14 | Q   Okay. |
| 15 | A   Pushed the button. |
| 16 | Q   Well, there's almost never an occasion where |
| 17 | you're on break and there's nobody else in the |
| 18 | ER, right? |
| 19 | A   Correct. |
| 20 | Q   I mean, that's not going to happen. |
| 21 | A   Right. |
| 22 | Q   So in most cases someone else is already in the |
| 23 | ER and is going to respond to that call, correct? |
| 24 | A   Just because there's someone else in the ER |
| 25 | doesn't mean they -- they're not answering |

| | Page 63 |
|---|---|
| 1 | because they have -- I mean, they're busy. |
| 2 | Q   So -- |
| 3 | A   So that could go on for several minutes. |
| 4 | Q   Okay.  How much time is supposed to go by before |
| 5 | you respond? |
| 6 | A   Before I -- there is no set rule on that. |
| 7 | Q   Okay.  What's your -- do you have a personal |
| 8 | gauge then that you go by? |
| 9 | A   Well, how long can you sit there and listen to |
| 10 | that -- |
| 11 | Q   Okay. |
| 12 | A   -- until you go and help that patient, you know. |
| 13 | Q   Well, and I'm trying to get a sense of what is |
| 14 | your personal gauge for that. |
| 15 | A   I know. |
| 16 | Q   I mean, obviously you're not jumping up every |
| 17 | time it goes off. |
| 18 | A   No. |
| 19 | Q   Because most times somebody else is going to |
| 20 | respond; is that fair? |
| 21 | A   Most times somebody else will respond. |
| 22 | Q   So how long then generally would it need |
| 23 | to go off before it indicated to you that |
| 24 | somebody else wasn't going to respond and that |
| 25 | you needed to jump in? |

| | Page 64 |
|---|---|
| 1 | A   15 seconds, 20 seconds.  It's a long time to hear |
| 2 | that bell ringing. |
| 3 | Q   Okay.  I'm trying to think of just in terms of |
| 4 | timing.  15 seconds seems very short to me, |
| 5 | because if I the press button, I mean, unless you |
| 6 | guys are running into the room, it might take |
| 7 | somebody 15 seconds at least to get in the room; |
| 8 | wouldn't it?  I mean, if you're on the floor, how |
| 9 | long would it take you if you're -- |
| 10 | A   I have no idea.  I don't know how long their |
| 11 | bells ring.  But I feel it's longer than ours, |
| 12 | because I've been up on a floor to deliver a |
| 13 | patient, and the bell can be ringing the entire |
| 14 | time while I'm delivering the patient. |
| 15 | Q   Okay.  We're still talking about the alarm in the |
| 16 | break room? |
| 17 | A   Well, you said up on the floor.  So when you say |
| 18 | up on the floor, that means on a floor. |
| 19 | Q   No.  I'm sorry.  I probably misspoke.  I mean out |
| 20 | in the ER, the floor in the ER. |
| 21 | A   Okay. |
| 22 | Q   I mean, 15 seconds seems like a short amount of |
| 23 | time.  If you're working, and I'm, you know, in a |
| 24 | room, and I press my call button, 15 seconds |
| 25 | seems like a pretty short response time to |

| | Page 65 |
|---|---|
| 1 | respond to a -- |
| 2 | A   Probably does, but I think we respond pretty fast |
| 3 | to our call lights. |
| 4 | Q   Okay.  But it might be -- you would agree it |
| 5 | might be a little bit longer than that? |
| 6 | A   It's possible.  But when it's -- it's a constant |
| 7 | bing, bing, bing.  How long do you want to listen |
| 8 | to that? |
| 9 | Q   Well, let me ask this. |
| 10 | A   You know, that's what I mean.  So 15 seconds |
| 11 | becomes quite long when that's happening. |
| 12 | Q   Sure.  Okay.  Well, you testified, I think, that |
| 13 | while it's not your practice, other people go to |
| 14 | the cafeteria, correct, during their breaks? |
| 15 | A   To get their food, yes. |
| 16 | Q   Okay.  Let me ask this.  Is there any requirement |
| 17 | that you take your break in the break room? |
| 18 | A   Well, we have to be able to respond back to the |
| 19 | ER if we're needed, so. |
| 20 | Q   Well, do people ever eat in the cafeteria? |
| 21 | A   I don't know of anybody that eats in the |
| 22 | cafeteria. |
| 23 | Q   Okay.  You don't know anybody who has been |
| 24 | disciplined for eating in the cafeteria? |
| 25 | A   No, I don't. |

17 (Pages 62 to 65)

Halma-Jilek Reporting, Inc.            414-271-4466            Experience Quality Service!

Case 2:15-cv-00506-WCG   Filed 03/14/16   Page 18 of 56   Document 50-1

Page 66

1  Q   And you've never been told that you have to take
2      your break in the break room, correct?
3  A   Correct.
4  Q   And you've never been told that you have to --
5      similarly never been told that, you know, you
6      have to be in the break room because if the light
7      goes off, you have to be there to respond during
8      your break, correct?
9  A   I've never been told that.
10 Q   And you testified earlier that while you've never
11     left the premises, you're aware that others have
12     left the premises, correct?
13 A   I know of one occasion where permission was
14     asked, and then a phone number was given.
15 Q   Okay. But that person wasn't, number one, denied
16     permission to leave, correct?
17 A   No.
18 Q   And wasn't disciplined for leaving the premises?
19 A   No, because the reason he had to get permission
20     was to make sure that -- at that time, but he had
21     to be able to respond back quickly. That's why
22     he had to give a phone number.
23 Q   Well, he had to be able to respond by phone,
24     correct, reachable by phone?
25 A   Correct.

Page 67

1  Q   Have you or anyone else ever been disciplined for
2      not responding either at all or quickly enough to
3      an alarm going off in the break room?
4  A   I have never been disciplined or know of anyone
5      that's been disciplined for that.
6  Q   Okay. What percentage of the shifts that you
7      work would you say that you get to take a meal --
8      that you take a meal break?
9  A   Rare occasion that I take a 30-minute meal break.
10 Q   I'm sorry. Rare occasion?
11 A   Correct.
12 Q   But, again, that's because you've decided that
13     the department is so busy that you're needed
14     for -- back for a shorter period of time,
15     correct?
16 A   Correct.
17 Q   No one in management has told you that. It's
18     your perception based on the needs of the
19     department that you're needed in the department,
20     correct?
21 A   That's part of it. The other part is our Press
22     Ganey reports. If a patient complains that they
23     haven't seen anybody for 30, 45 minutes -- I was
24     in the room; nobody showed up -- okay, that comes
25     back on the employees. So there's a

Page 68

1      responsibility to round and be in those rooms
2      every so often. And if I'm taking a break, I
3      can't be in there. And if I don't have anyone to
4      cover.
5  Q   Well, but no one in management has ever told you
6      that the result of these reports is that you
7      can't take a full 30-minute break, correct?
8  A   They've never used that verbiage, no.
9  Q   Well, they've never made any suggestion like
10     that, have they, in connection with discussing
11     those types of reports?
12 A   Well, the breaks aren't brought into it. It's
13     just the fact that they haven't seen somebody,
14     you know, that for me the breaks is part of that
15     problem.
16 Q   Okay. But, again, no one in management has
17     suggested that to you.
18 A   No.
19 Q   And, again, there are people, not only the nurse
20     that you're working with, but presumably the
21     other paramedic who can cover for you while you
22     take a break, correct?
23 A   They're asked to cover, yes.
24 Q   Okay. And you testified that they do cover for
25     you, correct?

Page 69

1  A   If the nurse asks them to help, yes, then they
2      need to go over there and help.
3  Q   Okay.
4  A   But I want to make it clear that if that ER is
5      full, meaning all the rooms except maybe the
6      trauma room at some point in time, there isn't
7      time to do more than what you're already assigned
8      to. So does that happen that the other paramedic
9      does not respond or can't respond because they're
10     already busy in other rooms? All the time.
11 Q   Okay.
12 A   All the time.
13 Q   And you've testified that you understood that on
14     those occasions where -- at least since February
15     of 2013 when Marianne was there, that on
16     occasions where you didn't get a lunch that you
17     could punch "no lunch" to get your lunch
18     canceled, correct?
19 A   I understood that, yes.
20 Q   And you've done it, correct?
21 A   I have done it.
22 Q   And there's not been an occasion where you have
23     done it and the lunch has been -- the
24     cancellation has been overturned or denied,
25     correct?

18 (Pages 66 to 69)

Halma-Jilek Reporting, Inc.          414-271-4466          Experience Quality Service!

Case 2:15-cv-00506-WCG   Filed 03/14/16   Page 19 of 56   Document 50-1

Page 70

| | | |
|---|---|---|
| 1 | A | Since then, no. |
| 2 | Q | And no occasion when you punched "no lunch" where |
| 3 | | someone has -- in management has told you that's |
| 4 | | inappropriate or you shouldn't be punching "no |
| 5 | | lunch," correct? |
| 6 | A | Correct. |
| 7 | Q | Other than the light that is in the break room, |
| 8 | | are there any other interruptions or pages during |
| 9 | | your meal periods? |
| 10 | A | Oh, yes. |
| 11 | Q | Okay. And what are those? |
| 12 | A | They can come in and get you because it's busy. |
| 13 | Q | Okay. And how often does that occur? |
| 14 | A | Well, I don't get that many lunches, so not real |
| 15 | | often. But it can -- but it can happen. |
| 16 | Q | Okay. And on those occasions then would you |
| 17 | | punch "no lunch" if you were called off your |
| 18 | | lunch period? |
| 19 | A | If I remembered to at the end of the shift, yes. |
| 20 | Q | Okay. So sometimes your testimony is you would |
| 21 | | work through your shift, you wouldn't get the |
| 22 | | lunch period, and you would simply forget to even |
| 23 | | punch in the "no lunch." |
| 24 | A | That's true. |
| 25 | Q | Okay. |

Page 72

| | | |
|---|---|---|
| 1 | Q | And what hours have you been working there? |
| 2 | A | Varies. |
| 3 | Q | Okay. So what different shifts have you worked? |
| 4 | A | Like 5:00 in the afternoon to 3:00 in the |
| 5 | | morning. The morning shift is also a ten-hour |
| 6 | | shift. It starts at seven. |
| 7 | Q | Seven to five? |
| 8 | A | Correct. |
| 9 | Q | Any other shifts that you've worked? |
| 10 | A | Those are the only two. |
| 11 | Q | Okay. And what days of the week have you worked? |
| 12 | A | Varies. |
| 13 | Q | Both weekdays and weekends? |
| 14 | A | Correct. |
| 15 | Q | And how often? |
| 16 | A | Very, very limited right now. |
| 17 | Q | Was it more frequent previously? |
| 18 | A | Yes. |
| 19 | Q | Okay. Meaning towards the beginning of the time |
| 20 | | that you started working there? |
| 21 | A | Yes. |
| 22 | Q | And by very limited, what do you mean? |
| 23 | A | The hours aren't available. |
| 24 | Q | So how frequently have you worked there, for |
| 25 | | instance, over the last two months, if at all? |

Page 71

| | | |
|---|---|---|
| 1 | | MR. EISENBERG: I don't know where |
| 2 | | you're at. When you get a chance, why don't we |
| 3 | | take a break. |
| 4 | | MR. SCULLEN: This is as good a time |
| 5 | | as any. |
| 6 | | MR. EISENBERG: Okay. |
| 7 | | (A recess was taken.) |
| 8 | | BY MR. SCULLEN: |
| 9 | Q | I want to talk a little bit about your |
| 10 | | experiences working at AMC. I think you've |
| 11 | | testified that over the past -- did you say it |
| 12 | | was about the last nine months you've been |
| 13 | | filling in there? |
| 14 | A | I was -- I think I said year, approximately a |
| 15 | | year. I don't know the exact date that I first |
| 16 | | started there. |
| 17 | Q | Okay. And in what role have you been filling in |
| 18 | | there? |
| 19 | A | As a paramedic. |
| 20 | Q | Similar role to the role you have at Theda-Clark? |
| 21 | A | That's correct. |
| 22 | Q | Okay. In the ER? |
| 23 | A | Correct. |
| 24 | Q | Not going out on ambulances? |
| 25 | A | No. |

Page 73

| | | |
|---|---|---|
| 1 | A | I have not worked in the last two months there. |
| 2 | | I will be working this Sunday there for someone |
| 3 | | else. |
| 4 | Q | Okay. When was the last time you worked at AMC? |
| 5 | A | This summer. |
| 6 | Q | Do you recall what month? |
| 7 | A | I do not. |
| 8 | Q | Did you have to interview for that role? |
| 9 | A | It was not an interview process, no. |
| 10 | Q | Was there any sort of orientation before? |
| 11 | A | Yes. |
| 12 | Q | Who conducted the orientation? |
| 13 | A | I'm not real sure. I believe it was a lead |
| 14 | | nurse. |
| 15 | Q | A lead nurse in the ER? |
| 16 | A | In the ER, yes. |
| 17 | Q | You don't recall who? |
| 18 | A | No. |
| 19 | Q | Was it just for you, or were there others in that |
| 20 | | orientation? |
| 21 | A | It was just me that day. |
| 22 | Q | Was that at the beginning of a shift or prior to |
| 23 | | a shift, or did you just come in for a specific |
| 24 | | orientation? |
| 25 | A | I just came in for orientation that day. |

19 (Pages 70 to 73)

Page 74

1  Q    Okay. And what was covered in the orientation?
2  A    Basically where the equipment was. If there was
3       equipment that we weren't familiar with at Theda,
4       then we covered that. Basically the same role as
5       I have at Theda ER.
6  Q    Are there any differences between the roles?
7  A    No. You're still helping a nurse or nurses.
8  Q    Okay. Are there any differences between the
9       policies or practices particularly as they relate
10      to meal breaks?
11 A    Well, at AMC we had to carry a phone from the
12      beginning of the shift until the shift was over.
13 Q    What type of phone?
14 A    I would say it's a zone phone for that area.
15 Q    And what does that mean? What do you mean by a
16      zone phone for the area?
17 A    Meaning that it wouldn't be a phone that I could
18      leave the facility and carry with me, that they
19      would be able to contact me outside of the AMC
20      hospital.
21 Q    And who is able to -- who would typically contact
22      you on the phone?
23 A    Would be a lead nurse or the nurse I was working
24      with.
25 Q    Did you sign out the device?

Page 75

1  A    It wasn't actually a sign-out, but the number
2       that I had on my phone was put into the computer
3       so you would know who had what phone to match
4       what, you know, person with it.
5  Q    Okay. So that would be -- that number would
6       be -- did you take care of doing that, or does
7       someone else do that?
8  A    Someone else would put it in the computer.
9  Q    Was your punching -- I mean, did you punch in
10      your time in the same way that you do at
11      Theda-Clark, meaning in the computer?
12 A    Correct.
13 Q    But someone else takes care of the phone
14      assignment.
15 A    Well, there is a designated phone for the
16      paramedic, or two phones. So you just pick one
17      of those.
18 Q    So at AMC how many paramedics are there per
19      shift, working per shift?
20 A    There was only one medic when I was working
21      there. That may have changed. I'm not sure.
22      But one from seven to five and one from
23      five to three. But they also have CNA's working
24      in the ER.
25 Q    Unlike at Theda-Clark?

Page 76

1  A    Correct.
2  Q    And did you carry the phone on a belt or how did
3       you carry the --
4  A    Pocket.
5  Q    Was there a sign-off or trade-off? If you went
6       on break, were you supposed to give the phone to
7       someone else?
8  A    No.
9  Q    What discussion, if any, did you have about
10      taking breaks at AMC in your orientation or
11      afterwards?
12 A    I don't recall any discussion about breaks.
13 Q    Would you similarly work with the RNs and the
14      CNAs to cover you when you went on break?
15 A    The lead would take care of that because they
16      would tell you if they wanted you to go on break.
17 Q    Okay. So your testimony is the process at AMC
18      was different than the process at Theda-Clark.
19 A    What I'm saying is at AMC I didn't take a break
20      unless the lead said I could take a break.
21 Q    Why not?
22 A    Because I thought that was the way their system
23      works, so.
24 Q    Did you ever on occasions when the lead didn't
25      tell you to take a break, did you ever ask to

Page 77

1       take a break?
2  A    No.
3  Q    What percentage of the time did -- on the shifts
4       that you worked at AMC did the lead tell you to
5       take a break?
6  A    It was consistent.
7  Q    Meaning on most shifts --
8  A    Correct.
9  Q    -- the lead told you to take a break.
10 A    Correct.
11 Q    And would you get a 30-minute break on most of
12      those occasions?
13 A    I cannot answer yes to that, because she'd say go
14      in and eat something quick and come back out on
15      occasion. So if it's busy, you get in there, eat
16      something quick, and come back out. I did not
17      get a 30-minute break, no.
18 Q    Never?
19 A    I'm not going to say never.
20 Q    On occasions when you didn't get a 30-minute
21      break, did you cancel your lunch?
22 A    No, because the understanding was that was your
23      break.
24 Q    Well, you understood that you weren't getting
25      paid for 30 minutes, right? Well, let me back

Page 78

1   up. You understood the expectation was that you
2   were going to take a 30-minute unpaid break and
3   weren't going to get paid for that 30 minutes,
4   correct?
5 **A**   **If the department allowed that, being the**
6   **patients. So that expectation wasn't there as an**
7   **employee that I was going to get a 30-minute**
8   **uninterrupted break every day that I worked. No,**
9   **that expectation was not there.**
10 **Q**   Well, let me ask this question. Put yourself in
11   the role of a manager in the department where
12   they believe people understand that when they
13   tell them to take a break that they're going to
14   take a 30-minute break. If those people don't
15   come back to them and say, you know, I didn't get
16   a 30-minute break, how are they supposed to know,
17   especially where you're not cancelling your
18   lunches?
19        MR. EISENBERG: Object to the form of
20   the question.
21 BY MR. SCULLEN:
22 **Q**   You can answer.
23 **A**   **So you want me to look at this as a manager?**
24 **Q**   Yeah. I mean, tell me why --
25 **A**   **Why would the manager think I was getting a**

Page 79

1   **30-minute break?**
2 **Q**   Because the manager is busy doing their own
3   thing, and they're not clocking you in and out,
4   right? You talked about how much autonomy you
5   have, right?
6        MR. EISENBERG: Object to the form of
7   the question.
8        You can answer if you understand it.
9 BY MR. SCULLEN:
10 **Q**   Well, your managers aren't clocking you, right?
11 **A**   **Correct.**
12 **Q**   I mean, you're all professionals. You talked
13   about you have a pretty high degree of autonomy,
14   right, in terms of how you go about scheduling
15   the duties and carrying out the duties for the
16   day.
17 **A**   **Uh-huh.**
18 **Q**   Correct?
19 **A**   **But my question to you is, why would I think that**
20   **the manager -- why would I as the manager think**
21   **that people were getting 30-minute breaks? I**
22   **don't believe they felt that way.**
23 **Q**   Why not?
24 **A**   **In fact, I believe they knew that we weren't all**
25   **getting 30-minute breaks.**

Page 80

1 **Q**   Why do you say that?
2 **A**   **Because of the volume of patients that we had.**
3 **Q**   So is it your belief that when you went into the
4   break room the managers were clocking how much
5   time you were spending and whether you were
6   clocking a full 30 minutes?
7 **A**   **I don't believe that at all.**
8 **Q**   So how would a manager know when they're busy
9   taking care of their own responsibilities whether
10   you've taken a full 30 minutes or not on any
11   given occasion?
12 **A**   **I don't expect them to know that.**
13 **Q**   Well, do you feel any responsibility to let your
14   manager know that, I didn't get 30 minutes, and
15   either -- you know, I should either get this
16   lunch canceled or, you know, that -- I mean,
17   you're now coming back and saying, I didn't get
18   -- I should be paid for all these lunches that I
19   didn't take. But I never told my manager at the
20   time, and I never took a canceled lunch. But you
21   should now pay me for all these occasions where,
22   my position is, whether you knew it or not, I
23   didn't get a full 30 minutes. And I didn't
24   telling you at the time. I mean, do you feel any
25   responsibility for that?

Page 81

1        MR. EISENBERG: Object to the form of
2   the question.
3        You can answer if you understand it.
4        THE WITNESS: I'd rather you rephrase
5   that.
6 BY MR. SCULLEN:
7 **Q**   Yeah, I mean, why is it fair in your mind that
8   you should get paid for these lunches that you
9   claim that you didn't get when you never told
10   anyone in management at the time that you weren't
11   getting a full 30 minutes. You had the ability
12   to cancel a lunch, but at times either forgot or
13   just didn't do it. And now even though
14   management didn't know you weren't taking the
15   full 30 minutes, you're now claiming you didn't
16   get it and should be paid for it.
17        MR. EISENBERG: Object to the form of
18   the question.
19        You can answer if you understand.
20        THE WITNESS: I'm not claiming that
21   the manager should know that.
22 BY MR. SCULLEN:
23 **Q**   Okay.
24 **A**   **I'm claiming that we are not guaranteed a**
25   **30-minute break every time we work. That's what**

21 (Pages 78 to 81)

Halma-Jilek Reporting, Inc.      414-271-4466      Experience Quality Service!

Case 2:15-cv-00506-WCG   Filed 03/14/16   Page 22 of 56   Document 50-1

Page 82

1      I'm claiming.
2    Q    Okay. Fair enough. But it's also true, is it
3    not, that even though you're not guaranteed a
4    30-minute break every time, on some occasions you
5    did get a 30-minute break uninterrupted, correct?
6    A    Rarely.
7    Q    Okay. But the answer is you did on occasion,
8    correct?
9    A    Rarely, yes.
10   Q    And you also had the ability to cancel lunches on
11   occasions when you didn't, correct?
12   A    Correct.
13   Q    And sometimes you either consciously chose not to
14   do that, even though you hadn't gotten your
15   lunch, correct? I mean, that's your claim.
16   Sometimes you --
17   A    I'm not saying consciously chose that. When I
18   want to get out of there after 12 hours of no
19   break, I forget to punch it.
20   Q    Okay. Right, sometimes you forgot it. But there
21   were other times where you testified that rather
22   than potentially have a conflict or have to
23   justify yourself, you just chose not to punch the
24   "no lunch," correct?
25   A    What I'm saying is we were led to believe if you

Page 83

1      had time to go in and quickly throw something
2      down, whether that would be five minutes or
3      20 minutes, that was your break. That's what we
4      were led to believe.
5    Q    Okay. Based on what? Who said that to you?
6    A    No one said that. I said that was what we were
7      led to believe. Well, you got a break.
8    Q    So no one said that to you. What was the basis
9    for you forming that belief in your mind? Does
10   this go back to what we talked about earlier
11   where this was your feeling based on, if the
12   department was busy, you couldn't be gone longer
13   than that, and, therefore, you took whatever
14   break you had. And you felt that you had
15   taken 15 minutes, that was enough?
16   A    Not necessarily. We were actually told, quickly
17     eat something, if that happened.
18   Q    Okay. Well, quickly could be 30 minutes, right?
19   A    No.
20   Q    Well, we just discussed that 30 minutes was a
21   short period of time, right?
22   A    Yeah. But that isn't what quickly is to us in
23     the ER.
24   Q    But, again, I'm really trying to get back to, did
25   anyone tell you that 30 minutes was -- you

Page 84

1      couldn't take 30 minutes, and that quickly wasn't
2    30 minutes, you know, that even though the
3    company has a policy that you get a 30-minute
4    unpaid lunch period, when we say take a break, we
5    don't really mean 30 minutes.
6    A    There are times when we were told, no, we
7      couldn't take a 30-minute break. Yes.
8    Q    Okay. And on any of those occasions were you
9    denied the lunch cancellation?
10   A    No.
11   Q    Okay.
12   A    That would be like after Marianne's reign.
13   Q    Right, so from February, 2013, on any occasions
14   where you were told you couldn't take the lunch,
15   the lunch cancellation was never denied, correct?
16   A    Correct.
17   Q    Are you a smoker?
18   A    No.
19   Q    Okay. Are co-workers of yours, do you know
20   whether co-workers of yours in the ER are
21   smokers?
22   A    Yes.
23   Q    Are they able to -- do any of them smoke on their
24   breaks?
25   A    I think some of them take breaks to smoke.

Page 85

1    Q    Okay. Do you know whether smoking is permitted
2    on the premises?
3    A    It is not.
4    Q    Okay. So they have to go off premises on their
5    breaks to smoke, correct?
6    A    As far as I know.
7    Q    And that's permitted under the break policy,
8    correct?
9    A    I don't know if it's permitted or not. I just
10     know that it's been done.
11   Q    Okay. You're not aware of anyone being
12   disciplined for going off premises to smoke on
13   their breaks, correct?
14   A    I think it was a possibility, but I don't know
15     for sure.
16   Q    Have you ever used the "no lunch" punch for any
17   of your shifts at AMC?
18   A    I don't recall.
19   Q    Did anyone at AMC ever discourage you from using
20   the "no lunch" punch?
21   A    No.
22   Q    Have you ever discussed with anyone in management
23   that you felt you weren't adequately getting
24   breaks or being discouraged from punching out on
25   occasions when -- punching "no lunch" on

22 (Pages 82 to 85)

Halma-Jilek Reporting, Inc.          414-271-4466          Experience Quality Service!

Case 2:15-cv-00506-WCG   Filed 03/14/16   Page 23 of 56   Document 50-1

Page 86

1   occasions when you didn't?
2  A   Can you repeat that?
3  Q   Sure.  Did you ever have any communication with
4      anyone in management, including Human Resources,
5      that either you felt you weren't getting
6      30-minute breaks, uninterrupted breaks, or that
7      you were being denied pay because you weren't
8      able to utilize the "no lunch" punch on occasions
9      where that occurred?
10 A   It was discussed at a staff meeting this summer.
11 Q   So when did that staff meeting occur?
12 A   I don't have that information right in front of
13     me.  But at the staff meeting it was -- we were
14     told by our manager that now we would either have
15     to come in 15 minutes before our regular time and
16     stay 15 minutes after, or stay 30 minutes after
17     to make up for that FTE we weren't getting,
18     instead of pulling it from our PTO.
19             And there was some discussion about
20     why don't we just punch "no lunch," and that
21     would take care of that problem.  And I tried to
22     tell her that at the other hospital that I had
23     worked at, that that was common.  That was the
24     way it was in the ER.  The ER did not have to
25     punch.  It was across the board, "no lunch."

Page 87

1      Because of the fluctuation of the patients, that
2      they couldn't guarantee us a lunch, so they just
3      did it that way.  And we were told she was going
4      to get back to us about it, and nothing has been
5      done since then.
6  Q   So who is the manager you were referring to?
7  A   Jen Fredrickson.
8  Q   And was there -- so did neither of those things
9      happen?  In other words --
10 A   Nothing has happened yet.
11 Q   Okay.  Has Jen Fredrickson ever had any other
12     discussions in staff meetings or otherwise around
13     the lunch periods or meal periods and the
14     company's expectations?
15 A   Not that I recall.
16 Q   So if she were to testify that at staff and other
17     meetings she's, you know, reiterated to you and
18     other people in the department the expectation
19     that people either take a 30-minute lunch or
20     punch "no lunch," you wouldn't have a reason to
21     dispute that?
22         MR. EISENBERG:  Object to the form of
23     the question.
24         If you understand it, you can answer.
25         THE WITNESS:  I would rather you

Page 88

1      repeat it, because I -- it didn't make sense to
2      me.
3  BY MR. SCULLEN:
4  Q   Well, I asked you whether you recalled; you said
5      you don't recall.  And so if Jen Fredrickson says
6      that at staff and other department meetings,
7      including meetings in which you were present, she
8      and/or other members of management or HR had
9      discussions about the need or the expectation
10     that people take 30-minute lunches, and to the
11     extent they don't get 30 minutes uninterrupted
12     that they cancel their lunches, you wouldn't have
13     a reason to dispute that because you just simply
14     don't recall whether that occurred or not,
15     correct?
16 A   I never heard her say that, no.
17 Q   So if she says that, she's lying?
18 A   I'm not saying she's lying.  I'm just saying I
19     never heard her say that.
20 Q   Is it possible she's made those statements and
21     you just don't recall?
22 A   It's possible that it was a meeting I wasn't at,
23     because I was unable to attend the last one.
24         (Exhibit 1 was marked.)
25 BY MR. SCULLEN:

Page 89

1  Q   I'm showing you what's been marked as Exhibit 1,
2      which is a chart that was prepared based on your
3      time records which indicates since February of
4      2012 the dates on which you have punched "no
5      lunch."  And I'd ask you to review it, and ask
6      you whether you have any reason to believe that
7      the record is inaccurate as to those occasions on
8      which you punched "no lunch."
9  A   Well, honestly, I don't know if it's accurate or
10     not.
11 Q   But looking at the dates and the frequency,
12     there's nothing that strikes you as being --
13 A   Nothing standing out that's inappropriate.
14 Q   Let me ask you about -- if you can turn to the
15     second page.  On 7/30 and 7/31 there's a
16     different code.  NL is "no lunch."  Do you know
17     what the MD is?
18 A   No, I don't.
19 Q   Has anyone else ever told you that they were
20     discouraged from using the "no lunch"?
21 A   Yes.
22 Q   Who is that?
23 A   Laura Smolinski.
24 Q   Any idea how to spell that last name?
25 A   No.

23 (Pages 86 to 89)

Halma-Jilek Reporting, Inc.              414-271-4466              Experience Quality Service!

Case 2:15-cv-00506-WCG   Filed 03/14/16   Page 24 of 56   Document 50-1

Page 90

| | | |
|---|---|---|
| 1 | Q | Okay. |
| 2 | A | I think it's S-M-O-L-I-N-S-K-I. |
| 3 | | What is Dani's last name? Dani -- |
| 4 | | Conrad. |
| 5 | Q | Anyone else? |
| 6 | A | That's the only two I can think of off the top of |
| 7 | | my head. |
| 8 | Q | Is Laura a current employee? |
| 9 | A | Part-time. |
| 10 | Q | Where does she work? |
| 11 | A | She works for the college. |
| 12 | Q | No, no. Where does she work within ThedaCare? |
| 13 | A | She works in the ER. |
| 14 | Q | How long has she worked in the ER? |
| 15 | A | Many years. I don't know the exact number of |
| 16 | | years. |
| 17 | Q | Okay. And when did you have a discussion with |
| 18 | | her about -- |
| 19 | A | That was early on in my employment when she had |
| 20 | | hours taken away from her, lunch taken away from |
| 21 | | her. |
| 22 | Q | And that was under Marianne? |
| 23 | A | Correct. |
| 24 | Q | Would that have been sometime around 2009? |
| 25 | A | That would only be a guess. I don't know the |

Page 91

| | | |
|---|---|---|
| 1 | | exact month or year. |
| 2 | Q | Okay. And she just relayed to you that she had |
| 3 | | put in for a "no lunch" punch and it had been |
| 4 | | reversed? |
| 5 | A | And then went in and tried to discuss it with |
| 6 | | her, and of no avail. |
| 7 | Q | Do you recall any of the other specifics around |
| 8 | | that? |
| 9 | A | No. |
| 10 | Q | Or why it was denied? |
| 11 | A | It's just what she did. Meaning Marianne. |
| 12 | Q | Okay. But she didn't relay to you any specifics |
| 13 | | as to why Marianne made that decision? |
| 14 | A | No. |
| 15 | Q | Or the circumstances? |
| 16 | A | No. |
| 17 | Q | What about Doug Conrad, when did you talk to him? |
| 18 | A | Dani. And it's a female. |
| 19 | Q | Sorry. Wrong on both assumptions. When did you |
| 20 | | talk to her? |
| 21 | A | It's been a while. She doesn't work in the ER |
| 22 | | right now, anymore. |
| 23 | Q | Around the same time that you talked to Laura? |
| 24 | A | Could be. |
| 25 | Q | And what was your discussion with Dani? |

Page 92

| | | |
|---|---|---|
| 1 | A | She also had a "no lunch" taken away, and went in |
| 2 | | and tried to talk with the manager about it, |
| 3 | | Marianne. And Marianne said that she would have |
| 4 | | to have the lead write that she was busy and |
| 5 | | wasn't able to take -- had to be okayed through |
| 6 | | the lead. |
| 7 | Q | Okay. |
| 8 | A | As I understood it. |
| 9 | Q | And do you know whether the lead ever -- |
| 10 | A | I don't know what the end result was on that. |
| 11 | Q | So you don't know whether it was ultimately |
| 12 | | approved or not? |
| 13 | A | No. |
| 14 | Q | And you said there was no one else that you |
| 15 | | talked to about that issue. |
| 16 | A | That I can recall. It's been a while. |
| 17 | | (Exhibit 2 was marked.) |
| 18 | BY MR. SCULLEN: |
| 19 | Q | Why don't you take a look through Exhibit 2, and |
| 20 | | then let me know once you've had a chance to |
| 21 | | review it. |
| 22 | | Are you familiar with Exhibit 2, |
| 23 | | which is ThedaCare's Breaks and Lunches Policy |
| 24 | | and Procedure? |
| 25 | A | I have read it. |

Page 93

| | | |
|---|---|---|
| 1 | Q | Okay. When did you originally review this |
| 2 | | document, or this policy? |
| 3 | A | I don't recall. It's quite interesting, though. |
| 4 | | I don't recall when the last time I read that. |
| 5 | Q | When do you think the first time you read it |
| 6 | | would be? Would you have read it during |
| 7 | | orientation when you started? |
| 8 | A | Yeah, possibly. |
| 9 | Q | And then have you read it -- have you referred to |
| 10 | | it subsequently over the years? |
| 11 | A | No. |
| 12 | Q | So if orientation was the first time you would |
| 13 | | have read it, when would the next time you would |
| 14 | | have reviewed this policy have been? |
| 15 | A | I'm going to say I probably looked at this policy |
| 16 | | first of the year. |
| 17 | Q | Of this year? Is there anything in the policy |
| 18 | | that you believe requires you to work during your |
| 19 | | meal periods? |
| 20 | A | Well, they do talk about workload and discretion |
| 21 | | of the managers and supervisors. So I take that |
| 22 | | to mean any kind of break, including a lunch |
| 23 | | break. |
| 24 | Q | Okay. But in the first paragraph it talks |
| 25 | | explicitly about the expectation that employees |

24 (Pages 90 to 93)

Halma-Jilek Reporting, Inc.          414-271-4466          Experience Quality Service!

Case 2:15-cv-00506-WCG   Filed 03/14/16   Page 25 of 56   Document 50-1

Page 94

1      take a 30-minute break, and to the extent that
2      they don't, that they record a "no lunch" --
3   A    **Correct.**
4   Q    -- entry. Correct? Okay. So --
5         MR. EISENBERG: You have to wait for
6      him to finish the whole question.
7         THE WITNESS: I'm sorry.
8   BY MR. SCULLEN:
9   Q    So you understood, at least based on the Policy
10     and Procedure that's been in place throughout
11     your employment, that the expectation was that at
12     least based on the policy and procedure that you
13     take a 30-minute unpaid, uninterrupted lunch, and
14     that otherwise you record a "no lunch," correct?
15   A    **Correct.**
16        **(Exhibit 3 was marked.)**
17   BY MR. SCULLEN:
18   Q    Let me know once you've had a chance to review
19     Exhibit 3.
20        You've had a chance to review
21     Exhibit 3?
22   A    **Uh-huh.**
23   Q    Are you familiar with this document?
24   A    **No.**
25   Q    Okay.

Page 95

1   A    **This was revised on 3/1/2014. That's after I --**
2     **initial policy on this, so if there's changes.**
3   Q    Okay. So you haven't reviewed this policy in its
4     current form?
5   A    **No.**
6   Q    And you have no recollection of reviewing the
7     policy in any prior iteration?
8   A    **Policy prior, but I believe there's changes on**
9     **it.**
10   Q    Okay. So your recollection is that you've
11     reviewed prior versions of this same policy?
12   A    **Correct.**
13   Q    Okay. What, if any, changes do you note between
14     what you previously reviewed and the policy
15     that's in front of you as Exhibit 3?
16   A    **Well, for one thing that myHRConnection wasn't**
17     **even available when I started, so I know that's**
18     **definitely a change.**
19     **It says in here about the department**
20     **designated payroll person, which would have been**
21     **Dorothy, who now that has been taken away from**
22     **her, and we don't have a designated department**
23     **payroll person. She would make corrections on**
24     **our payrolls before they went to whoever does the**
25     **payroll. She would make the changes that were**

Page 96

1     **necessary.**
2   Q    What's Dorothy's last name?
3   A    **Meyer.**
4   Q    And when did she stop having responsibility for
5     review of the time records?
6   A    **I don't know the exact time, but it's been quite**
7     **recently, within the last couple months, I**
8     **believe.**
9   Q    So now what is your understanding as to what
10     happens now?
11   A    **We're totally responsible for our own. And if**
12     **there's a mistake, then it's -- or as we see it a**
13     **mistake, then we're responsible to correct it**
14     **before it goes on.**
15   Q    And do you review your time records then before
16     they're submitted, or you're just saying based on
17     when you clock in and out?
18   A    **Well, we're supposed to look over our timecard,**
19     **per se, in the computer before it's submitted.**
20   Q    Okay. And do you do that?
21   A    **I do look it over, yes.**
22   Q    Okay. And what, if any, changes would Dorothy
23     typically make?
24   A    **I don't know all of the changes. I know like if**
25     **you punched -- forgot to punch out, your next**

Page 97

1     **punch on the following day is going to be -- come**
2     **in as out. So she would help people correct**
3     **that.**
4   Q    She would reach out to them and note to them,
5     hey, you --
6   A    **Well, you could e-mail Dorothy and say, I don't**
7     **know how to do this, and this is wrong, and how**
8     **can I correct that, and she would help.**
9   Q    Okay. So now you're responsible -- if you forget
10     to punch out, you're responsible for identifying
11     that --
12   A    **Correct.**
13   Q    -- on your own records before it goes to payroll.
14   A    **Correct.**
15   Q    Okay. Did Dorothy ever override lunch punches?
16   A    **That I don't know.**
17   Q    Okay. But in your experience she never did?
18   A    **In my experience, no.**
19   Q    Okay. And did you ever go back -- were there
20     ever occasions where you forgot to enter a "no
21     lunch" punch that you would go back to Dorothy
22     after the fact and ask her to record it?
23   A    **No.**
24   Q    Okay. But you have the ability to do that now,
25     certainly in Dorothy's absence, before your

25 (Pages 94 to 97)

Halma-Jilek Reporting, Inc.       414-271-4466       Experience Quality Service!

Case 2:15-cv-00506-WCG   Filed 03/14/16   Page 26 of 56   Document 50-1

Page 98

1    timecards are ultimately submitted, correct?
2  A    Correct.
3         (Exhibit 4 was marked.)
4  BY MR. SCULLEN:
5  Q    You've had a chance to review Exhibit 4?
6  A    Uh-huh.
7  Q    What is Exhibit 4?
8  A    Exhibit 4 is talking about PTO, Paid Time Off.
9  Q    So this is Theda-Clark's Paid Time Off policy as
10      you understood it?
11 A    As I understand it.
12 Q    Are you familiar with this document?
13 A    I have read it before.
14 Q    Okay. And in what way, if at all, does this
15      policy relate to your claims for unpaid lunches?
16 A    It actually doesn't say in the policy that if you
17      don't meet your FTE, you have to use PTO, but
18      that's what we've been doing.
19 Q    What does that have to do with your claim for
20      unpaid lunches?
21 A    We're being made to use our benefit, PTO, to
22      cover for the FTE that we're not getting because
23      they're taking away the lunch.
24 Q    Okay. But, again, is it your contention that
25      that supports your claim that you're entitled to

Page 99

1      unpaid lunches, or are you just claiming that
2      that's not fair from the standpoint of the way in
3      which the PTO is being used?
4  A    I'm claiming that it's unfair to use a benefit
5      that you gave me to now cover for the -- because
6      we're not meeting our FTE.
7  Q    Okay. You understand, though, that the company
8      is under no obligation to give you PTO, correct?
9  A    It's a benefit.
10 Q    Right. So it's under no obligation. The company
11      is free to define the terms of that benefit,
12      correct?
13 A    Correct.
14 Q    And you're not claiming that's a violation of the
15      law, of wage and hour law for the company to
16      utilize the PTO in the way you've just described,
17      correct?
18 A    No. I'm saying it's unfair for Theda to take
19      that and use it to make up for what we're not
20      receiving -- what we were hired for. I was hired
21      for a .75.
22 Q    Okay. I just want to be clear. Is it your
23      understanding that that claim related to
24      unfairness is one of the claims in your lawsuit?
25 A    I'm claiming that that's part of the whole lunch

Page 100

1      problem that we have.
2  Q    But are you claiming that's a violation of wage
3      and hour laws?
4  A    Using our PTO?
5  Q    Right.
6  A    No, I'm just saying it's unfair.
7  Q    Okay. Are there any other policies than what
8      we've just reviewed, or any other policies or
9      written statements you're aware of other than
10      what we've just reviewed in Exhibits 2 through 4,
11      either these policies or the prior versions of
12      those policies, covering the same issues that
13      address or relate to meal break?
14 A    Not that I'm aware of.
15 Q    Okay. You would agree there's nothing in any of
16      the policies that suggests that you're not
17      expected to get a 30-minute unpaid lunch period,
18      or if you don't get a 30-minute uninterrupted
19      lunch period that's unpaid that you are required
20      to cancel the lunch, correct?
21 A    It states in the policy it's on the discretion of
22      the manager/supervisor, depending on the patient
23      load, whether we get it or not.
24 Q    Right. And what does the policy say if you don't
25      get the lunch? You would agree that Exhibit 2

Page 101

1      says that if you don't get the lunch, you must
2      record a "no lunch."
3  A    Correct.
4  Q    I'm just trying to get at the fact that you're
5      not claiming that there's anything in the written
6      policies which states that you're not entitled to
7      either -- the expectation of the company based on
8      the written policies is that you either take a
9      30-minute uninterrupted lunch, or if you don't,
10      that you record a "no lunch," correct?
11 A    Where does it say 30-minute uninterrupted?
12 Q    Well, let's go back to Exhibit 2. Well, I mean,
13      you tell me. Are you saying there's anything in
14      the policy that says that based on -- again, I'm
15      talking not about the practices, but I'm talking
16      about the written policies. And these were -- at
17      least with regard to the Break and Lunch policy
18      you acknowledged you read it, you know, from
19      the --
20 A    Does it say 30-minute uninterrupted, though?
21 Q    Well, it says 30 minutes, right?
22 A    30 minutes uninterrupted. That's not happening.
23 Q    Okay. What about 30-minute lunch period? Is
24      this a distinction with a difference in your
25      mind?

26 (Pages 98 to 101)

Page 102

1   A    I think it is a distinction.
2   Q    Okay. So let's back up. So your understanding
3        based on the -- my understanding of your
4        testimony is you're not getting 30 minutes,
5        period. Right? To the extent you're not --
6   A    Most of the time, yes.
7   Q    Right. So and when you are interrupted, did you
8        restart your lunch periods for 30 minutes?
9   A    No.
10  Q    Okay. Your testimony is that when you were
11       interrupted, you stopped your break, correct?
12  A    Correct.
13  Q    Okay. So, again, with regard to the written
14       policies, you would agree that there's nothing in
15       the written policies contrary to the company's
16       contention that at least their written policies
17       provide that employees are to receive 30 minutes
18       for a meal break, and that if they don't, then
19       they get -- they're required to record a "no
20       lunch," and they'll get paid for that time,
21       correct?
22  A    It does say that, but it doesn't say anything
23       about interrupted or not interrupted. And I
24       believe the company's expectation is that we can
25       be interrupted at any point in time, just in the

Page 103

1        fact that there's that call light that goes off
2        in our break room. There's no purpose for having
3        it in there other than to interrupt us.
4   Q    Okay. Well, if you're interrupted, would you
5        think -- if you have a 30-minute break, and you
6        get interrupted, is it your contention that you
7        didn't get the 30 minutes?
8   A    Correct.
9   Q    Okay. So at least based on the written language
10       of the policies, which say employees get a half
11       hour or 30-minute unpaid lunch, and if they don't
12       get the 30-minute unpaid lunch, then the employee
13       is required to record a "no lunch," would you
14       agree at least based on the written policies that
15       that was the expectation explained to you as
16       employees, correct?
17  A    As in the policy, yes.
18  Q    Okay. Why don't you go back to Exhibit 2.
19       Exhibit 2, the Break and Lunch policy, talks
20       about 15-minute paid breaks, correct?
21  A    Correct.
22  Q    All right. And your testimony is that those
23       sometimes happen, sometimes not, and in your
24       experience typically not. Is that your
25       testimony?

Page 104

1   A    Typically not. It's not like a paper mill --
2   Q    Right.
3   A    -- where, okay, now you get your break, and you
4        go. Everything depends on what's happening in
5        the ER at that time on that day. It fluctuates.
6   Q    Okay.
7   A    You cannot depend on a 15-minute break. You
8        cannot depend on a 30-minute uninterrupted lunch
9        break.
10                (Exhibit 5 was marked.)
11  BY MR. SCULLEN:
12  Q    Do you recognize Exhibit 5?
13  A    I believe it looks like the copy I have.
14  Q    Okay. And Exhibit 5, are -- we talked about
15       these at the beginning of your deposition --
16       these are the responses that you provided to the
17       written interrogatories that we requested.
18  A    Correct.
19  Q    If you could turn to Page 5. With regard to No.
20       5, you were asked the basis for your claim. And
21       there you stated, during such lunch periods Named
22       Plaintiff was subjected to being called back to
23       work, was required to return to work in the event
24       of major trauma events or short staffing and was
25       frequently required to carry a phone for purpose

Page 105

1        of returning to work.
2             I just want to clarify with regard to
3        that last response, I believe you've testified
4        that never occurred at Theda-Clark, only at AMC,
5        correct?
6   A    That is correct.
7   Q    And, in fact, certainly at least at Theda-Clark
8        you have acknowledged that you were able to leave
9        the premises. You just never attempted to do so,
10       correct?
11  A    I don't know if I was able to because I never
12       asked. I just know of one particular person that
13       did in the six years I've been there.
14  Q    Okay. But no one ever told you, you couldn't
15       leave, correct?
16  A    Nobody told me to my face that I could not leave.
17  Q    Well, did anyone tell you behind your back you
18       couldn't leave?
19  A    Probably. I don't know.
20  Q    Okay. You don't know of anyone saying that
21       behind your back.
22  A    No.
23  Q    All right. And there was nothing in any policy
24       or anything you saw in writing that said you
25       couldn't leave the premises during your break,

27 (Pages 102 to 105)

Page 106

1    correct?
2  A    It said you had to have permission.
3  Q    Well, permission isn't saying you couldn't,
4    right?
5  A    Correct.  But it might be that you can't.
6  Q    Okay.  But no one ever told you, you couldn't,
7    correct?
8  A    I never asked to.
9  Q    Right.  So no one ever told you, you couldn't.
10 A    That is correct.
11 Q    And, in fact, your testimony is, not only the
12    only person that you're aware of that did ask was
13    given permission, correct?
14 A    Uh-huh.
15 Q    Yes?
16 A    Yes.
17 Q    Okay.  And also you're aware, aren't you, that
18    smokers leave the premises during their breaks,
19    on a regular basis during the breaks, including
20    co-workers in your department, correct?
21 A    This -- only ones I know was on night shift.
22 Q    So the answer is, yes.
23 A    Yes.
24 Q    The second paragraph in Response No. 5 you say,
25    you respond, Where Named Plaintiff returned to

Page 107

1    work, her supervisor had the discretion upon
2    request from the Plaintiff -- from the Named
3    Plaintiff -- which is you -- to cancel the
4    automatic deduction and pay Named Plaintiff for
5    work.  Do you see that?
6  A    You said the second paragraph?
7  Q    Yes, the second paragraph in the response.  So
8    it's actually the last paragraph on the page, is
9    an easier reference for you.
10 A    Okay.
11 Q    I'm on the second sentence down.  Do you see
12    where it says, Where Named Plaintiff returned to
13    work, her supervisor had the discretion upon
14    request from Named Plaintiff to cancel the
15    automatic deduction and pay Named Plaintiff for
16    such work?
17    Do you see that sentence?
18 A    Correct.
19 Q    And based on your testimony as we talked today,
20    in fact, you had the ability to cancel your own
21    lunches without review or approval from your
22    supervisor, correct, at least after February
23    of 2013?
24 A    I was able to punch a "no lunch."
25 Q    Okay.  Without your supervisor having to

Page 108

1    authorize it, correct?
2  A    Correct.
3  Q    Then if you turn to the next page, you state,
4    Additionally, Defendant's lunch period policy
5    stated "combined" breaks of 30 minutes were
6    treated "the same as a lunch period, and is
7    unpaid."  Thus breaks of less than 30 minutes,
8    which should be paid, were combined in a way that
9    made such breaks unpaid.
10    I don't understand what you mean by
11    that.
12 A    That's in the policy.
13 Q    But I don't understand --
14 A    The two 15-minute breaks, is the way I understand
15    it --
16 Q    Yeah.
17 A    -- would be treated the same as a lunch period,
18    and unpaid.
19 Q    But only if they were combined, correct, for a
20    total of 30 minutes contiguous.
21 A    Correct.
22 Q    Because, in fact, the policy states explicitly
23    that employees can't combine breaks.  In other
24    words, you can't take two 15-minute breaks
25    separate and view that as your lunch period,

Page 109

1    right?
2  A    That's the way the policy states it.
3  Q    Okay.  And the only time you -- only if you
4    combine them contiguously so that they're not two
5    15-minute separate breaks, it's one 30-minute
6    break, only in that circumstance will it be
7    treated as an unpaid lunch break, correct?
8    That's what the policy says.
9  A    That's what I understand.
10 Q    Okay.
11    MR. SCULLEN:  My understanding,
12    Nathan, on paragraph -- Response No. 16, Page 9.
13    MR. EISENBERG:  Typo.
14    MR. SCULLEN:  The sentence, In
15    addition, Named Plaintiff claims wages for
16    uncompensated pre- and post-shift work at her
17    regular rate of pay, should be stricken as a
18    typo?
19    MR. EISENBERG:  That's right.
20 BY MR. SCULLEN:
21 Q    With regard to the shifts that you've worked at
22    AMC, I believe your testimony was that you
23    couldn't recall who the lead nurse was that did
24    your orientation?
25 A    Correct.

28 (Pages 106 to 109)

Halma-Jilek Reporting, Inc.                    414-271-4466                    Experience Quality Service!

Case 2:15-cv-00506-WCG   Filed 03/14/16   Page 29 of 56   Document 50-1

Page 110

1  Q    Okay. And I believe your testimony was that you
2       worked a number of different shifts. Well, you
3       worked two different shifts and a variety of
4       different days. Was there a supervisor in the
5       department that you worked under when you worked
6       at AMC?
7  A    There was a lead nurse.
8  Q    Who was someone different than the person who
9       conducted the orientation?
10 A    Well, I don't know if it's the same person.
11      There are several lead nurses, depending on the
12      shift and what day it is. So it isn't like one
13      supervisor.
14 Q    Okay. So it was whoever the lead nurse was.
15 A    Correct.
16 Q    You weren't familiar with who the supervisor of
17      that department was, to the extent there was one,
18      because you were working sporadically; is that
19      right? Or was the structure different than at
20      Theda-Clark?
21 A    They had a manager and a supervisor. The manager
22      was --- it is still Ann.
23 Q    Do you know Ann's last name?
24 A    I know her maiden name is Kylofer (phonetic). I
25      don't remember what her married name is. And

Page 111

1       then there was a Lena, who is gone now. I don't
2       know who the new supervisor is.
3  Q    And did you ever have any communications directly
4       with them?
5  A    In reference to what?
6  Q    Well, anything to do with breaks, for example?
7  A    No.
8  Q    Okay. Only with regard to sort of day-to-day in
9       passing, or assignments?
10 A    Yeah, if they came out into the ER and chatted.
11 Q    Okay. And I believe you already testified that
12      the lead nurses with whom you worked rotated
13      based on the different shifts that you worked.
14 A    Yeah. It could be different for different times
15      that I go.
16 Q    Okay. Any discussions with anyone at AMC about
17      issues around your meal breaks?
18 A    Not that I recall. Over the six years there's
19      been a huge turnover, too, so the leads have
20      changed, people we work with has changed
21      considerably, both hospitals in the ER.
22 Q    Have you talked with any co-workers about your
23      claims in the lawsuit?
24 A    I have talked with Kathy who is named, and Linda
25      who is named.

Page 112

1  Q    Anyone else?
2  A    There was a couple other people.
3  Q    Who were they?
4  A    Craig Neville. Let's see, Heather Krause, who is
5       not there anymore. Megan; I don't recall her
6       last name either.
7  Q    Is that a former employee or current?
8  A    She's currently back after a leave, and it's a
9       PRN position. She quit full-time. That's the
10      only ones I can recall right now.
11 Q    What's Craig's position?
12 A    RN. Also works as a lead or charge nurse.
13 Q    In the ER?
14 A    Correct.
15 Q    And Heather you said is a former employee?
16 A    Yeah, she's an RN. And she does not work at all
17      for Theda.
18 Q    She was previously in the ER?
19 A    Correct.
20 Q    And what was your discussion with Craig?
21 A    I asked him about the fact that he went to Human
22      Resources about the way we were getting a lunch
23      and how that was being handled.
24 Q    When did he do that?
25 A    Shortly after -- he told me shortly after he had

Page 113

1       started there.
2  Q    When was that?
3  A    I can't remember if it was the same year I was
4       hired or a year later.
5  Q    So that would have been as far back as 2009 or
6       '10?
7  A    Correct, a ways back, yeah.
8  Q    Okay. And what did he say?
9  A    He just said that basically he went down to Human
10      Resources, and it got to the point where he felt
11      he better leave; otherwise, he wouldn't have his
12      job. He didn't disclose what the discussion was
13      about.
14 Q    Did he say who he talked to in Human Resources?
15 A    No.
16 Q    And did he say this to you at the time or more
17      recently?
18 A    At the time.
19 Q    Okay. So you haven't talked to him since 2009 --
20 A    I have.
21 Q    Okay. So after that, when did you talk to him
22      about the issues in the lawsuit?
23 A    Earlier this year.
24 Q    And what was that discussion?
25 A    I was just asking him about that.

29 (Pages 110 to 113)

Page 114

| | | |
|---|---|---|
| 1 | Q | About what had happened back in 2009 or '10? |
| 2 | A | **Correct.** |
| 3 | Q | Which he had already told you back then? |
| 4 | A | **He had mentioned it, yeah.** |
| 5 | Q | Okay. Did he tell you anything different than |
| 6 | | what you've told me? |
| 7 | A | **Not that I recall.** |
| 8 | Q | Okay. Anything else that you recall discussing |
| 9 | | with Craig? |
| 10 | A | **No.** |
| 11 | Q | What about with Heather, what was your discussion |
| 12 | | with Heather? |
| 13 | A | **Just about the breaks and not getting breaks,** |
| 14 | | **using our PTO. That's it.** |
| 15 | Q | Okay. What about Megan? |
| 16 | A | **Same thing.** |
| 17 | Q | And Kathy and Linda? |
| 18 | A | **Same thing.** |
| 19 | Q | Okay. Did they provide -- did any of those |
| 20 | | people provide any additional information other |
| 21 | | than what you've already testified to today in |
| 22 | | support of your claims? |
| 23 | A | **I don't know what was discussed between them and** |
| 24 | | **the attorneys. I don't know.** |
| 25 | Q | That's not what I'm asking. So you've testified |

Page 115

| | | |
|---|---|---|
| 1 | | as to all the reasons why you believe you were |
| 2 | | entitled to breaks. Did any of them tell you |
| 3 | | anything that is different than what you've |
| 4 | | already told me in terms of -- |
| 5 | A | **Not that I recall.** |
| 6 | Q | Okay. Is there anything else that we haven't |
| 7 | | discussed or that you haven't already told me |
| 8 | | today that you believe support your claims? |
| 9 | A | **Not that I can think of.** |
| 10 | Q | Okay. |
| 11 | | MR. SCULLEN: Why don't you give us a |
| 12 | | few minutes, and I'll figure out whether I'm done |
| 13 | | or -- in any event, I am almost done. |
| 14 | | MR. EISENBERG: Okay. |
| 15 | | (A recess was taken.) |
| 16 | | BY MR. SCULLEN: |
| 17 | Q | There's just one thing I wanted to close out. I |
| 18 | | had talked to you about whether you had any |
| 19 | | communications with anyone else about the |
| 20 | | lawsuit, and you named two of the other opt-ins |
| 21 | | and then you named three other people. Have you |
| 22 | | had any other communication, like through |
| 23 | | e-mails, social media or otherwise related to the |
| 24 | | lawsuit? |
| 25 | A | **No. That's easy, because I don't do e-mails and** |

Page 116

| | | |
|---|---|---|
| 1 | | **I don't do social media.** |
| 2 | Q | You don't a facebook? |
| 3 | A | **No. And I have an old flip phone.** |
| 4 | Q | Do you know whether someone else is using a |
| 5 | | profile with your name on it under facebook? |
| 6 | A | **I hope not.** |
| 7 | Q | Would it surprise you to know there's a facebook |
| 8 | | page out there with your name on it with links to |
| 9 | | the lawsuit? |
| 10 | A | **Yes, it would.** |
| 11 | Q | Okay. |
| 12 | | MR. SCULLEN: No other questions. |
| 13 | | MR. EISENBERG: I had a couple |
| 14 | | follow-up questions. |
| 15 | | EXAMINATION |
| 16 | | BY MR. EISENBERG: |
| 17 | Q | Sean had asked you about a written policy about |
| 18 | | not being able to leave the premises on your |
| 19 | | breaks. Do you remember those questions? |
| 20 | A | **Okay.** |
| 21 | Q | I wanted you to look at Exhibit 2. And can you |
| 22 | | look at the second paragraph, the last sentence. |
| 23 | | Can you read that? |
| 24 | A | **Oh, yeah. Employees are not -- may not leave the** |
| 25 | | **premises during a break.** |

Page 117

| | | |
|---|---|---|
| 1 | Q | How do you understand that language as it relates |
| 2 | | to your meal periods? |
| 3 | A | **Well, as I understand it, a break is whether** |
| 4 | | **you're going out and having cigarette or you're** |
| 5 | | **eating. A break is a break.** |
| 6 | | MR. EISENBERG: Okay. That's all I |
| 7 | | have. |
| 8 | | EXAMINATION |
| 9 | | BY MR. SCULLEN: |
| 10 | Q | Okay. Under this policy you understand that it |
| 11 | | draws a distinction between breaks which are |
| 12 | | 15-mintes breaks and lunch periods, correct? |
| 13 | A | **Well, they're called lunch breaks, so.** |
| 14 | Q | Right, as opposed to just breaks, correct? |
| 15 | A | **Right. But what I'm saying is that a break is a** |
| 16 | | **break, whether it's for lunch or for -- but,** |
| 17 | | **yeah, I know you're talking about a distinction** |
| 18 | | **between the 15 minutes --** |
| 19 | Q | Right. |
| 20 | A | **-- and the 30 minutes we're supposed to get.** |
| 21 | Q | Well, I'm trying to understand what's changed |
| 22 | | between the testimony you gave when I asked you |
| 23 | | the question and you testified that you |
| 24 | | understood that the policy didn't prohibit people |
| 25 | | from leaving on lunch breaks, and the question |

30 (Pages 114 to 117)

Page 118

1   your lawyer just asked you.
2          So let me clarify. Is it your
3   contention now that you believe based on the
4   language that says, employees may not leave the
5   premises during a break, that employees weren't
6   allowed to leave the premises during their lunch
7   periods?
8   A   **I believe that that can be taken that way, yes.**
9   Q   Well, Ms. Miller, when I asked you the question
10  earlier, you acknowledged, right, you earlier
11  testified that you understood that employees
12  weren't prohibited from leaving during their
13  lunch periods, right? Do you remember giving
14  that testimony?
15  A   **Unless they got permission.**
16  Q   Right. So we went through this. And, in fact,
17  if you go down to the second paragraph towards
18  the end, it says that employees are not required
19  to record their lunch period if they remain on
20  premises. However, if an employee leaves the
21  premises, the lunch period must be recorded.
22         By implication that suggests that
23  employees are allowed to leave the premises,
24  right?
25  A   **I would say probably with that. And the**

Page 119

1   A   **difference is, is that you have to punch out if**
2       **you're leaving the premises versus if you're**
3       **staying in-house, no timecard is punched. No**
4       **time is punched in or out.**
5   Q   Right.
6   A   **And that's what they're talking about there.**
7   Q   Right. But you understand that employees when
8       they're on their paid break, meaning their paid
9       15-minute break, can't leave the premises,
10      correct? You understand that that's the
11      company's position, right?
12  A   **But if they're going out to smoke, they have to**
13      **leave the premises.**
14  Q   Okay. Well, you understood that that's --
15      generally that's the company's -- I mean, that's
16      what it says, employees may not -- so are you
17      saying they're allowed to leave on both?
18  A   **I'm saying people that go out on their 15-minute**
19      **break are going out usually to smoke, and they're**
20      **doing it off premises.**
21  Q   Okay. Again, you never understood anything in
22      this policy to be saying that people could not
23      leave the premises during their lunch periods,
24      correct?
25  A   **With stipulations.**

Page 120

1   Q   Sure, that you had to have permission.
2   A   **And you had to have a phone.**
3   Q   Okay.
4   A   **Whether it be your phone, or --**
5   Q   Right.
6   A   **-- somebody else's.**
7   Q   Okay.
8   A   **So it's restrictive.**
9   Q   Well, you're not answering my question. The
10      question is, you understood that employees were
11      permitted to leave the premises during their
12      breaks, correct, their lunch periods, correct?
13  A   **Correct, but it was not that it would be**
14      **uninterrupted. You would -- they would have the**
15      **ability to call you back during that time.**
16  Q   Well, you're not answering my -- I know you want
17      to say that, but that's not -- I didn't ask that
18      question, right?
19          MR. EISENBERG: She's answering your
20      question.
21          MR. SCULLEN: No. I mean, I'd move
22      to strike everything after the yes, as
23      nonresponsive.
24          MR. EISENBERG: I don't think that's
25      appropriate. I think she's answering your

Page 121

1   question.
2          MR. SCULLEN: You're not answering my
3   question.
4   BY MR. SCULLEN:
5   Q   You understand I'm asking a yes or no question,
6       right? Could you leave the premises -- yes or
7       no -- during your lunch period?
8   A   **You could.**
9   Q   Okay.
10  A   **With restrictions.**
11  Q   And the restriction was at least -- well, you
12      can't speak to anyone other than your department,
13      correct?
14  A   **Correct.**
15  Q   You're not saying it was a policy that said --
16      you're not saying there's any policy that says
17      everyone who leaves the premise during their
18      lunch period has to provide a phone number where
19      they can be reached, correct?
20  A   **Everyone, meaning people in other departments.**
21  Q   Right.
22  A   **Correct.**
23  Q   Okay. You're only speaking with regard to the
24      Emergency Department at Theda-Clark.
25  A   **Or AMC.**

31 (Pages 118 to 121)

Page 122

1  Q    Or AMC.  Correct?
2  A    Correct.
3              MR. SCULLEN:  Okay.  I don't have any
4  further questions.
5              MR. EISENBERG:  I have nothing
6  further.
7              MR. SCULLEN:  Thank you.
8              (The proceeding concluded at
9              1:34áp.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 123

1  STATE OF WISCONSIN  )
2  COUNTY OF MILWAUKEE ) SS:
3
4              I, PHYLLIS KAPARIS, Registered
5  Professional Reporter and Notary Public in and for the
6  State of Wisconsin, do hereby certify that the above
7  deposition of JUELAINE MILLER, was taken before me at
8  the law offices of Quarles & Brady, 411 East Wisconsin
9  Avenue, Milwaukee, Wisconsin on October 29, 2015,
10  commencing at 10:08 a.m.
11              I further certify that I am not a
12  relative or employee or attorney or counsel of any of
13  the parties, or a relative or employee of such attorney
14  or counsel, or financially interested directly or
15  indirectly in this action.
16              In witness whereof, I have hereunto set my
17  hand and affixed my seal of office on this 5th day of
18  November, 2015.
19
20              _____
21                   Notary Public
22              In and for the State of Wisconsin
23
24  My commission expires:  5/29/16
25

32 (Pages 122 to 123)

Halma-Jilek Reporting, Inc.          414-271-4466          Experience Quality Service!

Case 2:15-cv-00506-WCG   Filed 03/14/16   Page 33 of 56   Document 50-1

Juelaine Miller "No Lunch" Punches 01/2012 - 05/2015

| Emp ID | Employee Name | Date | Time | In/Out | Special Code1 | Special Code2 | Special Code3 | Dept | Job |
|--------|---------------|------|------|--------|---------------|---------------|---------------|------|-----|
| 28415 | Miller, Juelaine C | 02/14/12 | 0509 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 02/20/12 | 2201 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 03/02/12 | 2209 | Out | NL | | | 01685 | 2240 |
| 28415 | Miller, Juelaine C | 03/03/12 | 2200 | Out | NL | | | 01685 | 2240 |
| 28415 | Miller, Juelaine C | 06/10/12 | 0207 | Out | NL | | | 01685 | 2240 |
| 28415 | Miller, Juelaine C | 06/25/12 | 2000 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 07/08/12 | 2153 | Out | NL | | | 01685 | 2240 |
| 28415 | Miller, Juelaine C | 07/09/12 | 2159 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 07/25/12 | 0154 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 09/04/12 | 0157 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 01/05/13 | 2154 | Out | NL | | | 01685 | 2240 |
| 28415 | Miller, Juelaine C | 04/27/13 | 2157 | Out | NL | | | 01685 | 2240 |
| 28415 | Miller, Juelaine C | 04/28/13 | 2218 | Out | NL | | | 01685 | 2240 |
| 28415 | Miller, Juelaine C | 05/06/13 | 0554 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 05/08/13 | 0455 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 05/19/13 | 0456 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 05/20/13 | 0553 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 06/01/13 | 0608 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 06/02/13 | 0554 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 06/03/13 | 0557 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 06/04/13 | 0453 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 06/18/13 | 0505 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 06/29/13 | 0553 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 06/30/13 | 0553 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 07/01/13 | 0455 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 07/02/13 | 0554 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 07/13/13 | 0603 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 07/14/13 | 0555 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 07/17/13 | 0456 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 07/27/13 | 0557 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 07/28/13 | 0554 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 07/29/13 | 0554 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 07/31/13 | 0502 | Out | NL | | | 01685 | 3222 |

THEDACARE001064



EXHIBIT 1
WIT: MILLER
DATE: 10/29/15
Halma-Jilek Reporting, Inc.

| Emp ID | Employee Name | Date | Time | In/Out | Special Code1 | Special Code2 | Special Code3 | Dept | Job |
|--------|---------------|------|------|--------|---------------|---------------|---------------|------|-----|
| 28415 | Miller, Juelaine C | 08/04/13 | 2213 | Out | NL | | | 01685 | 2240 |
| 28415 | Miller, Juelaine C | 08/10/13 | 0555 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 08/11/13 | 0610 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 08/25/13 | 0553 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 08/26/13 | 0554 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 09/02/13 | 0212 | Out | NL | | | 01685 | 2240 |
| 28415 | Miller, Juelaine C | 09/04/13 | 0609 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 09/17/13 | 2203 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 09/29/13 | 2202 | Out | NL | | | 01685 | 2240 |
| 28415 | Miller, Juelaine C | 10/13/13 | 2216 | Out | NL | | | 01685 | 2240 |
| 28415 | Miller, Juelaine C | 12/31/13 | 2359 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 01/12/14 | 0203 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 01/26/14 | 2234 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 04/03/14 | 0502 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 04/17/14 | 0554 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 05/07/14 | 0553 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 05/19/14 | 0154 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 06/06/14 | 2354 | Out | NL | | | 01685 | 2240 |
| 28415 | Miller, Juelaine C | 07/03/14 | 0005 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 07/30/14 | 1445 | Out | NL | MD | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 07/31/14 | 1558 | Out | MD | NL | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 08/18/14 | 2213 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 08/23/14 | 1652 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 09/14/14 | 2133 | Out | NL | | | 01685 | 2240 |
| 28415 | Miller, Juelaine C | 09/23/14 | 1659 | Out | NL | | | 04685 | 3222 |
| 28415 | Miller, Juelaine C | 09/27/14 | 2211 | Out | NL | | | 01685 | 2240 |
| 28415 | Miller, Juelaine C | 10/26/14 | 2153 | Out | NL | | | 01685 | 2240 |
| 28415 | Miller, Juelaine C | 11/02/14 | 0159 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 11/21/14 | 2207 | Out | NL | | | 01685 | 2240 |
| 28415 | Miller, Juelaine C | 12/08/14 | 2155 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 12/26/14 | 0153 | Out | NL | | | 01685 | 3222 |
| 28415 | Miller, Juelaine C | 01/04/15 | 2154 | Out | NL | | | 01685 | 2240 |
| 28415 | Miller, Juelaine C | 01/31/15 | 2153 | Out | NL | | | 01685 | 2240 |
| 28415 | Miller, Juelaine C | 03/25/15 | 1602 | Out | NL | | | 01685 | 3222 |

THEDACARE001065

# ThedaCare

## Policy & Procedure

| | | | |
|---|---|---|---|
| Policy Title: | Breaks And Lunches | Policy Number: | 347 |
| Location(s): | All Locations | Department(s): | [Departments] |
| Date Last Reviewed: | 7/25/2013 | Reviewing Body(s): | Human Resources |
| Date Last Revised: | 7/25/2013 | Approving Body(s): | VP, Sr., Talent Development and Human Resources |

**POLICY/PURPOSE:**

As a general practice, employees who work at least a 6 hour shift are scheduled for a half-hour unpaid lunch. This half-hour will be deducted by the time and attendance system. For employees who work a shift of 14 or more hours, a second unpaid lunch break is deducted by the time and attendance system. If employees' shift length qualifies them for an unpaid lunch break that they are required to forego, employees must record a "no lunch" entry in accordance with the site's timekeeping procedures. Managers or their designee are responsible for oversight and approval of "no lunch" situations.

Breaks are discretionary and are subject to the pressures of the daily workload. If department workload permits, an employee who works at least 4 hours may take one 15-minute paid break during the first half of the shift. If the employee works beyond 7 hours, he/she may take another 15-minute break during the second half of the shift. An employee may be asked to forego the break, or be called from a break, if the demands of duty require it. Breaks should be taken in the employee's home department break room, or in the campus lunch room / cafeteria. If the employee is leaving the department, the employee should let his/her supervisor know where to reach them should there be a need. Employees may not leave the premises during a break.

The employee should exercise discretion in taking breaks and lunches in such a way that both the needs of the employee and the needs of the organization are met. In some work areas, managers or their designees may designate breaks. However, patient load along with professional practice and team collaboration, generally determines the practicality of breaks.

Employees should not use break time to start work late, to extend the lunch hour, or to leave early. Employees may not combine breaks as a substitution for their lunch period. A combined break of 30 minutes is treated the same as a lunch period, and is unpaid.

Generally, employees are not required to record the lunch period if they remain on the premises. However, if an employee leaves the premises, the lunch period must be recorded using the appropriate record keeping method for the site (i.e., time clock, manual timecard, etc.).

Where there is a conflict regarding the opportunity or timing of breaks during the workday, the employee should address this concern with his/her manager or designee.



EXHIBIT 2
WIT: MILLER
DATE: 10/29/15
Halma-Jilek Reporting, Inc.

PLAINTIFFS00007

Employees should address specific questions or concerns regarding this policy with his/her manager or manager's designee.

PLAINTIFFS00008

# ThedaCare

## Policy & Procedure

| | | | |
|---|---|---|---|
| **Policy Title:** | Pay: General Information And Employee Responsibilities | **Policy Number:** | 938 |
| **Location(s):** | All Locations | **Department(s):** | [Departments] |
| **Date Last Reviewed:** | 3/1/2014 | **Reviewing Body(s):** | Human Resources |
| **Date Last Revised:** | 3/1/2014 | **Approving Body(s):** | VP, Sr., Talent Development and Human Resources |

### POLICY/PURPOSE:

The purpose of this policy is to provide information about pay and attendance policies and procedures at ThedaCare.

### Pay Period

The pay period starts on Sunday and ends two weeks later on Saturday. The first time that an employee starts work after midnight on the first Sunday of the pay period will mark the beginning of the pay period for that individual.

### Recording Time Worked

Hourly employees must accurately record time worked either through a time clock or through myHRConnection. myHRConnection is a software application used by employees to enter and view their time and attendance data. myHRConnection is available on the ThedaCare internet. In rare instances an employee may work at a location where neither a time clock nor myHRConnection is available. In such cases, payroll will provide an alternate method for recording time worked.

For exempt employees, their time is automatically recorded in the time and attendance system based on their FTE. Exempt employees are required to adhere to their work schedule, report unscheduled absences according to department procedures, ensure that their PTO hours are correctly entered into myHRConnection, and review their bi-weekly time card report for accuracy, reporting any discrepancies to their supervisor or department payroll person.

### Wage and Hour Regulations

Wage and Hour laws require that we identify each position at ThedaCare as exempt from overtime wages or as non-exempt. Non-exempt employees are paid overtime in accordance with wage and hour law when a certain minimum number of hours are worked in a specified time frame. Specific information on overtime can be found in the

EXHIBIT 3
WIT: MILLER
DATE: 10/29/15

PLAINTIFFS00001

Overtime Policy. Exempt employees are paid a bi-weekly salary, and not by the hour, and are not eligible for overtime pay.

## Scheduling Work and Time Off

Managers and supervisors are responsible to ensure that there is sufficient staff to meet quality and operational requirements. This includes determining the hours to be worked within the workday, breaks and lunch times. Schedules may be changed subject to the needs of the organization. Managers may implement department or site policies and practices to address work schedules. ThedaCare tries to avoid having staff work beyond what they've been scheduled to work. However, when additional hours are required to meet patient care or other operational needs, employees may be required to work beyond scheduled hours. Managers and supervisors will attempt to distribute extra work evenly within their departments.

Once an employee has obtained the manager or supervisor's approval to take paid time off (PTO), it is the employee's responsibility to enter the PTO into the time and attendance system through myHRConnection or the time clock. See the Paid Time Off (PTO) policy for more information about ThedaCare's paid time off benefit.

## Breaks and Lunches

As a general practice, employees are scheduled for a half hour lunch. Breaks are discretionary and are subject to the pressures of the daily workload. Managers and supervisors are responsible for the scheduling of breaks and lunches. See the separate policy on Breaks and Lunches for more information.

## Attendance and Timeliness Expectations

Employees are responsible to meet standards of attendance. It is essential to report to work on time and in accordance with your work schedule. Chronic, habitual and/or excessive lateness or absenteeism will not be tolerated. Your failure to report for work on time, or to not report at all, affects ThedaCare's ability to provide patient care and other operational services, and places an undue burden on co-workers.

For hourly employees using time clocks or myHRConnection, punches are rounded to the nearest quarter of an hour. Therefore, employees should not punch in more than seven minutes prior to their start time. Pay is not reduced if an individual clocks in within seven minutes of their start time. However, punching in after the designated start time will be considered late.

See the separate Absence Management Policy for more information.

PLAINTIFFS00002

## Recording Non-Productive Time

All employees (both exempt and non-exempt) are responsible for accurately reporting time away from work. Non-productive pay codes include PTO (paid time off), and funeral pay. Employees are responsible for entering their own PTO time either using a time clock or myHRConnection. The employee's supervisor or the department's designated payroll person will enter funeral pay.

The employee must follow the department's procedures for scheduling vacation, and also for reporting unexpected absences, such as an absence due to an illness. In the event an illness lasts seven or more consecutive calendar days, the employee needs to call FMLA Source to request a leave of absence.

## Reviewing Your Time Card

Every pay period employees are responsible for reviewing their electronic Time Card Report and immediately reporting any errors to the supervisor or department's designated payroll person. Errors need to be reported no later than Monday noon following the close of the pay period.

Time Card Reports are electronic and are available through myHRConnection.

## Reviewing Your Direct Deposit Notice

Employees are expected to review the Direct Deposit Notice and immediately report any inaccuracies in their paycheck to their supervisor or payroll extender.

Your paycheck is automatically deposited in to the bank or credit union of your choice. Payday is the Friday following the end of the pay period, and your money is available to you on payday. Your direct deposit notice is e-mailed to you. You can view your current as well as past direct deposit notices in myHRaccess. MyHRaccess is an electronic employee self-service module available on the ThedaCare intranet that allows you to view your personal demographic information, your pay history, your W4 withholding elections, your benefit elections, and your dependent information. You can also update your address and telephone numbers and change your W4 withholding exemptions through myHRaccess.

All required deductions, such as federal and state taxes, and all authorized voluntary deductions, such as health insurance contributions, will be withheld automatically from your bi-weekly pay. Be sure to review your benefit elections for accuracy.

## Falsification of Time Records

PLAINTIFFS00003

Any falsification of time records may result in disciplinary action and may be grounds for immediate termination. This includes misrepresentation of hours worked, such as falsifying time in and time out. Recording time for another employee is prohibited.

## Garnishment of Wages

A garnishment is a legal process that requires an employer to withhold a portion of an employee's income to pay off a legal judgment or debt. Support orders are similar to garnishments except that they require money to be withheld from an employee to pay for child or spousal support. ThedaCare is required to comply with garnishments and support orders. Employees will be notified of a garnishment order by the payroll department.

## Compensation at ThedaCare

ThedaCare's compensation is based on market pricing and is monitored and maintained to ensure our competitive position in the marketplace. Adjustments to pay generally occur annually. We do not tie our compensation to the performance management process. The performance management process is used to provide performance-based feedback and to support employee learning, growth and development.

Positions are assigned to pay ranges that are internally equitable and externally competitive. The position of each employee's salary within the range that has been established for his or her job will be determined primarily by the employee's relevant experience.

ThedaCare's compensation program is designed and administered to comply with applicable laws and to provide fair and equitable treatment for employees.

## Other Types of Pay

In addition to base pay, some non-exempt employees may receive the following types of pay based on their position requirements:

**Shift Differential:** Non-exempt employees who are required to work evening and night shifts may be eligible for shift differential. Shift differential is paid according to rules built into the time and attendance system.

**Weekend Premium:** Non-exempt employees who are required to work weekend shifts may be eligible for weekend premium. Weekend premium is paid according to rules built in to the time and attendance system.

**On-Call Pay:** Non-exempt employees who are required to be available for work on an on-call basis may be eligible for on-call pay. See the separate On-Call Pay Policy for more information.

PLAINTIFFS00004

**Called-In On-Call Pay:** Non-exempt employees who are called in from an on-call status may be eligible for time and one-half pay.

**Holiday Premium:** The following six holidays are observed by ThedaCare: New Years Day, Memorial Day, Independence Day, Labor Day, Thanksgiving, and Christmas. Because it is not possible for all employees to be off on a holiday, non-exempt employees who must work on these days may be paid holiday premium equal to one-half the employee's hourly rate times the number of hours worked on the holiday. In order to qualify for holiday premium, eligible employees must work a minimum of two consecutive hours during the holiday timeframe (see table below). Holiday premium may also be paid for eligible employees who work the Christmas Eve and New Years Eve shift.

| Holiday | Day Holiday Premium Starts | Holiday Hours (if scheduled) |
|---|---|---|
| New Years Eve | 12/31 | Starts at 3 p.m. |
| New Years Day | 1/1 | to 11 p.m. |
| Memorial Day | Night Prior | 11 p.m. to 11 p.m. |
| Independence Day | Night Prior | 11 p.m. to 11 p.m. |
| Labor Day | Night Prior | 11 p.m. to 11 p.m. |
| Thanskgiving Day | Night Prior | 11 p.m. to 11 p.m. |
| Christmas Eve | 12/24 | Starts at 3 p.m. |
| Christmas Day | 12/25 | to 11 p.m. |

**Unscheduled Weekend Incentive Pay:** Non-exempt employees who are required to work additional weekend shifts over and above their normal scheduled weekend shifts may be eligible for unscheduled weekend incentive pay (see separate policy).

PLAINTIFFS00005

Case 2:15-cv-00506-WCG   Filed 03/14/16   Page 42 of 56   Document 50-1

# ThedaCare

## Policy & Procedure

| | | | |
|---|---|---|---|
| **Policy Title:** | Paid Time Off (PTO) | **Policy Number:** | 632 |
| **Location(s):** | All Locations | **Department(s):** | [Departments] |
| **Date Last Reviewed:** | 9/1/2011 | **Reviewing Body(s):** | Human Resources |
| **Date Last Revised:** | 9/1/2011 | **Approving Body(s):** | VP, Sr., Talent Development and Human Resources |

### POLICY/PURPOSE:

The purpose of this policy is to describe the Paid Time Off benefits (PTO) that are available to eligible employees with an FTE of .47 and above. The Paid Time Off Plan provides for vacations, holidays and days for a variety of personal reasons. PTO accrues on eligible hours at a rate that is determined by length of service with ThedaCare.

### PROCEDURE:

A.   Eligible employees accrue PTO benefits on eligible hours up to a maximum of 80 hours per pay period. Eligible hours include worked hours, PTO hours, funeral leave, jury duty, and RSO or LC (Request Shift Off or Low Census). PTO does not accrue on Short-Term Disability benefits including Short-Term Disability Supplement. Accrual rates vary based on the employee's hire date. Employees accumulate up to two times the annual accrual rate of an employee working 2,080 hours. When an employee reaches the maximum, PTO accrual stops. Employees are responsible to manage their PTO balance in order to avoid reaching the maximum. Lost accruals will not be reinstated.

#### Full and Part-Time Employees

| Years of Service | Approximate Yearly Benefit | Accrual Rate | Maximum Accrual Per Pay Period | Maximum Accrual |
|---|---|---|---|---|
| 0 to 4 | 23.8 Days | .0915 | 7.32 hours | 380.64 |
| 5 to 14 | 29 Days | .1115 | 8.92 hours | 463.84 |
| 15 to 19 | 34 Days | .1315 | 10.52 hours | 547.04 |
| 20+ | 39.4 Days | .1515 | 12.12 hours | 630.24 |

B.   PTO accrues from the date of hire.

C.   Employees are required to use PTO whenever the employee misses scheduled work time unless the time off is for an approved, short-term disability claim, or the employee is taking

Paid Time Off (PTO)
Page 1 of 3

EXHIBIT 4
WIT: MILLER
DATE: 10 29 15
Helma-Jilek Reporting, Inc.

PLAINTIFFS00009

approved RSO or LC (Request Shift Off or Low Census), or the time off is covered by the Wisconsin Family and Medical Leave Act, in which case the employee has the option to be unpaid.

D.  When PTO is taken, the PTO code will be used, except when PTO is used for the employee's own illness, the PTO SK pay code will be used.

E.  All PTO must be requested in advance and receive manager's approval unless it is being used for unexpected illness or other emergency. Approval of PTO requests is subject to department staffing needs. In case of illness, the employee must follow the department's notification procedure.

F.  An employee is not required to use PTO for the waiting period for an approved short-term disability, to supplement an approved short-term disability, or for an approved Wisconsin FMLA. ThedaCare will automatically pay PTO, so if the employee does not want to use PTO in these situations, the employee must notify Human Resources via e-mail by the end of the pay period so that the PTO can be removed.

G.  The maximum allowable vacation period is 30 days. Any absence longer than 30 days requires a leave of absence request.

H.  PTO may be taken in less than full increments, but not less that one quarter (.25) hour increments. PTO will be paid based on the number of hours scheduled. PTO is available for use when earned. PTO shall not be taken in excess of scheduled hours.

I.  Employees must deplete their PTO balance before they can take any scheduled time off without pay, except in the event of an approved short-term disability claim of Wisconsin FMLA. The manager must approve scheduled time off without pay.

J.  Unused PTO balances will be paid out at the time of termination or status change to part-time casual or temporary classification. PTO does not accrue after the last day of work. PTO will not be used to extend a termination date, i.e., covering hours with PTO and returning for a token period of time (i.e., one day) in the future in order to gain benefits. If this occurs, benefits will not be granted. This applies to all employees, including retiring employees.

K.  To receive PTO, the employee should enter PTO in the time and attendance system, note it on a timesheet, or notify the site payroll contact by last day of the pay period in which PTO is taken. If payroll is not notified prior to the close of the payroll process, requested PTO will be paid on the next check. If PTO is for a personal illness, the PTO SK code will be used.

L.  RSOPTO may be used to cover request shift off at the employee's discretion. When PTO is used to cover request shift off, no request shift off hours are credited.

PLAINTIFFS00010

M.  PTO is used to cover major holidays for employees who aren't scheduled either because the department is closed or staffing is reduced. Major holidays are defined as New Years Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day.

N.  PTO is not paid out in advance of accruing it.

O.  Employees with 10 or more years of service may cash out up to 80 hours of PTO per year (January 1 through **December 15**). Employees with 4 through 9 years of service may cash out up to 40 hours of PTO per year (January 1 through **December 15**). Employees cashing out PTO must retain a minimum of 40 hours in their PTO account to be eligible for cash out. Requests for cash out PTO must be entered into the time and attendance system or notified to the site payroll contact by the last day of the pay period in which cash out PTO is taken.

PLAINTIFFS00011

UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JUELAINE MILLER, et al.,

    Plaintiffs,

v.              Case No. 15 CV 00506

THEDACARE, INC.,

    Defendant.

---

**NAMED PLAINTIFF JUELAINE MILLER'S ANSWERS TO DEFENDANT'S FIRST
SET OF INTERROGATORIES TO EACH NAMED AND EACH OPT-IN PLAINTIFF**

---

TO: ThedaCare, Inc.
  c/o Attorneys Sean Scullen and Christopher L. Nickels
  Quarles & Brady LLP
  411 East Wisconsin Avenue, Suite 2350
  Milwaukee, WI 53202-4426

   Named Plaintiff, Juelaine Miller, by and through her attorneys, Nathan D. Eisenberg and

Erin F. Medeiros of the Previant Law Firm, and Barry P. Gill of Gill & Gill, S.C., hereby

submits the following responses to Defendant's First Set of Interrogatories to each Named and

each Opt-In Plaintiff.

### GENERAL OBJECTIONS

   1. Named Plaintiff objects to the requests to the extent they seek to impose upon

Named Plaintiff requirements greater than those permitted by law.

   2. Named Plaintiff objects to any individual request to the extent it purports to

require Named Plaintiff to produce any information which is subject to a claim of privilege or

immunity from disclosure, including the attorney-client privilege, the work product doctrine, or

any other applicable privilege or immunity.

1

EXHIBIT 5
WIT: MILLER
DATE: 10/29/15
Halma-Jilek Reporting, Inc.

3.    Named Plaintiff objects to any individual request to the extent it purports to require the production of information not in the possession, custody or control of Named Plaintiff or no longer in the possession, custody or control of Named Plaintiff.

4.    Named Plaintiff objects to the extent that the requests are unreasonably cumulative or duplicative, or that the information sought by such requests is obtainable from some other source that is more convenient, less burdensome or less expensive.

5.    Named Plaintiff objects to the extent that the requests are unreasonably overbroad and unduly burdensome.

6.    Named Plaintiff objects to the extent that the requests are not relevant to the subject matter involved in the pending action and are beyond the scope of actual claims and/or defenses.

Named Plaintiff's responses to Defendant's requests are made without waiving, but on the contrary, reserving, and intending to reserve, each of the above objections and/or privileges.

Named Plaintiff's responses to Defendant's requests are without prejudice to its right to object to the admission of information provided into evidence or its right to object to further discovery relating to the same subject matter upon any valid ground.   Furthermore, Named Plaintiff expressly reserves the right to supplement her responses based upon, but not limited to, information gained through discovery requests.

## INTERROGATORIES

1.    Identify all persons likely to have discoverable facts or information relating to the allegations in your Complaint, and for each such person, summarize those facts or information.

**RESPONSE:** Named Plaintiff objects to such question on the basis that the instant interrogatory is being posed at an early state of litigation, prior to the completion of discovery.

2

Subject to such objection, Named Plaintiff states that Defendant's pay practices impact all employees in the putative class (or classes), that such class members are subject to uniform policies which impact all of Defendant's employees, and that each impacted employee therefore potentially has discoverable facts and information relating the allegations contained in the Complaint.

2.      Identify each person with whom you or your representatives have communicated or attempted to communicate concerning any of the substantive allegations stated in your Complaint. For each person, identify when you communicated with that person and the subject of the communication.

**RESPONSE:** Named Plaintiff objects to the request to the extent that it seeks communications covered by the attorney-client privilege or are attorney work product. Additionally, the extent that the such request seeks communications between herself and putative class members for the purpose of supporting and prosecuting the allegations stated in the Complaint, such communications are privileged under the "common interest rule" since those communications were for the purpose of undertaking a joint effort with respect to the common legal interest of contesting Defendant's unlawful pay practices.

Subject to such objection, Named Plaintiff answers that during her employment with Defendant she would routinely discuss with co-workers Defendant's failure to pay them for periods of time before and after her shifts, their inability to take uninterrupted lunch periods, the fact that they were not being paid for work performed during her unpaid lunch periods, and Defendant's rounding policies. In addition, Named Plaintiff would have discussed Defendant's paid lunch policies with each of the Charge Nurses (including Laura Schmolinski, Craig N., Jody, and Chrissy), who supervised her, when Named Plaintiff was asked to work during unpaid

3

lunch periods, in those instances when Named Plaintiff attempted to claim compensation for work during lunch periods, and when supervisors discussed the automatic lunch deduction with her. Such discussions were numerous and undocumented, and Named Plaintiff is unable to identify such conversations with precision.

3.      Identify all persons who have made or given to you any statement or report, whether oral or reduced to writing or otherwise recorded, relating to the substantive allegations in your Complaint.

RESPONSE: Named Plaintiff objects to such request to the extent that it seeks attorney-work product. Subject to such objection, Named Plaintiff will supplement her response to the interrogatory where such statements are solicited in support of this litigation, which we are not covered by such doctrine. Moreover, other than informal conversations with other class members and co-workers, Named Plaintiff answers that she is not personally solicited formal statements or reports relating to this case.

4.      State the entire factual basis for your claim that otherwise individuals employed by Defendants are similarly situated to you for purposes of 29 U.S.C § 216(b) and/or Fed. R. Civ. P.23, including by identifying each common policy or plan you allege unites you with those to whom you claim you are similarly situated.

RESPONSE: Named Plaintiff objects to such request in that it seeks legal conclusions concerning class and collective certification. Subject to such objection, Named Plaintiff answers that Defendant maintained uniform written policies which applied to all hourly employees at each of its locations. This includes, but is not limited to policies entitled "Pay: General Information and Employee Responsibilities" and the specific policies on "Breaks and Lunches." See PLAINTIFFS00001-00011. Such written policies were subject to periodic updates and were

4

supplemented by other policies maintained by Defendant. The result of such policies was that each of Defendant's employees was subject to common written policies which resulted in employees not being paid for all hours of compensable work.

5.    State the entire factual basis for your claim that you performed work during unpaid meal periods including by indentifying what job duties you performed and what policy, practice, employment action and/or supervisor(s) required you to perform such job duties during your meal period.

RESPONSE: During the relevant time periods, Defendant maintained a policy automatically deducting 30 minutes for each lunch period from her pay check. Such policy is produced as PLAINTIFFS00007-00008. During such lunch periods, Named Plaintiff was subjected to being called back to work, was required to return to work in the event of major trauma events or short staffing situations, and was frequently required to carry a phone for the purpose of returning to work. As a result of such policies, Named Plaintiff was not able to have uninterrupted lunch periods, and was not able to leave the employer's premises. As a result of such policies, such unpaid lunch periods were "on duty" and "on-call."

During the lunch periods, Named Plaintiff actually performed work, where she was called back to work during the 30 minute lunch period and where she was responsible for answering calls during the unpaid lunch. Where Named Plaintiff returned to work, her supervisor had the discretion, upon request from Named Plaintiff, to cancel the automatic deduction and pay Named Plaintiff for such work. However, since each break was "on duty" all automatic deductions were improper. Since Named Plaintiff performed work during the unpaid lunches on a consistent basis, her supervisors were unreceptive to ongoing or repeated requests that all lunch periods be paid.

5

Additionally, Defendant's lunch period policies stated that "combined" breaks of 30 minutes were treated as "the same as a lunch period, and is unpaid." Thus, breaks of less than thirty minutes, which should be paid, were combined in a way that made such breaks unpaid.

To the extent that such request obligates Named Plaintiff to identify dates and times that such policies resulted in Named Plaintiff not being compensated, Named Plaintiff objects to the interrogatory to the extent that it seeks to shift Defendant's time keeping obligations onto Named Plaintiff. The obligation to record accurate information about working time remains with Defendant. Named Plaintiff answers that Defendant's policies resulted in a daily failure to correctly compensate her for hours worked.

6. State the entire factual basis for your claim that your unpaid meal periods should have been compensated, including by specifying the dates and circumstances of any such unpaid breaks.

**RESPONSE:** See response to Interrogatory No. 5.

7. State the entire factual basis for your claim that your meal periods with "on duty" or "on call".

**RESPONSE:** See response to Interrogatory No. 5.

8. For any unpaid meal period for which you claim you should have been compensated, state the basis for your claim and whether you notified Defendant that the unpaid meal period should be cancelled and this paid and, if not, why not.

**RESPONSE:** The frequency with which Named Plaintiff worked during such unpaid meal periods made it both impossible to continually notify Defendant that work was being performed and made it unbelievable that Defendant was not aware that work was being performed during such breaks. When Named Plaintiff reported work performed during breaks to

6

her supervisors, they were dismissive of such claims, and discouraged her from reporting such breaks in the future. As stated above, Defendant's policies resulted in a daily failure to correctly compensate her for hours worked.

9. To the extent applicable, identify all practices, polices, employment action and/or supervisors that or whom discouraged you from recording work performed during your meal periods as compensable time to Defendants' time keeping systems.

**RESPONSE:** See answer to Interrogatory No. 8.

10. To the extent application, identify all practices, polices, employment actions and/or supervisors that or whom caused or discouraged you from leaving the premises during an unpaid meal period.

**RESPONSE:** See production of documents Bates stamped PLAINTIFFS00001-00011. In addition, please see response to Interrogatory No. 5.

11. Identify every week in which you contend you did not receive all minimum wages due from Defendant for hours worked from April 2012 to the present including by identifying the hours you worked in each week and the basis for your contention.

**RESPONSE:** Named Plaintiff incorporates her answers and objections to Interrogatory No. 5. Additionally, Named Plaintiff answers that within the applicable statute of limitations period, she performed uncompensated work during every week that she was employed. Since such work was uncompensated, it did not meet the minimum wage requirements of state and federal wage statutes.

12. Identify every week in which you content you were not paid all regular wages due from Defendant for hours worked from April 2012 to the present including by identifying the hours you worked in each week and the basis for your contention.

7

**RESPONSE:** Named Plaintiff incorporates her answers and objections to Interrogatory No. 5. Additionally, Named Plaintiff answers that within the applicable statute of limitations period, she performed uncompensated work during every week that she was employed. Since such work was uncompensated, she was not paid her regular wages for such hours.

13. Identify every week in which you content you were not paid all overtime wages due from Defendant for hours worked from April 2012 to the present including by identifying the hours you worked in each week and the basis for you contention.

**RESPONSE:** Named Plaintiff incorporates her answers and objections to Interrogatory No. 5. Additionally, Named Plaintiff answers that within the applicable statute of limitations period, she performed uncompensated work during every week that she was employed. During any week in which she was employed and her total number of hours exceeded forty hours in that week, she would be owed overtime wages.

14. Identify every other employee of Defendant you content was similarly situated to you for whom you have knowledge that she or he was not compensated for all minimum, regular or overtime wages in any given week since April 2012 to the present, including the dates for each week, the number of hours worked in each week and the basis for your contention.

**RESPONSE:** See response to Interrogatory 4. Because Defendant maintains enterprise-wide policies concerning hours of work and lunch policies, every employee, within the class, who was subject to such policies would be similarly situated.

15. State the entire factual basis for your claim that Defendant willfully violated the Fair Labor Standards Act and Wisconsin wage and hour laws.

**RESPONSE:** During Named Plaintiff's employment with Defendant she was regularly and routinely asked to perform work during unpaid lunch periods. Her supervisors were aware

8

that she and all other hourly employees were also performing work during such periods. During her employment, Named Plaintiff would periodically discuss unpaid lunch periods with members of management and co-workers, and representatives of Defendant acknowledged that Named Plaintiff was working during the unpaid lunch periods, and before and after her scheduled shifts. Moreover, the written terms of the employers lunch and break polices knowingly violate provisions of Wisconsin law, where they fail to correctly treat breaks of less than 30 minutes as paid.

16.     Describe in detail all damages and relief you claim in this action and include the nature of the damage or relief claimed, the date(s) and the damage was allegedly incurred and the amount, basis for the calculations of any monetary damages claimed to date.

**RESPONSE:** Named Plaintiff objects to such question on the basis that the instant interrogatory is being posed at an early stage of litigation, prior to the completion of discovery. Subject to such objection, Named Plaintiff incorporates her prior interrogatories as to the nature of damages and the dates for such damages.

With respect to the amount of damages, Named Plaintiff would claim wages at her regular rate of pay for each unpaid lunch period which was automatically deducted from her pay during the applicable statues of limitations. In addition, Named Plaintiff claims wages for uncompensated pre-and post–shift work at her regular rate of pay. For any week where uncompensated time, either due to unpaid lunch periods or uncompensated pre-and post-shift work, would have resulted in her weekly hours of work totaling more than forty hours, Named Plaintiff would also claim that all such time beyond forty hours be paid at time and one half. For all damages which result from violations arising under the Fair Labor Standards Act, Named Plaintiff would also claim liquidated damages in an amount equal to her unpaid wages. For all

9

damages, which result from violations arising under Wisconsin law, Named Plaintiff would also claim liquidated damages in an amount equal to half of the unpaid wages. Named Plaintiff would also claim attorneys' fees and costs in bringing the instant lawsuit.

17. Identify every person you intend to use as a fact witness in this case for any purpose including each person's name, address, telephone number, and a summary of the subject matter of the person's relevant knowledge and/or intended testimony.

**RESPONSE:** Named Plaintiff objects to such question on the basis that the instant interrogatory is being posed at an early stage of litigation, prior to the completion of discovery. At the point that fact witnesses are identified, Named Plaintiff will supplement such discovery responses. However, at this time it is not possible to identify each potential fact witness, since Named Plaintiff, and counsel are still interviewing such witnesses.

Subject to such objection, Named Plaintiff states that Defendant's pay practices impact all employees in the putative class or classes, and that each impacted employee is therefore a potential fact witness.

18. Identify each person whom you expect to call as an expert witness at trial, if any, and as to each potential expert identified include: the subject matter on which the expert is expected to testify; a complete statement of all opinions to which the expert if expected to testify and be expressed, and the basis, reasons and grounds therefore; the data or other information considered by the witness in forming the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the proceeding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

10

**RESPONSE:** Named Plaintiff objects to such question on the basis that the instant interrogatory is being posed at an early stage of litigation, prior to the completion of discovery. No expert witness has been currently retained. At the point that expert witnesses are retained, Named Plaintiff will supplement such discovery responses consistent with the Federal Rules of Civil Procedure. Named Plaintiff objects to such request to the extent that the interrogatory seeks information beyond that required by such rules.

Dated this ⟨16⟩ day of ~~September~~ *October*, 2015.

_____
Juelaine Miller

As to Objections Only:

By: _____
Nathan D. Eisenberg (State Bar No. 1030555)
nde@previant.com
Erin F. Medeiros (State Bar No. 1097910)
efm@previant.com
The Previant Law Firm, S.C.
1555 North RiverCenter Drive, Suite 202
Milwaukee, WI 53212
(414) 271-4500
(414) 271-6308 (fax)

Barry P. Gill (SBN 1089246)
bpgill@gillandgillsc.com
GILL & GILL, S.C.
128 North Durkee Street
Appleton, WI 54911
Telephone 920/739-1107
Facsimile 920/739-3027

ATTORNEYS FOR PLAINTIFFS

11