## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

JUELAINE MILLER, KATHLEEN ALBERS,
AND LINDA AULER,

individually and on behalf
of all others similarly situated,

        Plaintiffs,

      v.                                      Case No. 15-CV-00506

THEDACARE, INC.

        Defendant.

## BRIEF IN SUPPORT OF THEDACARE'S MOTION
## TO DECERTIFY THE CONDITIONAL FLSA COLLECTIVE ACTION

## <u>INTRODUCTION</u>

Plaintiffs' Amended Complaint alleges a wage and hour action under the Fair Labor

Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., brought by Juelaine Miller, Kathleen Albers,

and Linda Auler, the three named Plaintiffs, on behalf of a group of more than 2,400 employees.

These employees work in at least 17 job titles in 33 departments, with dozens of different

supervisors and managers, and are or were employed by ThedaCare at its hospitals located in

Appleton and Neenah, Wisconsin.  On August 29, 2016, the Court conditionally certified the

following FLSA class:

> All persons who have been or are employed by ThedaCare at the
> Appleton Medical Center or Theda Clark Medical Center hospitals
> on an hourly basis as direct patient care providers, administrative
> associates, unit resource associates and employees of the Staffing
> Resources department at any time three years prior to the
> commencement of this lawsuit to the present whose scheduled
> hours included an automatic deduction for unpaid meal breaks and
> who were denied minimum wage or overtime wages for hours for

compensable "on call" time and/or hours performing work during unpaid meal periods.

Following conditional certification, notice was sent to approximately 2,420 past or present ThedaCare employees, of whom 165 (less than 7%) opted to join the conditionally certified FLSA class.  The parties have engaged in significant discovery, including taking the depositions of the three named Plaintiffs, nine opt-in Plaintiffs,[1] ThedaCare's Federal Rule of Civil Procedure 30(b)(6) representatives, and 14 of ThedaCare's department managers.  The parties have also exchanged more than 16,600 pages of documents, as well as over two million rows of data relating to class members' time records and nearly 200,000 rows of data relating to class members' wages.

The deposition testimony and documentary evidence of record demonstrates the highly individualized nature of the named and opt-in Plaintiffs' claims and applicable defenses.  The localized formulation and implementation of lunch period and timekeeping procedures at the hospital, department and supervisory levels, along with myriad other differences in the named Plaintiffs' and opt-ins' work settings, as well as highly individualized reasons provided by different opt-ins as the basis for their claims, means that named Plaintiffs -- who themselves work in different jobs -- are not similarly situated to the opt-ins or to each other.  These circumstances would make it impossible for a trier of fact to fairly decide their claims on the basis of representative evidence.  The only fair way to try these lunch period claims is to permit ThedaCare to assert its various individual defenses against each named Plaintiff and each opt-in.

---

[1] Several opt-in Plaintiffs declined to participate in a deposition when noticed.  ThedaCare has asked that these individuals withdraw their consent to participate in the FLSA collective action and plaintiffs' counsel has stated they will.

QB\45625125.3

That would result in more than 160 mini-trials on liability alone, which is the antitheses of the collective action's purpose.[2]

This lawsuit is nothing more than a copycat of other lawsuits filed against hospital systems challenging timekeeping systems that automatically deduct an unpaid lunch period from non-exempt employees' hours if no action is taken to cancel the automatic deduction. This Court has already noted that the Plaintiffs face an uphill battle in seeking certification. Further discovery has only fleshed out why decertification is appropriate. Courts that have addressed whether the FLSA claims in these hospital lunch period cases should remain certified at the second stage routinely hold that they should not, due to the absence of any common unlawful policy or practice and the disparate factual circumstances surrounding the employees' claims. *See, e.g.*, *Aguilera v. Waukesha Mem'l Hosp., Inc.*, 2015 WL 3791469 (E.D. Wis. June 18, 2015); *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869 (6th Cir. 2012); *Hinterberger v. Catholic Health Sys.*, 299 F.R.D. 22 (W.D.N.Y. 2014); *Rindfleisch v. Gentiva Health Servs., Inc.*, 22 F. Supp. 3d 1295 (N.D. Ga. 2014); *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D 339 (N.D. Ill. 2012); *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 2011 WL 6372873 (W.D. Pa. Dec. 20, 2011); *Kuznyetsov v. West Penn Allegheny Health Sys.*, 2011 WL 6372852 (W.D. Pa. Dec. 20, 2011); *Frye v. Baptist Mem'l Hosp.*, 2010 WL 3862591 (W.D. Tenn. Sept. 27, 2010). This case is no different and, as routinely held in other similar hospital lunch period cases, the Court should decertify the FLSA class in this matter.

## **BACKGROUND**

---

[2] Plaintiffs will be filing their motion to certify a Fed. R. Civ. P. 23 class action at the same time ThedaCare files this FLSA motion to decertify. The issues addressed in this brief for the three named Plaintiffs and the 165 opt-ins expand exponentially with the need for an individualized inquiry for all 2,400+ individuals who potentially would be included in a Rule 23 class.

ThedaCare is a non-profit community health system consisting of seven hospitals and numerous clinics that provide medical services to individuals in Northeast Wisconsin. (Wilcox Dep. Tr. 11-12 (Dkt. 50-4)). [3] The named Plaintiffs and opt-ins work in 33 different departments at ThedaCare's hospitals in Neenah and Appleton, Wisconsin. Over the past three years, those departments have been managed, supervised and lead by hundreds of different managers, supervisors and charge nurses. (Wilcox Dec. (Dkt. 52) ¶ 2).

# I.    THIS COURT HAS ALREADY HELD THAT THEDACARE'S WRITTEN LUNCH POLICIES ARE LAWFUL

ThedaCare maintains two generally applicable written policies that govern employee breaks and work hours: 1) the "Breaks and Lunches" Policy ("Breaks and Lunches Policy") and 2) the "Pay: General Information and Employee Responsibilities" Policy ("Pay Policy"). The Breaks and Lunches Policy provides that employees who work at least a six hour shift should take a 30 minute unpaid lunch break. (*See* Wilcox Ex. 3 (Dkt. 50-4)). For shifts over six hours, ThedaCare's time and attendance system automatically deducts 30 minutes from most hourly employees' clockings. *Id*. If an employee is not able to take a full 30-minute lunch, whether because of a missed or interrupted lunch, the policy requires that employee to report this event by recording a "no lunch" entry into the time system so that the automatic deduction is cancelled and the employee is accordingly paid for the full 30 minutes. *Id*. It also expressly provides that employees are allowed to leave the premises during their 30-minute unpaid lunch period. *Id*. Further, the Breaks and Lunches policy expressly delegates to individual department managers

---

[3] The depositions of the named Plaintiffs, Juelaine Miller, Linda Auler and Kathy Albers, together with ThedaCare's corporate designees, Anna Wilcox and Karen Garvey, and several declarations were previously filed in this matter *See* Dkt. 50-54, 56. ThedaCare will, therefore, not refile those materials. All other opt-in Plaintiff depositions, declarations and other material cited herein are contained in the Second Nickels Declaration filed simultaneously with this brief. Counsel have agreed that Plaintiffs will file the deposition transcripts of the ThedaCare managers that Plaintiffs' deposed, and that Defense counsel will file the deposition transcripts of the opt-in Plaintiffs that ThedaCare deposed.

- 4 -

or their designees the responsibility and oversight of managing 30-minute lunches, including the no lunch entry. (Wilcox Dep. Tr. 33-36, Ex. 3 (Dkt. 50-4)).

ThedaCare's related Pay Policy requires employees to accurately record and report their time worked. (*See* Garvey Ex. 6 (Dkt. 50-5)). The Pay Policy delegates to department managers the responsibility of ensuring that departments and shifts are properly staffed to meet operational requirements and authorizes them to implement department specific practices to determine hours, breaks and lunches. *Id.* Employees are responsible under the Pay Policy for reviewing their time reports every pay period and reporting any errors to their supervisors or designated payroll person by noon on the Monday following the close of the pay period. *Id.*

This Court has already held that these policies are lawful on their face. (*See* Decision and Order Granting Conditional Certification In Part, Dkt. 60 at 7-8 ("*ThedaCare I*")). As the Court noted, ThedaCare's policies "provide[] a mechanism to prevent employees from having pay automatically deducted for time they are really working." (*Id.* at 8). The Court further correctly noted that nothing in ThedaCare's policies "requires employees to continue in their work responsibilities during their unpaid lunch breaks" and that nothing in ThedaCare's policies "requires the employees to perform their duties during breaks or lunches and employees are allowed to interrupt lunches -- so long as the employee is paid for that lunch period." *Id.* at 9-10. As the Court has already found, ThedaCare's policies enshrine common sense by recognizing that work in a hospital setting, including the need to provide medical care or treatment, can arise without forewarning. *Id.* at 9. ThedaCare's policies thus appropriately state: "[t]he employee should exercise discretion in taking breaks and lunches in such a way that both the needs of the employee and the needs of the organization are met." *Id.* at 9. This means that it is necessary for

QB\45625125.3

employees to work together in order to plan for, cover one another, and to each take lunch at a time that works best for one's co-workers and patients. *Id.*

## II. THEDACARE TRAINS STAFF AND MANAGEMENT ON ITS TIME KEEPING SYSTEMS

ThedaCare trains newly hired employees on its timekeeping systems during orientation, including how to use the lunch cancellation procedure. (Garvey Dep. Tr. (Dkt. 50-5) at 32-33, Ex. 9). Managers and supervisors train new employees on their department's specific lunch and break practices and expectations. (Wilcox Dep. Tr. (Dkt. 50-4) at 50-56). In the day-to-day setting, many managers and supervisors routinely communicate with their employees as to their department's lunch break practices. (Crandall Dep. Tr. 43-45, 47-48,[4] January 23, 2017; Bardon Dec. (Dkt. 51) ¶ 3-7; Wood Dep. Tr. 29-31, May 10, 2015; Doornink Dep. Tr. 52-54, May 10, 2015; Cynthia Miller Dec. ¶ 8). ThedaCare's policies, including the Breaks and Lunches Policy and Pay Policy, are available to employees on the Company's internal website, which it refers to as "Heartbeat." (Wilcox Dep. Tr. (Dkt. 50-4) at 53-54). ThedaCare also routinely trains managers on its lunch break policies. (Crandall Dep. Tr. 40-43).

## ARGUMENT

## I. LEGAL STANDARD

The FLSA, § 216(b), permits actions by "any one or more employees for and on behalf of himself or themselves and other employees similarly situated." *See Alvarez v. City of Chicago*, 605 F.3d 445, 448 (7th Cir. 2010); *Jonites v. Exelon Corp.*, 522 F.3d 721, 725-26 (7th Cir. 2008). Employees do not have a right, however, to proceed in a collective manner. To demonstrate the propriety of collective treatment, named Plaintiffs must factually establish their similarity to each other and the opt-in Plaintiffs, and Wisconsin federal courts have adopted a

---

[4] Ann Younger Crandall is a ThedaCare manager, therefore Plaintiffs will file a copy of her deposition.

two-stage process for determining whether a collective action is proper under § 216(b).  *See Adair v. Wisconsin Bell, Inc.*, 2008 WL 4224360, at *3 (W.D. Wis. Sept. 11, 2008); *Espenscheid v. DirectSat USA, LLC*, 2010 WL 2330309, at *6 (W.D. Wis. Jun. 7, 2010).

During the first stage, Plaintiffs are typically afforded a more lenient burden. *Espenscheid*, 2010 WL 2330309 at *6.  The second stage of the analysis, "decertification," occurs after discovery and implicates a far more stringent standard, and the court must assess whether continuing as a collective action will provide efficient resolution in one proceeding of common issues of law and fact.  (*See ThedaCare I*, Dkt. 60 at 6) (citing *Hoffmann-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989).  While ThedaCare is the "movant" at this second-stage, the burden ultimately remains on Plaintiffs to establish that they are "similarly situated" to one another and the class of opt-in Plaintiffs.  *See Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 280 (N.D. Tex. 2008); *Ellis v. Elgin Riverboat Resort*, 217 F.R.D. 415, 419 (N.D. Ill. 2003).  Plaintiffs must present admissible evidence to meet the more "rigorous" analysis applicable at stage two.  *See Pacheco v. Boar's Head Provisions, Inc.*, 671 F. Supp. 2d 957, 959 (W.D. Mich. 2009) (noting that "[a]t the close of discovery, [the Court] make[s] a second determination, using a more rigorous standard, as to whether the lead plaintiffs and the opt-in plaintiffs are similarly situated").

To make this second stage determination, the Court is to consider:  1) any disparate factual and employment settings of the individual plaintiffs; 2) the various individualized defenses available to the defendant; and 3) fairness and procedural considerations.  *See Dekeyser v. Thyssenkrupp Waupaca, Inc.*, 314 F.R.D. 449, 456 (E.D. Wis. 2016).  Decertification is appropriate where the relevant issues are tethered to specific circumstances that are individualized to the plaintiffs rather than any generally applicable policy or practice.  *See*

QB\45625125.3

*Proctor*, 250 F.R.D. at 280 (reasoning that "the more material distinction revealed by the evidence, the more likely the district court is to decertify the collective action"). "The more dissimilar plaintiffs' job experiences are from one another and the more individuated an employers' defenses are, the less appropriate the matter is for collective treatment." *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 573 (E.D. La. 2008). Use of the collective action mechanism in § 216(b) is "egregious" where the claims at issue are "hopelessly heterogeneous." *Jonites v. Exelon Corp.*, 522 F.3d 721, 725-26 (7th Cir. 2008); *see also Pacheco*, 671 F. Supp. 2d at 966 (reasoning that certification is improper where parties would be required to introduce individualized proof as to both liability and damages).

## II.    DISPARATE FACTUAL AND EMPLOYMENT SETTINGS IN THIS CASE REQUIRE DECERTIFICATION

Even based on the preliminary evidence at the conditional certification stage, the Court correctly noted that Plaintiffs "face[] a difficult obstacle" and "a number of hurdles in showing they are similarly situated." (*ThedaCare I*, Dkt. 60 at 14-17). These obstacles include the sheer expanse of a class,[5] the fact that employees are from 33 different departments and work at two hospitals, that employees perform a variety of jobs including some with and some without direct patient care, that employees work under varying levels of pressure, and critically, that employees work under the management of dozens of different managers and supervisors who have been delegated the authority to determine staffing levels and to develop their own systems for ensuring employees receive duty-free lunches. *Id.*

---

[5] Although the Court granted a conditional FLSA class comprised of ThedaCare's hospitals in Neenah and Appleton, Wisconsin, and did not include ThedaCare's five other hospitals in rural areas, it is the Neenah and Appleton hospitals that comprise most of ThedaCare's patient care employees and putative class members (2,400+ as compared to 3,000+ if the rural hospitals were included). While only 165 individuals consented to join the FLSA collective action, all 2,400+ will be the subject of Plaintiffs' motion for certification of a Rule 23 state law class.

- 8 -

As noted above, the Court has held that ThedaCare's written policies are lawful. The Plaintiffs must therefore demonstrate that ThedaCare's lawful policies are *applied* in a manner that: 1) requires employees to work during their lunch periods, and 2) does not allow employees to avail themselves of ThedaCare's lunch cancellation procedure. Plaintiffs must also demonstrate that this "as applied" violation is based on a *common* practice, custom or scheme that is capable of being decided on a class-wide basis. *See Reed v. Cnty. of Orange*, 266 F.R.D. 446, 450 (C.D. Cal. 2010) (plaintiffs must provide "substantial evidence that their claims arise out of a single policy, custom, or practice that leads to FLSA violations"); *see also Howard v. Securitas Sec. Servs., USA Inc.*, 2009 WL 140126, at *6 (N.D. Ill. Jan. 20, 2009) (denying conditional FLSA certification where "the plaintiff could not show that the same policies and procedures were followed at other offices or branches of a company"); *Blaney v. Charlotte-Mecklenburg Hosp. Auth.*, 2011 WL 4351631, at *10 (W.D.N.C. Sept. 16, 2011) (denying conditional certification where "the record before the court demonstrates that there is no common policy or scheme and instead individualized questions of fact predominate").

As discussed below, the disparate factual and employment settings here reveal that there is no common practice of uniformly requiring employees to work during their lunch and/or preventing employees from using ThedaCare's lunch cancellation procedure. As a result, the conditional FLSA collective must be decertified.

A.  **PLAINTIFFS WORKED AT DIFFERENT FACILITIES AND IN DIFFERENT DEPARTMENTS**

Plaintiffs and opt-ins do not work in a single location, rather, they work in two separate hospitals and in 33 different departments within those hospitals. As detailed below, named Plaintiffs and opt-ins at these locations reported to different managers and supervisors and were subject to unique work environments with different staffing models and different departmental

lunch period practices and rules, all of which weigh heavily in favor of decertification. *See Kuznyetsov*, 2011 WL 6372852, at *4-5 (decertifying hospital meal break collective action, in part, because of vast facility and departmental variances); *Frye*, 2010 WL 3862591, at *3-4, 8 (decertification of hospital meal break collective action proper where class members worked in three hospital facilities and many different departments); *Gatewood v. Koch Fouchs of Miss., LLC*, 2009 WL 8642001, at *15 (S.D. Miss. Oct. 20, 2009) ("It is therefore not possible to fairly determine whether, and to what extent, [plaintiffs and opt-ins], have been allegedly under compensated on a class-wide basis" when the putative class worked in four locations, in numerous departments, over three shifts and performed a wide variety of job duties for numerous supervisors).

### B. NAMED AND OPT-IN PLAINTIFFS HAD DIFFERENT MANAGER AND SUPERVISORS

The named Plaintiffs and opt-ins reported to dozens of different managers and supervisors based on where and when they were employed.[6] ThedaCare has delegated department managers the authority to determine staffing levels and to establish their own practices for how to provide employees with uninterrupted lunches. (*ThedaCare I*, Dkt. 60 at 16). In practice, the coordination among employees to cover for one another so that each are able to enjoy a duty-free lunch is further delegated to charge nurses (aka "Lead RNs") and to the employees themselves, as set forth below.

Many employees stated that they use the lunch cancellation, and their supervisors instruct and encourage them to use the lunch cancellation, when they were not able to receive a 30-minute uninterrupted lunch. (Miller Dep. Tr. (Dkt. 50-1) at 50-54, October 29, 2015; Auler Dep. Tr. (Dkt. 50-2) at 50-59, November 19, 2015; Bartman Dep. Tr. 14-15, 22-23, April 25, 2015;

---

[6] Almost all of the departments at issue had both a manager and supervisor. (Wilcox Dec. (Dkt. 52) ¶ 2).

QB\45625125.3

Vanroy Dec. ¶ 11; Collar Dec. ¶ 9; Hall Dec. ¶ 9; Baranczyk Dec. ¶ 9; Kabat Dec. ¶ 9; Parker Dec. ¶ 8; Guthu Dec. ¶ 10; Tuchscherer Dec. ¶ 9-10; Turba Dec. ¶ 10; Buzzanca Dec. ¶ 7-8; Niquette Dec. ¶ 7; Cynthia Miller Dec. ¶ 7; Rohloff Dec., Dkt. 56-1 at ¶ 9; Loughrin Dec., Dkt. 56-3 at ¶ 10; Koch Dec., Dkt. 56-2 at ¶ 12; Mickelson Dec., Dkt. 56-6 at ¶ 9; Blattner Dec., Dkt. 56-4 at ¶ 11; Selwitschka Dec., Dkt. 56-5 at ¶ 11). It defies logic, as an initial matter, to find any common violation of wage-hour law where many employees state that their supervisors have implemented and promote a lawful lunch system where employees either receive a 30-minute duty-free lunch or they use the lunch cancellation when they do not.

Indeed, the named Plaintiffs highlight a stark contrast in their experiences with different managers in the Neenah Emergency Department ("ED") alone. During the relevant time period, the Neenah ED was managed by three individuals: Mary Ann Bashaw, who managed the department until February 2013, Mike Huntley, who managed the department for an interim period from February 2013 through September 2013, and Jen Fredriksen, the present manager. (Wilcox Dec. (Dkt. 52) at ¶ 5). Named Plaintiff Miller testified that *she used the lunch cancellation procedure* when supervised by Fredriksen, but did not use it under Bashaw, because she did not want Bashaw to inquire about the reasons why she was unable to take a full 30-minute lunch. (Miller Dep. Tr. (Dkt. 50-1) at 50-54, 83-87, 89-91). Thus, Miller perceived that Bashaw discouraged her from using or overusing the lunch cancellation, but that Fredriksen did not. (*Id*. at 53-54; *see also* Bartman Dep. Tr. 34-35). Named Plaintiff Auler echoed Miller's testimony, stating that she has had no problems using the lunch cancellation under Fredriksen's management. (Auler Dep. Tr. (Dkt. 50-2) at 50-59). Like Miller, Auler also stated that Bashaw would ask her to provide the reasons why she was unable to take a full 30-minute lunch, which Auler perceived as an implied threat to not overuse the lunch cancellation procedure. *Id*. Named

- 11 -

Plaintiff Albers testified that she did not use the lunch cancellation because she did not want to confront Bashaw, but after speaking with her lawyers in this lawsuit in April of 2015, she started using the lunch cancellation and none of her supervisors complained. (Albers Dep. Tr. (Dkt. 50-3) at 42-53, 58-59, 66-67). Unlike the named Plaintiffs, another employee in the Neenah ED declared that she used the lunch cancellation procedure despite Bashaw asking her to explain why she was not able to take a 30-minute lunch. (Mickelson Dec. (Dkt. 56-6) ¶ 10).

There is no FLSA violation simply because a manager asks why an employee was unable to take a lunch. Even more significant to whether this matter can be resolved on a collective basis is the fact that whether any given employee views a manager's questions as "discouraging" the future use of the lunch cancellation is an individualized inquiry, which cannot be resolved on a collective basis. *See Hadley v. Journal Broad. Grp., Inc.*, 2012 WL 523752, at *4-5 (E.D. Wis. Feb. 16, 2012) ("each employee's own subjective interpretation of his supervisor's directive would require an individualized, rather than common, approach"); *see also Richardson v. Wells Fargo Bank, N.A.*, 2012 WL 334038, at *4 (S.D. Tex. Feb. 2, 2012) (finding certification inappropriate when "resolution of each Plaintiff's claim will require individualized inquiries about his or her specific managers' policies and practices").

There are myriad ways in which ThedaCare's managers impact the lunch process, including their many efforts to ensure that their employees are able to receive a 30-minute lunch. For example, in many departments, managers have developed processes where employees are assigned specific "buddies" who are responsible for covering for one another so that each may take a 30-minute uninterrupted lunch. (Crandall Dep. Tr. 56-57; Vanroy Dec. ¶ 6; Niquette Dec. ¶ 5; Delanty Dec. ¶ 6). For instance, in the Appleton Surgical Services Department, the manager developed overlapping shifts specifically intended to facilitate lunch relief, where a second wave

- 12 -

of employees start work several hours after the first, and each are able to provide lunch relief for the other. (Vanroy Dec. ¶ 7; *see also* Bartman Dep. Tr. 14-15). As another example, in response to a January 2015 employee satisfaction survey (before the filing of this lawsuit), the manager in the Neenah Birth Center initiated a "Lunch Tracking Tool" that is posted in the department and which requires employees to write down whether or not they received their 30-minute lunch. (Bardon Dep. Tr. 60-63, January 17, 2017).[7] When this same manager took over responsibility for the Appleton Birth Center in September of 2016, she changed the daily practices in that department by adding morning huddles during which time employees discuss their "game plan" for how they are going to take their lunches. (Bardon Dep. Tr. 49-50).

Another example includes the Appleton ED, where in response to a November 2015 employee engagement survey, the manager modified the existing lunch buddy process to include a specific, scheduled lunch time and also expanded the pool of employees who could cover for one another during lunch (e.g., allowing paramedics to cover for nurses where nurses had complained that it was hard for them to cover each other's patients during lunch). (Crandall Dep. Tr. 56-57; Lang Dep. Tr. 31-32, May 10, 2017; Barancyzk Dec. ¶ 7; Turba Dec. ¶ 6). After implementing these changes in the Appleton ED, the frequency of uninterrupted lunches increased from 60-70% to 95%. (Crandall Dep. Tr. 56-57).

Managers routinely make decisions that impact lunch practices, such as staffing more employees or sending newsletters and explaining during huddles the importance of taking an uninterrupted lunch. (Crandall Dep. Tr. 13-14; 21-22; Wood Dep. Tr. 29-31; Doornink Dep. Tr. 52-54; Cynthia Miller Dec. ¶ 8). Some Plaintiffs testified that their managers were less vociferous about lunch instruction and reminders relating to ThedaCare's lunch cancellation

---

[7] Amy Bardon is a ThedaCare manager, therefore Plaintiffs will file a copy of her deposition.

procedure.  (Jeffrey Olson Dep. Tr.  27-28, April 25, 2017; Wood Dep. Tr. 38).  The presence or absence of managers also varies as department managers often are not present during the evening and night shifts, leaving team leaders and charge nurses in control.  (Bartman Dep. Tr. 21; Bardon Dep. Tr. 14-16).  For example, the Appleton hospital (but not the Neenah hospital) has a house manager who is available to assist with issues that may arise during night and weekend shifts when the manager is not present.  (Lang Dep. Tr. 12-13; Bardon Dep. Tr. 14-16).

However, these are only a few examples of ways in which managers impact employee lunches.  Simply put, Plaintiffs cannot establish that ThedaCare applied a *common* unlawful scheme to deprive employees of their lunches where all of these differences are materially relevant to whether there was an FLSA violation.  *See Kuznyetsov*, 2011 WL 6372852, at *5 (finding that number of supervisors "exponentially compounds the differences and individualized experiences that go to whether there is a violation of the law, rather than creating consistency").  The large number of supervisors all but necessitates decertification because determining whether any named Plaintiff or opt-in has a valid FLSA claim here hinges on: 1) the lunch procedures, practices and rules devised and implemented by each supervisor (*see Blaney*, 2011 WL 4351631, at *7 (declining to certify collective action because, among other things, defendant established that the alleged common policies were actually left to the decentralized discretion of the individual units)); 2) whether a supervisor had actual or constructive knowledge that the plaintiff worked through the lunch period (*see Kellar v. Summit Seating, Inc.*, 664 F. 3d 169, 177 (7th Cir. 2011) (to state a claim under the FLSA for unpaid overtime, employee must show that employer had actual or constructive knowledge of her overtime work)); and 3) the interpersonal relations of each supervisor in relation to each plaintiff (*see Richardson v. Wells Fargo Bank, N.A.*, 2012 WL 334038, at *4 (S.D. Tex. Feb. 2, 2012) (denying certification when "resolution of each

- 14 -

Plaintiff's claim will require individualized inquiries about his or her specific managers' policies and practices")).

### C. NAMED AND OPT-IN PLAINTIFFS PERFORMED DIFFERENT JOB DUTIES

Named and opt-in Plaintiffs performed at least 17 different jobs in the 33 different departments in which they worked. As a result, there are significant variations in the work environments and related causes for missing or interrupting a lunch that weigh in favor of decertification. For example, named Plaintiff Miller worked as a Paramedic, named Plaintiff Auler worked as a Registrar, and named Plaintiff Albers worked as a Unit Resource Associate ("URA"). The duties of those three positions are quite different. Paramedics take patient vitals, provide medications, and provide life support among other duties. (Miller Dep. Tr. (Dkt. 50-1) at 14). Registrars greet patients who come to the ED, gather information about them and input that information into the computer system. (Auler Dep. Tr. (Dkt. 50-2) at 9-10; Albers Dep. Tr. (Dkt. 50-3) at 24-25). URAs manage patient flow and ensure ED patients are placed in the correct room, coordinate with physicians and nurses, and place orders for medical imaging or other treatment. (Albers. Dep. Tr. (Dkt. 50-2) at 26-27; Wideman Dep. Tr. 24-25, April 24, 2017). Unlike Paramedics, neither Registrars nor URAs *provide any direct patient care*. *Id*.

Notably, none of the named Plaintiffs worked as nurses, yet they seek to represent a class of many nurses in this matter (108 of the opt-ins work in a nurse, or nurse-like role). Registered Nurses ("RNs") provide direct patient care including patient assessment, perform admissions and discharges, and are responsible for doctor calls and paperwork. (Olson Dep. Tr. 11; Nowakowski Dep. Tr. 22, April 28, 2017; Doornink Dep. Tr. 14-15). Licensed Practical Nurses ("LPNs") and Certified Nursing Assistants ("CNAs") are also included in the collective class; they typically receive instruction from the RNs and perform duties like administering medication, hanging IV bags and performing wound care. (Crandall Dep. Tr. 22; Wideman Dep.

- 15 -

Tr. 10; Groehler Dep. Tr. 18-19, April 28, 2017). RNs, LPNs and CNAs thus all provide patient care. *Id*.

Schedulers, who are also part of the collective class, do not perform patient care. They work in an office environment where they either prepare employee work schedules six weeks out -- which is clearly not emergency work (Rodriguez Dep. Tr. 15-17, April 24, 2017; Knox Dec. (Dkt. 5 ¶ 3) -- or they answer phones and assign float employees in response to unexpected increases in patient census or employee absences. (Rodriguez Dep. Tr. 13-15; Knox Dec. (Dkt. 53) ¶ 3; Bruchert Dec. ¶ 4).

Such material variations in job duties strongly weigh in favor of decertification. *See Creal v. Group O, Inc.*, 155 F. Supp. 3d 831, 840 (N.D. Ill. 2016) (decertifying FLSA collective action where the Plaintiffs and 91 opt-ins worked in 27 different positions and thus had different work duties, locations, shifts, and supervisors making it difficult for the court to manage the claims' collectively); *Marshall v. Amsted Rail Co., Inc.*, 2012 WL 5499431 (S.D. Ill. 2012) (decertifying FLSA collective action where the opt-in plaintiffs held a wide-range of manufacturing jobs, and therefore the significant differences in "job titles, job duties, compensation plans, and other employment circumstances [would] produce highly particularized claims requiring fact-specific inquiries which render it inappropriate to try them collectively"); *Kuznyetsov*, 2011 WL 6372852, at *1 (decertifying a class of hospital employees which included nurses, technicians, secretaries and others because of differences in their work settings).

### D. NAMED AND OPT-IN PLAINTIFFS HAVE DIFFERENT INTERPRETATIONS OF THEDACARE'S LUNCH POLICIES

Named and opt-in Plaintiffs' personal interpretations of when to use the lunch cancellation procedure also reflect significant differences that weigh in favor of decertification. Some Plaintiffs stated they used the lunch cancellation only when they missed their lunch

QB\45625125.3

entirely, and did not use it when they were interrupted but were otherwise off the floor for 30 minutes. (Olson Dep. Tr. 28-29; Groehler Dep. Tr. 34). Several Plaintiffs testified that they chose to interrupt their lunch, even when not asked to, because they felt they were needed in the department, and then they chose to not use the lunch cancellation. (Miller Dep. Tr. (Dkt. 50-1) at 44-48; Auler Dep. Tr. (Dkt. 50-2) at 42-45; Albers Dep. Tr. (Dkt. 50-3) at 29, 39, 56-57; Doornink Dep. Tr. 43-44). In other situations, Plaintiffs testified that they believed they had received a substantial lunch, even where it did not last 30 minutes, and for that reason they chose to not use the lunch cancellation. (Auler Dep. Tr. (Dkt. 50-2) at 94-96; Wideman Dep. Tr. 38-39; Wood Dep. Tr. 29-31). Yet other Plaintiffs started using the lunch cancellation procedure when their co-workers told them to use it. (Wideman Dep. Tr. 37-38; Bartman Dep. Tr. 25-28). One Plaintiff testified he did not understand he was supposed to use the lunch cancellation where his lunch was interrupted, and acknowledged that he never sought to clarify his misunderstanding with his supervisor. (Groehler Dep. Tr. 40-41). Another Plaintiff, when interrupted during her lunch, has told the person interrupting her that she is on her lunch period and that she would address the situation after she is finished with her lunch, which was respected. (Wideman Dep. Tr. 48).

These differences in each Plaintiffs' interpretation of ThedaCare's lunch policies and how they reacted to potential interruptions in a hospital work environment would need to be explored on an individual basis, and cannot be resolved on a collective basis. *See Journal Broad. Grp., Inc.*, 2012 WL 523752, at *4-5 ("each employee's own subjective interpretation of his supervisor's directive would require an individualized, rather than common, approach"). Employee interpretation or misunderstanding is not a common policy, and this matter cannot proceed on a collective basis where some employees simply chose to not use the lunch

- 17 -

cancellation procedure. *See Fernandez v. Wells Fargo Bank, N.A.*, 2013 WL4540521 (S.D.N.Y. August 28, 2013) (denying conditional certification where employees felt that their employer assigned them more work than could be performed in a 40 hour week because there was no "specific, concrete, management directive concerning plaintiffs' off-the-clock work or any purported requirement not to record hours worked").

### E.    LUNCH PERIOD PRACTICES VARY BY DEPARTMENT

Named Plaintiffs and opt-ins work in distinctly different work environments that directly impact the procedures and practices used to relieve them from duty and provide a lunch period. *See Camesi*, 2011 WL 6372873, at *7; *White*, 2011 WL 1883959, at *7; *Blaney*, 2011 WL 4351631, at *7. The unique work environment in each department is a function of various factors, including: variability and unpredictability of patient census and acuity; nature of the care provided to patients; whether care is provided pursuant to a schedule or on a walk-in/emergency basis; staffing; number of shifts; and operating hours.

For example, in some departments, patient acuity can escalate given the often critical condition of patients. (Wideman Dep. Tr. 30-31, 55-56; Buzzanca Dec. ¶ 10; Rohloff Dec. ¶ 8; Loughrin Dec. ¶ 8-9; Koch Dec. ¶ 9; Blattner Dec. ¶ 8). As a result, lunch periods are not scheduled, and nurses decide when to take a lunch period based on their workload. (Parker Dec. ¶ 6; Guthu Dec. ¶ 7). Conversely, in numerous other departments, patients receive treatment and care pursuant to structured schedules, or employees do not provide patient care at all, allowing for lunch periods to be scheduled or taken at regular times. (Crandall Dep. Tr. 50-51; Collar Dec. ¶ 6). Indeed, the number of patients that a patient care employee is responsible for at any given time varies with discharges and admissions. (Groehler Dep. Tr. 30-31).

In the Neenah Behavioral Health Department, patients often leave their room and walk around the unit, which differs from other medical floors where patients typically remain in their

- 18 -

rooms. (Doornink Dep. Tr. 25). Opt-in Plaintiff Autumn Wood testified that her lunch experiences in the Neenah Birth Center were different from when she floated to other departments, because in the Neenah Birth Center she would bring her computer and phone with her over her lunch period. (Wood Dep. Tr. 12). In the Appleton Birth Center, however, Wood testified it was much more likely for her to get a lunch because there were large monitors that Lead RNs could use to monitor Wood's patients while she took a 30-minute lunch. (Wood Dep. Tr. 39-40).

Furthermore, the different departments employ a variety of mechanisms to relieve employees from duty during lunch periods. In some departments, employees are assigned partners to cover their patients while they take a lunch, while in others charge nurses otherwise facilitate coverage, as previously noted. (Delanty Dec. ¶ 6; Hall Dec. ¶ 6; Guthu Dec. ¶ 7; Tuchscherer Dec. ¶ 6; Niquette Dec. ¶ 5). In departments where employees must work together to determine when to take their lunch, some employees were more willing than others to make themselves available to provide relief. (Nowakowski Dep. Tr. 52). In some departments, the Lead RN will round during the shift to ask each employee their plan for taking a 30-minute lunch. (Buzzanca Dec. ¶ 6; Niquette Dec. ¶ 6).

As noted above, managers have modified and adapted the practices in their departments over time in an effort to increase the opportunity to take a 30-minute lunch. Examples of changes that can impact lunches include modifying the staffing-to-patient ratios, modifying shifts/schedules, modifying whether charge nurses/Lead RNs are assigned their own patients, or removing call lights from the break room. (Wideman Dep. Tr. 16-17; Rodriguez Dep. Tr. 10-11, 42-43; Bartman Dep. Tr. 16-18; Groehler Dep. Tr. 19-20, 44-45; Nowakowski Dep. Tr. 26-29; Barancyzk Dec. ¶ 7; Turba Dec. ¶ 6; Cynthia Miller Dec. ¶ 8). In some departments, employees

- 19 -

must tell their manager or a charge nurse before they take a lunch period. (Groehler Dep. Tr. 36-37; Nowakowski Dep. Tr. 48-49; Doornink Dep. Tr. 38-39; Rohloff Dec. ¶ 6). While in other departments, employees coordinate with one another and do not require any supervisor notification before taking their lunch. (Miller Dep. Tr. (Dkt. 50-1) at 44-48; Wideman Dep. Tr. 31 Guthu Dec. ¶ 6; Loughrin Dec. ¶ 6; Blattner Dec. ¶ 6).

Some units require employees to post on an assignment board when they are on their lunch so, for example, providers and others know not to interrupt them, and the employees' name is then crossed off once they have received their lunch. (Crandall Dep. Tr. 51; Vanroy Dec. ¶ 8). In other departments, the charge nurse writes down when an employee takes his or her lunch and confirms whether it was 30 uninterrupted minutes. (Tuchscherer Dec. ¶ 6). When working night shifts in some jobs/departments, there is only one employee working in a given role and that employee will use the lunch cancellation on every shift with no push-back from management. (Rodriguez Dep. Tr. ¶37-38; Bartman Dep. Tr. 36).

These notable distinctions in lunch practices are borne out in the variable frequency across departments in which the lunch cancellation is used. Indeed, Plaintiffs retained Tracy Coenen to prepare and provide an expert report in this matter (the "Coenen Report"). The Coenen Report shows that, as a percentage of all shifts worked, employees in various departments used the lunch cancellation anywhere from 3.1% to 69.7% of the time. (Coenen Report at 9-10). The Neenah ED, where each of the named Plaintiffs worked, had one of the *highest* frequencies of lunch cancellation, with employees in that department using the lunch cancellation on 46.7% of their shifts. *Id.* Where, for example, employees used the lunch cancellation on nearly half of all shifts they worked, an individualized inquiry is needed to establish: 1) whether (or how many) of the remaining shifts employees, in fact, worked; and 2) if

so, how ThedaCare supposedly prevented employees from using the lunch cancellation. These variabilities are at the heart of whether there has been an FLSA violation. They are clearly not part of a common plan or practice and they cannot be determined on a class wide basis.

### F. USE OF WIRELESS HOSPITAL PHONES OR PAGERS VARIES BY DEPARTMENT AND JOB

Another major variation among the Plaintiffs that weighs in favor of decertification is the disparity in the use of communication devices. While employees in some departments carry wireless hospital ("zone") phones and/or pagers, many do not. Further, some employees who are assigned zone phones/pagers do not carry them during their lunch period or hand them off to the person covering their patients. (Loughrin Dec. ¶ 12; Blattner Dec. ¶ 13; Parker Dec. ¶ 9; Tuchscherer Dec. ¶ 7; Turba Dec. ¶ 9; Blattner Dec. ¶ 13; Niquette Dec. ¶ 9). Other employees assigned zone phones might choose to carry them during their lunch, but understand that they are not required to do so. (Groehler Dep. Tr. 47; Vanroy Dec. ¶ 12; Delanty Dec. ¶ 8; Baranczyk Dec. ¶ 10; Guthu Dec. ¶ 8). Patients in some departments are able to contact nurses on the zone phone, while patients in other departments are not provided with zone phone contact information. (Groehler Dep. Tr. 24-25; Nowakowski Dep. Tr. 35-36; Wood Dep. Tr. 23, 36; Crandall Dep. Tr. 28-29).

Moreover, many employees have jobs or work in departments that do not carry zone phones or pagers at all. (Miller Dep. Tr. (Dkt. 50-1) at 41-43; Albers Dep. Tr. (Dkt. 50-3) at 25, 31-32; Rodriguez Dep. Tr. 29-30; Rohloff Dec. ¶ 12; Selwitschka Dec. ¶ 13; Bruechert Dec. ¶ 10; Hall Dec. ¶ 10; Buzzanca Dec. ¶ 9; Michelson Dec. ¶ 13). In some departments, employees in certain jobs carry zone phones but not others. (Auler Dep. Tr. (Dkt. 50-2) at 23-27; Albers Dep. Tr. (Dkt. 50-3) at 31-32; Bartman Dep. Tr. 42-43; Collar Dec. ¶ 10). For those that carried

pagers, the information that typically came to the pager was informative and did not require immediate action. (Olson Dep. Tr. 23-24; Wood Dep. Tr. 23-24; Groehler Dep. Tr. 27-28, 48).

Again, such disparities weigh heavily in favor of decertification. *See e.g. Aguilera v. Waukesha Mem'l Hosp., Inc.*, 2015 WL 3791469 (E.D. Wis. June 18, 2015) (decertifying an FLSA collective action consisting of certified nursing assistants and housekeepers where, among other things, there were disparate practices relating to monitoring phones during lunch periods).

### G.    EMPLOYEES' EXPERIENCES WITH TAKING LUNCH BREAKS VARY

There are also notable variations in the locations where employees take their lunch periods, as well as how they spend their time during the lunch periods, that further weigh in favor of decertification. Many employees stated they choose to eat where they want, and that the likelihood of them being interrupted varies depending on, for example, where they choose to eat (e.g., taking lunch in a break room located in their department versus taking lunch in the cafeteria much further away). (Miller Dep. Tr. 55-67; Wideman Dep. Tr. 36; Doornink Dep. Tr. 26-27; Koch Dec. ¶ 8; Turba Dec. ¶ 7; Cynthia Miller Dec. ¶ 7). In Appleton, three to four Schedulers are assigned per day shift, and they tend to take their 30-minute lunches in groups of two. (Kabat Dec. ¶ 4). When doing so, these Schedulers take their lunch break and put their landline phones on "not ready" (which allows a manager calling about staffing needs to leave a voice message) and typically walk together to the cafeteria, eat and decompress. *Id.* Some employees choose not to take their lunch earlier in their shift, when patient load permits, but then may not have an opportunity to take a lunch later in their shift when patient flow has increased. (Baranczyk Dec. ¶ 12). Opt-in Plaintiff Katherine Doornink testified that she is able to get a 30-minute uninterrupted lunch 50% of the time, which exemplifies the need for individualized inquiry into lunch experiences for each and every Plaintiff. (Doornink Dep. Tr. 48-49). During lunch periods, nurses engage in a variety of activities, including eating, conversation, reading,

television and talking on personal cell phones.  (Miller Dep. Tr. (Dkt. 50-1) at 55-67; Olson Dep. Tr. 36-37; Loughrin Dec. ¶ 7; Cynthia Miller Dec. ¶ 7).

It is also notable that consistent with ThedaCare's written "Breaks and Lunches" policy, many employees stated that they have left the hospital premises, or understood that they could leave the premises, so long as they clocked-out of the time-keeping system.  (Miller Dep. Tr. (Dkt. 50-1) at 66-67; Wideman Dep. Tr. 28-29, 33-34; Rodriguez Dep. Tr. 46-47; Bartman Dep. Tr. 14-15; Doornink Dep. Tr. 28-29; Vanroy Dec. ¶ 13; Collar Dec. ¶ 12; Delanty Dec. ¶ 9; Bruechert Dec. ¶ 11; Hall Dec. ¶ 11; Baranczyk Dec. ¶ 11; Parker Dec. ¶ 10; Guthu Dec. ¶ 11; Buzzanca Dec. ¶ 12; Rohloff Dec. ¶ 13; Loughrin Dec. ¶ 13; Mickelson Dec. ¶ 14; Selwitschka Dec. ¶ 14-15).  However, some employees acknowledged that 30 minutes simply is not long enough, from a practical perspective, to choose to leave the premises.  (Olson Dep. Tr. 43-44).

Employees' experiences, including where they choose to take a lunch and what they choose to do during their lunches, are highly individualized and weigh in favor of decertification.

## III.    PLAINTIFFS CANNOT SHOW THERE WAS A COMMON "AS APPLIED" VIOLATION

This Court has already held that ThedaCare's written lunch policies are lawful.  Plaintiff therefore bears the burden of demonstrating that ThedaCare maintains a common "as applied" practice that deprives employees of their wages, i.e., that there was a "policy-to-violate-the-policy."  *See Saleen v. Waste Mgmt., Inc.*, 2009 WL 1664451, at *5 (D. Minn. June 15, 2009) (lead plaintiff must show that "enforcement of the automatic deduction policy created a policy-to-violate-the-policy."); *Pacheco v. Boar's Head Provisions Co.*, 671 F. Supp. 2d 957, 962 (W.D. Mich. 2009) (same).

Plaintiffs have failed to show that ThedaCare's lawful policies are violated in practice based on some common unlawful scheme.  Instead, the evidence shows that managers have tried

many approaches to create opportunities for employees to take duty-free lunch periods, that managers have been very successful in these efforts, and that employees may use the lunch cancellation if they perform work during their lunch. (*See infra*, Sections II.B. and II.E.). Indeed, the fact that many individuals routinely use the no lunch recapture without discouragement by their managers wholly undermines the possibility that there can be a common "as applied" policy. (*See id.; see also* the Coenen Report). There is not a shred of evidence that ThedaCare has adopted a common practice to not pay employees who work during their lunch periods. *See Saleen*, 2009 WL 1664451, at *5-6 (denying conditional certification where employees failed to show a corporate decision not to follow its formal policy of paying for time worked during meal breaks).

Ultimately, determining why employees may have worked during a lunch break and failed to use ThedaCare's lunch cancellation policy is a highly individualized inquiry that will require a fact intensive determination that is not appropriate for class certification. A collective action is a procedural device aimed at facilitating, in an efficient and cost effective way, the adjudication of numerous claims in one action. "[T]he mere fact that violations [allegedly] occurred cannot be enough to establish similarity." *Barron v. Henry Cnty. Sch. Sys.*, 242 F. Supp. 2d 1096, 1104 (M.D. Ala. 2003). To allow a matter to proceed on a collective basis simply because more than one employee claims a violation of the law by the same employer -- in the absence of a common policy or practice -- is not proper. *Id*. Here, the record evidence and the relevant decisional authority compel decertification as there is simply no evidence that Defendants maintained a de facto policy to not pay for lunch periods worked and recorded.

QB\45625125.3

## IV. THEDACARE'S INDIVIDUALIZED DEFENSES REQUIRE DECERTIFICATION

When the employer's defenses are highly individual to each opt-in plaintiff, "this factor weighs heavily against proceeding . . . as [an FLSA] collective action." *Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 467 (S.D.N.Y. 2011). "Individualized defenses prevent efficient representative proceedings and courts have not hesitated to grant decertification on that basis." *Prise v. Alderwoods Grp., Inc.*, 817 F. Supp. 2d 651, 671 (W.D. Pa. 2011). Decertification is necessary here because resolution of multiple individual defenses for each Plaintiff's and opt-in's claims is required.

To prove liability, named Plaintiffs bear the burden of establishing that they and the opt-ins in fact "worked" during their lunch periods under the "predominant benefit" test. *Alexander v. City of Chicago*, 994 F.3d 333, 337 (7th Cir. 1993); *Kellar v. Summit Seating, Inc.*, 664 F.3d 169, 173, 175 (7th Cir. 2011). Multiple factors are used to determine whether an employee's lunch period is spent predominantly for the benefit of the employer or employee, including limitations/restrictions or the lack thereof on lunch periods, the frequency with which employees took uninterrupted lunch periods, the frequency of and reasons for interruptions, and whether employees resumed the lunch periods after interruptions. *Haviland v. Catholic Health Initiatives-Iowa*, 729 F. Supp. 2d 1038, 1061 (S.D. Iowa 2010). In other words, interruptions, in and of themselves, do not automatically make a lunch period compensable.

Whether ThedaCare had knowledge of employee work during lunch periods is yet another determination that would need to be made for each Plaintiff. If named Plaintiffs and opt-ins can prove they engaged in compensable work, they then must show that their managers or supervisors had actual or constructive knowledge that each of them was working during the lunch period without pay. 29 C.F.R. § 785.11; *Kellar*, 664 F.3d at 177. Evidence bearing on this

- 25 -

inquiry is unavoidably individualized for each named Plaintiff and opt-in and would call for the testimony of hundreds, if not thousands, of employees. *See, e.g.*, *Kuznyetsov*, 2011 WL 6372852, at *6.

ThedaCare may also challenge each Plaintiffs' allegations through a number of other individualized defenses, such as: 1) whether management knew that Plaintiffs were working but not recording their time; 2) whether the overtime claimed by these individuals is subject to the FLSA's *de minimis* exception; 3) whether an individual unreasonably relied upon comments by co-workers; and 4) whether the alleged unpaid time, if counted as working hours, would even result in the need to pay overtime.

These variant inquiries eliminate the ability to establish liability on a class-wide basis. Instead, in circumstances where adjudication of liability as to one Plaintiff will not have a corresponding effect on determining liability to other individuals, much less the entire class, decertification is appropriate. *See Camilotes*, 286 F.R.D at 352-53 (individualized nature of defenses militated against allowing nurses' claims to proceed as a collective action).

## V. FAIRNESS AND PROCEDURAL CONSIDERATIONS REQUIRE DECERTIFICATION

The third "similarly situated" factor requires that any collective action be managed in such a fashion that no party is unduly prejudiced. *Dekeyser*, 314 F.R.D. at 456. Here, a trial would have "enormous manageability" and fairness problems because Plaintiffs cannot show they were affected by a common plan or policy. *Johnson v. TGF Precision Haircutters, Inc.*, 2005 WL 1994286, at *7 (S.D. Tex. Aug. 17, 2005). Additionally, as demonstrated above, Plaintiffs are not similarly situated, and the issues in this case are highly individualized. Courts that have considered similar claims of and defenses to unpaid lunch break claims have determined that such claims are far too individualized and cannot be collectively managed at

trial. *Kuznyetsov*, 2011 WL 6372852, at \*7-8; *Frye*, 2010 WL 3862591, at \*10; *White v. Baptist Mem'l Health Care Corp. Hosp.*, 2011 WL 1883959, at \*14; *Camesi*, 2011 WL 6372873, at \*9; *Reed*, 266 F.R.D. at 462-63; *Zivali*, 784 F. Supp. 2d at 468-69.

Here, any benefit derived from proceeding collectively is vastly outweighed by countless factual inquiries that require individualized attention. *See Frye*, 2010 WL3862591, at \*9 (finding no waste of judicial resources where disparate factual and employment setting predominated). Additionally, as demonstrated above, Plaintiffs are not similarly situated, and the issues in the case are highly individualized. It would be fundamentally unfair, without proof of a uniformly applied policy and in light of the disparate theories, factual allegations and individualized defenses, to allow a jury to find that the experiences of a few individuals are indicative of how ThedaCare treated the remainder of the opt-in class. Such an exercise would, in essence, ask the jury to accept facts as true where competent evidence holds otherwise (or where there is no competent evidence at all).

Furthermore, the record shows that named Plaintiffs' experiences are not proxies for the opt-ins. As a result, the Court should not allow the case to proceed on a representative nature. No testimony from any named Plaintiff or opt-in can adequately address the varied lunch period policies and practices and experiences across the entire Hospital. *Johnson v. Big Lots Stores*, 561 F. Supp. 2d 567, 574 (E.D. La. 2008) ("[T]he more dissimilar plaintiffs are and the individuated [defendant's] defenses are, the greater doubts there are about the fairness of a ruling on the merits-for either side-that is reached on the basis of purported representative evidence").

## CONCLUSION

For the foregoing reasons, ThedaCare asks this Court to decertify the conditional FLSA collective action and to dismiss the opt-in Plaintiffs. *See Botero v. Commonwealth Limousine Serv. Inc.*, 302 F.R.D. 285, 286 (D. Mass. 2014) (FLSA opt-in plaintiffs are no longer part of the

- 27 -

case where conditional certification motion was denied); *Prescott v. Prudential Ins. Co.*, 729

F.Supp.2d 357, 370 (D. Me. 2010) (noting that if an FLSA conditionally certified class was

subsequently decertified, any "opt-in" plaintiffs would be dismissed without prejudice).


Dated:  May 31, 2017                            QUARLES & BRADY LLP


                                        *s/ Christopher L. Nickels*
                                        Sean M. Scullen, State Bar No. 1034221
                                        sean.scullen@quarles.com
                                        Christopher L. Nickels, State Bar No. 1083481
                                        christopher.nickels@quarles.com
                                        411 East Wisconsin Avenue, Suite 2350
                                        Milwaukee, WI  53202-4426
                                        414.277.5000

                                        Attorneys for Defendant, ThedaCare, Inc.

- 28 -