UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

JUELAINE MILLER, KATHLEEN ALBERS,
AND LINDA AULER,

individually and on behalf
of all others similarly situated,

        Plaintiffs,

     v.                          Case No. 15-CV-00506

THEDACARE, INC.

        Defendant.

---

## THEDACARE'S BRIEF IN RESPONSE TO
## PLAINTIFFS' MOTION FOR FINAL CLASS CERTIFICATION

---

## INTRODUCTION

ThedaCare demonstrated in its brief in support of its Motion to Decertify the Conditional

FLSA Collective Action (Dkt. 113) that the FLSA class should be decertified because the named

Plaintiffs are not similarly situated to the opt-ins.  As ThedaCare noted, every court to address

this question in the wave of lunch period class actions filed against hospital systems has

decertified the FLSA class.  Those courts found that the varied work environments, procedures

and lunch period experiences of employees in multiple hospitals, departments and shifts with a

host of different managers, supervisors and charge nurses are too disparate to satisfy the

similarly situated standard for class treatment under the FLSA.

The standard for Federal Civil Rule of Procedure 23 is just as stringent as the rigorous

standard for second stage FLSA certification.  Moreover, the net Plaintiffs cast for their Rule 23

class would capture literally thousands more nurses, staff employees, departments and meal

period practices than their FLSA opt-in group. The wide variability renders it impossible for Plaintiffs to satisfy the requirements for Rule 23 certification, and the courts agree.

As more fully explained below, Plaintiffs have offered no proof to support their broad allegations of "institutional pressure" to unlawfully suppress use of the lunch cancellation, which allegations the record evidence wholly contradicts. Plaintiffs have not met their burden to present significant proof that their Wisconsin claims meet all of the requirements for Rule 23 certification.

## RULE 23 CERTIFICATION STANDARD

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). The party seeking class certification must prove -- not merely plead or allege -- that all of the Rule 23 prerequisites have been satisfied. *Dukes*, 564 U.S. at 350; *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982) ("[A]ctual, not presumed, conformance with Rule 23(a) remains . . . indispensable."). The trial court may certify a class only after "rigorous analysis" of Rule 23's prerequisites. *Dukes*, 564 U.S. at 350-51.

Frequently, this "rigorous analysis" will entail some overlap with the merits of the Plaintiffs' underlying claim because "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Dukes*, 564 U.S. at 351; *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 376-77 (7th Cir. 2015) (merits questions may be considered to the extent they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied). The court "may not simply assume the truth of the matters as asserted by the plaintiff." *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 811 (7th Cir. 2012); *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010) (the court "must make the necessary factual and legal inquiries and decide all relevant contested issues

- 2 -

prior to certification."). It is the Plaintiffs' burden to demonstrate that certification is proper by a preponderance of the evidence. *Messner*, 669 F.3d at 811.

For this case to proceed as a class action under Rule 23, Plaintiffs must establish by a preponderance of the evidence that: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy of representation). *Bell*, 800 F.3d at 373.

In addition to meeting the Rule 23(a) requirements, Plaintiffs must satisfy one of the four conditions in Rule 23(b). In this case, Plaintiffs seek certification under Rule 23(b)(3), which allows for class certification when "questions of law or fact common to the class members predominate over any questions affecting individual members" and when a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).[1]

## ARGUMENT

Plaintiffs have failed to meet their burden of proving commonality, typicality, adequacy of the named Plaintiffs, as well as predominance and/or superiority. Plaintiffs' motion for certification rests on record misrepresentations, unsupported speculation, baseless conclusory allegations, and wholesale avoidance of the actual record facts where the record cuts against their arguments in support of certification. ThedaCare addresses Plaintiffs' factual misrepresentations throughout this brief, and in addition, Exhibit 1 to the Third Declaration of Christopher Nickels

---

[1] In hybrid wage-hour cases like the instant matter, the Seventh Circuit has indicated in dicta that the standards for certification under the FLSA and Rule 23 should be treated as the same. *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 771–72 (7th Cir.2013); *see also*, *Dekeyser v. Thyssenkrupp Waupaca, Inc.*, 314 F.R.D. 449, 456 (E.D. Wis. 2016), *aff'd* No. 16-2159, 2017 WL 2676765 at *1 (7th Cir. June 22, 2017).

- 3 -

is a chart that further highlights the significant misrepresentations that Plaintiffs have made in connection with the testimony of ThedaCare's managers.

# I. PLAINTIFFS CANNOT SATISFY THE COMMONALITY REQUIREMENT

Rule 23(a)(2) requires the Plaintiffs to show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Plaintiffs must prove that the class members "have suffered the same injury" and that their claims depend upon a common contention that is capable of class-wide resolution. *Dukes*, 564 U.S. at 350 (stating whether this common contention is true or false will resolve the plaintiff's claims in "one stroke"). As the Supreme Court has noted, any competent plaintiff can craft common questions; what matters to class certification "is not the raising of common 'questions' -- even in droves -- but, rather the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350. "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id*.

Plaintiffs' argue that commonality is satisfied where, allegedly: 1) top-down pressure on managers to meet performance metrics results in a common practice whereby all managers have decided to violate ThedaCare's otherwise lawful lunch policies by improperly discouraging and denying employees' use of the lunch cancellation feature, and 2) ThedaCare requires or permits all employees to work during all lunch periods. Plaintiffs' arguments fail on both the facts and the law.

First, ThedaCare has no top-down policy of pressuring managers to commit unlawful wage violations. Plaintiffs advance this theory despite a lack of any credible evidence supporting it and in complete denial of the undisputed record evidence (confirmed by Plaintiff's own expert) that employees use the lunch cancellation feature all of the time. As discussed in detail below, no manager testified to experiencing pressure from upper-management to violate

- 4 -

ThedaCare's lawful lunch break policies as speculated by Plaintiffs, and Plaintiffs have no valid evidence to support their contention. (*See* Sections I.A. and I.B., *infra*).

Second, ThedaCare also has no policy that requires employees to remain "on duty" during their lunch period. Some nurses may choose to eat their lunch close to their home department, or choose to keep their hospital-issued zone phone with them during lunch. The overwhelming record evidence, however, establishes that nurses and other employees in the proposed class are allowed to eat where they want, choose to carry or not carry a phone if they want, leave the premises if they want, are not required to remain available and may otherwise enjoy their 30-minute lunch for their benefit. (*See S*ection I.C., *infra*).

Significantly -- and fatal to Plaintiffs' claim -- is the fact that lunch period practices are not uniformly implemented on a system-wide basis. Indeed, the record establishes that department managers formulate lunch practices that work best for the differing work environments, unique characteristics and patient/business needs of their individual departments. (*See* ThedaCare's FLSA Decertification Brief, Dkt. 113 ("FLSA Decertification Brief") at 10-15, 18-21). The record also establishes that departments implement a variety of different mechanisms, such as buddy systems, phone handoffs, relief shifts, and lunch tracking tools among other things, for relieving nurses and other employees from duty during lunch periods and for recording time worked during lunch periods. *Id*. Moreover, the record establishes that nurses and other employees have highly individualized experiences in terms of patient care issues, personal preferences, group interpersonal dynamics, how they interpreted conversations with managers about the appropriate use of the lunch cancellation, and a variety of other issues that factor into each employee's lunch practices. (FLSA Decertification Brief at 11-12, 17-18). These individualized determinations significantly impact a fact finder's liability analysis and

preclude a finding of commonality. *See Wong v. AT&T Mobility Servs. LLC*, No. CV 10-8869, 2011 U.S. Dist. LEXIS 125988 at *8, *24 n.16 (C.D. Cal. Oct. 20, 2011) (notwithstanding plaintiffs' attempt to show commonality through defendant's "centralized control [and] policies" and "developed standardized processes" across its stores, "it is the *uncommon* answers . . . to the meal- and rest-break availability that will be 'apt to drive the resolution of the litigation.' ") (emphasis in original).

### A. PLAINTIFFS' ALLEGATION OF TOP-DOWN PRESSURE ON MID-LEVEL MANAGERS TO SUPPRESS LUNCH CANCELLATIONS LACKS ANY BASIS IN FACT

The Court has already held 1) that ThedaCare's Breaks and Lunches Policy and its Pay Policy are lawful on their face, 2) that these policies do not require employees to work through their lunch, and 3) they provide a mechanism -- the "lunch cancellation" feature -- which allows employees to be paid if they actually work during their lunch period. (*See* Decision and Order Granting Conditional Certification In Part, Dkt. 60 ("*ThedaCare I*") at 7-9; *see also* FLSA Decertification Brief at 4-6). The Court noted that Plaintiffs "face[] a difficult obstacle" and "a number of hurdles" in establishing that ThedaCare's lawful policies are applied in a common manner that requires employees to work during their lunch periods and which does not allow employees to avail themselves of ThedaCare's lunch cancellation procedure. (*ThedaCare I* at 14-17).

Faced with this challenge, Plaintiffs now premise their case on the baseless claim that there is "institutional pressure" from ThedaCare's upper management to unlawfully suppress use of the lunch cancellation. There is, however, no credible evidence for this theory. Indeed, Plaintiffs took the depositions of 14 ThedaCare managers, and none of them testified to experiencing pressure to unlawfully suppress lunch cancellations. As for upper management, Plaintiffs took no discovery of ThedaCare's upper management at all, and the declarations from

- 6 -

both the foregoing managers who were deposed and the relevant members of upper management completely refute such claims. Plaintiffs' "institutional pressure" theory is made up out of whole cloth, and is entirely based on unsupported speculation and guesswork. As a result, Plaintiffs have utterly failed to meet their burden of establishing facts, by a preponderance of the evidence, that support and meet Rule 23's rigorous requirements.

In support of their contention that there is broad based institutional pressure to suppress use of the lunch cancellation, Plaintiffs allege that: 1) managers are given department-level budgets with established FTE for their employees,[2] 2) routine use of the lunch cancellation causes employees to be paid for more hours than their FTE, which exceeds budget, 3) department managers who exceed budget are placed on, or threatened to be placed on, performance improvement plans because they are not meeting productivity targets set by upper management, and 4) managers universally translate ThedaCare's productivity targets as a tacit directive by upper management to allow employees to work during their lunches and to discourage the use of lunch cancellations. (Plaintiffs' Brief In Support of Final Certification, Dkt. 129 ("Plaintiffs' Certification Brief") at 9-10, 28-29). This is all done because, as the Plaintiffs allege in conclusory fashion, "managers are only concerned with meeting FTE and productivity goals." (Plaintiffs' Certification Brief at 10). **Each allegation of Plaintiffs' theory is factually incorrect and unsupported**.

First, ThedaCare does not prepare department-level budgets. Rather, ThedaCare forecasts its anticipated operating costs on a system-wide basis, which is not broken down by

---

[2] FTE (Full Time Equivalent) represents the hours worked by one employee on a full-time basis. An employee who is scheduled to work 40 hours per week is 1.0 FTE. An employee who is scheduled to work 24 hours per week is 0.6 FTE.

department. (Dunham Dec. ¶ 8; McGinnis Dec. ¶ 3).[3] Forecasted costs are based on historical costs, which include the actual wages paid to employees including wages paid to employees who use the lunch cancellation. (Dunham Dec. ¶ 8; McGinnis Dec. ¶ 4). Thus, when ThedaCare forecasts its upcoming operating costs, it does so based on the general expectation that employees will continue to use the lunch cancellation feature at rates that are consistent with historical practices.

Second, in recent years, ThedaCare has targeted a system-wide year-over-year increase in productivity of 3%. (Dunham Dec. ¶ 9). This is a system-wide target, not a department-level requirement. (Dunham Dec. ¶ 9; McGinnis Dec. ¶ 5). In simple terms, a department's "productivity" is the ratio of employee working hours over patient volume. (Dunham Dec. ¶ 9). Thus, an employee's FTE is largely a hiring tool (i.e., whether the employee will be hired to work part-time or full-time). FTE is not, as Plaintiffs' incorrectly presume, tied to ThedaCare's productivity targets. (Dunham Dec. ¶ 12).

Further, employee productivity can be impacted in many ways. If employees work the same number of hours and handle more patients, productivity goes up. (Dunham Dec. ¶ 11). If patient volume decreases and employees work the same number of hours, productivity goes down. (*Id.*) While increased use of the lunch cancellation will increase employee work hours, patient flow may also increase as a result, resulting in no net change in productivity. (*Id.*) Thus, there is no fixed relationship between lunch cancellations and productivity, such that increased use of the lunch cancellation necessarily means lower productivity. (*Id.*) More significantly, ThedaCare works with departments to help their employees become more productive in ways completely unrelated to lunch practices, such as: 1) creating efficiencies in documentation by

---

[3] ThedaCare includes an index at the end of this brief identifying the name and role of all record citations in ThedaCare's briefing together with the docket number where that information has been filed.

QB\46582003.1

utilizing electronic records, 2) eliminating redundant or repetitive employee tasks, 3) physically moving equipment and supplies closer to the patient rooms to reduce delays and to create improved flow throughout the department, 4) establishing team care conferences so that an entire patient team works in unison, which reduces individual calls to physicians, 5) automating processes via improved technology, 6) relieving employees when patient census is low, and 7) reassigning duties, where appropriate, to less expensive employees. (Dunham Dec. ¶ 9; McGinnis Dec. ¶ 6).

As for Plaintiffs' allegation that "managers are only concerned with meeting FTE and productivity goals," each department varies widely in terms of its year-over-year change in productivity. (Dunham Dec. ¶ 10; McGinnis Dec. ¶ 7). Some departments have negative productivity year-over-year, some departments have flat productivity, and some show increased productivity. (*Id.*). Contrary to Plaintiffs' unsupported speculation, ThedaCare management does not discipline managers for not meeting productivity goals. (Dunham Dec. ¶ 7; McGinnis Dec. ¶ 7; Schaffmeyer ¶ 14). No department manager testified to having faced negative consequences for failing to meet a productivity target. (Dunham Dec. ¶ 10; McGinnis Dec. ¶ 7; Schaffmeyer ¶ 14; Augustine Dec. ¶ 9; Tripp Dec. ¶ 9, Crandall Dec. ¶ 9; Thelen Dec. ¶ 9; Drath Dec. ¶ 10; Fredriksen Dec. ¶ 10; McNamara Dec. ¶ 9; Bardon Dec. ¶ 9; Reed ¶ 9; Lubinsky ¶ 10; Schoenauer ¶ 10; Martin Dec. ¶ 9; Knox ¶ 10; Olson ¶ 10). Similarly, no manager has perceived productivity goals as a directive to unlawfully suppress the use of the lunch cancellation. (Dunham Dec. ¶ 6; McGinnis Dec. ¶ 8; Augustine Dec. ¶ 9; Tripp Dec. ¶ 9, Crandall Dec. ¶ 9; Thelen Dec. ¶ 9; Drath Dec. ¶ 10; Fredriksen Dec. ¶ 10; McNamara Dec. ¶ 9; Bardon Dec. ¶ 9; Reed ¶ 9; Lubinsky ¶ 10; Schoenauer ¶ 10; Martin Dec. ¶ 9; Knox ¶ 10; Olson ¶ 10).

Of course, ThedaCare does have a legitimate interest in controlling labor costs. (Dunham Dec. ¶ 8). Managers also want employees, when possible, to take healthy, 30-minute lunch periods away from their work so that employees can rest, eat, and continue to provide high-level care to patients. (Dunham Dec. ¶ 9; Schaffmeyer ¶ 3; Augustine Dec. ¶ 3; Tripp Dec. ¶ 3, Crandall Dec. ¶ 3; Thelen Dec. ¶ 3; Drath Dec. ¶ 3; Fredriksen Dec. ¶ 3; McNamara Dec. ¶ 3; Bardon Dec. ¶ 3; Reed ¶ 3; Lubinsky ¶ 3; Schoenauer ¶ 3; Martin Dec. ¶ 3; Knox ¶ 3, Olson ¶ 3). The challenge that several managers have faced is how to convince nurses and other staff employees to work less by taking lunches. (Schaffmeyer ¶ 6). Managers have responded by developing their own individual approaches, often with input from employees themselves, to create ways to help employees take their lunches depending on the varied and individualized nature of the different departments. (Dunham Dec. ¶ 5; Schaffmeyer ¶ 11).

No manager has been disciplined or counseled for their department's use of the lunch cancellation. (Dunham ¶ 7; Schaffmeyer ¶ 14; Augustine Dec. ¶ 9; Tripp Dec. ¶ 9, Crandall Dec. ¶ 9; Thelen Dec. ¶ 9; Drath Dec. ¶ 10; Fredriksen Dec. ¶ 10; McNamara Dec. ¶ 9; Bardon Dec. ¶ 9; Reed ¶ 9; Lubinsky ¶ 10; Schoenauer ¶ 10; Martin Dec. ¶ 9; Knox ¶ 10; Olson ¶ 10). Plaintiffs' have provided no evidence that ThedaCare's managers, supervisors or charge nurses -- who are responsible for carrying out their department's localized lunch practices -- uniformly interpret any directive by upper management to cause employees to work through lunch and to not use the lunch cancellation. Further, Plaintiffs simply ignore the fact that managers routinely encourage employees to use the lunch cancellation, and that employees regularly use the lunch cancellation. (*See* Tracy L. Coenen's Forensic Expert Report, Dkt. 122 ("Coenen Report") at 8-10, Augustine Dec. ¶ 4; Tripp Dec. ¶ 4, Crandall Dec. ¶ 4; Thelen Dec. ¶ 4; Drath Dec. ¶¶ 4, 9;

QB\46582003.1

Fredriksen Dec. ¶¶ 4, 9; McNamara Dec. ¶ 4; Bardon Dec. ¶ 4; Reed ¶ 4; Lubinsky ¶ 4; Schoenauer ¶¶ 4, 9; Martin Dec. ¶ 4; Knox ¶¶ 4, 9; Olson ¶¶ 4, 9).

Under Rule 23, Plaintiffs cannot blithely assert unfounded speculation, which is flatly contradicted by the record, as a basis for a successful certification motion. *Messner*, 669 F.3d at 811 ("On issues affecting class certification . . . a court may not simply assume the truth of the matters as asserted by the plaintiff."); *Fetrow-Fix v. Harrah's Entm't, Inc.*, No. 2:10-cv-00560-RLH-PAL, 2011 WL 6938594 at *8 (D. Nev. Dec. 30, 2011) (at final certification the court "will not consider the evidence in the record supporting the [p]laintiffs' claims they are similarly situated to the putative class, while ignoring discovery suggesting they are not."). Plaintiffs' cornerstone argument that there is "institutional pressure" to unlawfully suppress use of the lunch cancellation is a fallacy. Unsupported speculation, which is contradicted by the record, cannot support a basis for commonality under Rule 23.

### B.     PLAINTIFFS' "INSTITUTIONAL PRESSURE" CLAIM IS NOT CAPABLE OF CLASS-WIDE RESOLUTION

Even assuming that ThedaCare was overzealous in controlling labor costs, there is no commonality vis-à-vis lunch period practices because that necessarily depends on how each manager individually interpreted and implemented any such pressure. Plaintiffs ask the Court to look to the Seventh Circuit's decision in *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360 (7th Cir. 2015), in deciding whether to certify this case, but the facts in *Bell* are completely distinguishable.

In *Bell*, members of the bank's upper management admitted to purposely not paying overtime and the *Bell* plaintiffs introduced evidence that high-level managers expressly stated that the bank maintained a policy against paying for overtime work. *Id.* at 365, 375. The *Bell* plaintiffs also introduced evidence that the bank was aware, via an internal investigation, that

- 11 -

managers uniformly did not pay for work performed outside of the normal, forty hour week. *Id.* at 366-370.

The *Bell* facts are entirely different from ThedaCare, where the record shows that ThedaCare pays employees who use the lunch cancellation. Indeed, of the 623,508 work shifts analyzed by Plaintiffs' expert, ThedaCare employees used the lunch cancellation 71,187 times. (Coenen Report at 8-10). Unlike the managers in *Bell* who stated that they were told to not pay for overtime, ThedaCare managers have developed their own, department-specific methods for finding ways for employees <u>to take</u> a bona fide lunch; and, if they cannot, employees must inform ThedaCare by using the lunch cancellation feature. (FLSA Decertification Brief at 10-15, 18-21). As noted in Section I.A., *supra*, no ThedaCare manager testified to having been disciplined by upper management for their employees' use of the lunch cancellation. (Augustine Dec. ¶ 9; Tripp Dec. ¶ 9, Crandall Dec. ¶ 9; Thelen Dec. ¶ 9; Drath Dec. ¶ 10; Fredriksen Dec. ¶ 10; McNamara Dec. ¶ 9; Bardon Dec. ¶ 9; Reed ¶ 9; Lubinsky ¶ 10; Schoenauer ¶ 10; Martin Dec. ¶ 9; Knox ¶ 10; Olson ¶ 10).

Even if some managers interpreted ThedaCare's legitimate efforts to control labor costs as a directive to suppress lunch cancellation, there is no common contention because it necessarily depends on how each manager interpreted any such alleged pressure to suppress lunch cancellations. The *Bell* court itself noted that "[c]ases in which low-level managers use their given discretion to make individual decisions without guidance from an overarching company policy do not satisfy commonality because the evidence varies from plaintiff to plaintiff." *Bell*, 800 F.3d at 375 (citing *Bolden v. Walsh Construction Co.*, 688 F.3d 839, 896 (7th Cir. 2012). To provide just one example, Neenah Emergency Department manager Jen Fredriksen surely did not feel pressure to suppress the lunch cancellation feature for employees

- 12 -

in her department, <u>who used the lunch cancellation on 46.7% of all shifts worked</u>. (Coenen Report at 9). Courts routinely deny similar requests for class certification based on allegations of top-down control over labor costs. *See Epps v. Oak St. Mortg., LLC*, No. 04-cv-46-OC-10, 2006 WL 1460273, at *7 (M.D. Fla. May 22, 2006) (decertifying collective action where, even assuming defendant had a corporate policy of discouraging overtime, proof of violation would depend on how and whether each manager implemented the policy as to each plaintiff); *Eng-Hatcher v. Sprint Nextel Corp.*, No. 07-cv-7350, 2009 WL 7311383, at *3 (S.D.N.Y. Nov. 13, 2009) (plaintiff's claims that Sprint's alleged strict control over its labor costs operated to suppress overtime not supported by the record).

*Bell* is also distinguishable based on the sheer size and scope of the class. Specifically, *Bell* involved 250 bank employees who all worked in office-like work environments, and who were not paid for off-the-clock work pursuant to an alleged corporate policy not to pay overtime. *Bell*, 800 F.3d at 365, 378. The proposed class here involves more than 2,400 hospital employees who work in a variety of different jobs, in multiple hospital settings and in different departments, where the condition and volume of patients can change unpredictably (at least with regard to those departments that involve direct patient care, which not all do), where the implementation of ThedaCare's lawful lunch policy is delegated to dozens of individual department managers, supervisors and charge nurses, where lunch practices are carried out in a variety of ways often requiring employees to coordinate with one another to take lunch periods, and where the employees were <u>actually paid</u> when they used the lunch cancellation.[4] Accordingly, Plaintiffs' reliance on *Bell* is misplaced and Plaintiffs' supposed institutional pressure contention does not support class certification.

---

[4] ThedaCare discussed the myriad individualized factors that make this case improper for class treatment in its FLSA Decertification Brief. (FLSA Decertification Brief at 9-26).

- 13 -

### C. PLAINTIFFS' ALLEGATION THAT THEDACARE REQUIRES EMPLOYEES TO UNIFORMLY REMAIN "ON DUTY" DURING LUNCH PERIODS IS NOT CAPABLE OF CLASS-WIDE RESOLUTION

Plaintiffs' propose that whether ThedaCare requires employees to remain "on-duty" and available to return to work during lunch periods is a common question. That contention similarly fails as both a matter of fact and the law.

Here, the alleged "injury" is whether, on every shift and in every department that is part of the massive proposed class, nurses and other employees were, in fact, "required to perform any duties, whether active or inactive, while eating." See 29 C.F.R. § 785.19(a); Wis. Admin. Code § DWD 272.12(2)(c)(2). Put another way, whether Plaintiffs, under either Wisconsin or federal law, "worked" during an unpaid lunch period requires determining whether they engaged in "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer." *See Musch v. Domtar Indus., Inc.*, 587 F.3d 857, 859 (7th Cir. 2009) (*citing Jonites v. Exelon Corp.*, 522 F.3d 721, 726 (7th Cir.2008)); *United Food & Commercial Workers Union, Local 1473 v. Hormel Foods Corp.*, 2016 WI 13, ¶¶ 38, 81-84 (2016) (applying same standard).

As the Seventh Circuit has explained, resolving this issue "require[s] [a] sufficient development of the facts to enable a capable application of the appropriate predominant benefit standard." *Alexander v. City of Chicago*, 994 F.2d 333, 339 (7th Cir. 1993); *see also Leahy v. City of Chicago*, 96 F.3d 228, 232 (7th Cir. 1996) ("The officers want just such a ['one-shot'] solution: because some officers on some days miss all or part of their meal periods, the plaintiffs want all meal periods to be compensable time. That would brook a result we cannot sanction, where officers might be paid for doing nothing more than eating during their meal periods."); *Haviland v. Catholic Health Initiatives-Iowa*, 729 F. Supp. 2d 1038, 1063 (S.D. Iowa 2010) ("[I]n determining whether the restrictions on the [plaintiffs]' meal break time makes the time

- 14 -

spent predominantly for Plaintiffs' benefit or for [defendant]'s benefit, the Court must look not just at what Plaintiffs *could not do* during their lunch breaks; it must also look at what Plaintiffs *could*, and *in fact did*, do during their lunch breaks.") (emphasis in original).[5]

In support of their broad "on-duty" claim, Plaintiffs re-argue that employees are required to "remain available to respond and to return to work before the employee completes his or her lunch" based on language from ThedaCare's Breaks and Lunches Policy. (Plaintiffs' Certification Brief at 32-34). However, that stale (and baseless) argument has already been dismissed by the Court. (*ThedaCare I* at 7-9). Specifically, the Court has already properly noted that "nothing about ThedaCare's [policies] as written requires employees to continue in their responsibilities during their unpaid lunch breaks." (*ThedaCare I* at 9).

Plaintiffs also allege there is common proof that managers expect employees to be available to respond, and to actually respond, to patient demands and departmental needs during lunch periods. (Plaintiffs' Certification Brief at 32-33). For these same reasons, Plaintiffs allege that employees were not able to leave the premises during lunch periods. (Plaintiffs' Certification Brief at 33-34). Again, Plaintiffs' allegation lacks valid record support and is legally not capable of class-wide resolution.

First, there simply is no common policy requiring employees to remain available during their lunch, or restricting employees to eat in a certain location.[6] Lunch practices and

---

[5] Plaintiffs mis-cite the applicable law where they cite to Wis. Admin. Code § DWD 272.12(2)(b)(3), which states that "[a]n employee is not 'off duty' unless he or she is completely relieved from duty and 'definitely told in advance that they may leave the job and that they will not have to commence work until a definitely specified hour has arrived.'" Section 272.12(2)(b)(3) of the Wisconsin Department of Workforce Development's ("DWD") administrative regulations relates to waiting time, not rest and meal period time. It is the predominate benefit test that determines whether an employee is "working" during his or her lunch period. *See Hormel*, 2016 WI 13, ¶¶ 38, 81-84.

[6] The only material difference between Wisconsin wage-hour law and the FLSA as it relates to unpaid meal periods is that the FLSA allows employers to prohibit employees from leaving the premise, while Wisconsin does not. *Compare* 29 C.F.R. § 785.19(b) *with* Wis. Admin. §§ DWD 272.12(2)(c)(2) and DWD 274.02(3). This distinction is not relevant in this case because no ThedaCare policy prohibits employees from leaving the premises, and many

expectations are delegated to individual managers, who have created their own, department-specific methods for finding ways for employees to take bona fide lunch periods. (FLSA Decertification Brief at 12-14, 19-20). This supervisor discretion -- particularly when spread across multiple departments and locations -- precludes Rule 23(a)(2) commonality under *Dukes* and its progeny. *See, e.g., Bolden*, 688 F.3d at 893 ("[W]hen multiple managers exercise independent discretion, conditions at different stores (or sites) do not present a common question.").

Indeed, the record evidence establishes that many employees routinely take bona fide lunch periods, including that employees are able to eat where they want, whether that is in the department break room, the cafeteria (to reduce the likelihood of interruption) or off premises. (Miller Dep. Tr. 55-67; Wideman Dep. Tr. 36; Doornink Dep. Tr. 26-27; Koch Dec. ¶ 8; Turba Dec. ¶ 7; Cynthia Miller Dec. ¶ 7; Kabat Dec. ¶ 4). The record also establishes that, during lunch periods, nurses and other clinical employees engage in a variety of activities, including eating, conversation, reading, watching television and talking on personal cell phones. (Miller Dep. Tr. 55-67; Olson Dep. Tr. 36-37; Loughrin Dec. ¶ 7; Cynthia Miller Dec. ¶ 7). Notably, consistent with ThedaCare's written Breaks and Lunches Policy, many employees stated that they have left the hospital premises, or understood that they could leave the premises, so long as they clocked-out of the time-keeping system. (Miller Dep. Tr. 66-67; Wideman Dep. Tr. 28-29, 33-34; Rodriguez Dep. Tr. 46-47; Bartman Dep. Tr. 14-15; Doornink Dep. Tr. 28-29; Vanroy Dec. ¶ 13; Collar Dec. ¶ 12; Delanty Dec. ¶ 9; Bruechert Dec. ¶ 11; Hall Dec. ¶ 11; Baranczyk Dec. ¶ 11; Parker Dec. ¶ 10; Guthu Dec. ¶ 11; Buzzanca Dec. ¶ 12; Rohloff Dec. ¶ 13; Loughrin Dec. ¶ 13; Mickelson Dec. ¶ 14; Selwitschka Dec. ¶ 14-15). There simply is no common policy,

_____

employees testified that they have left the premises during their lunch periods. (FLSA Decertification Brief at 22-23).

QB\46582003.1

across the entire ThedaCare organization, that deprives employees of the opportunity to relax and eat food during their lunch period.  Thus, there is no basis to certify the proposed class.  *See Zavala v. Wal-Mart Stores, Inc.*, No. 03-cv-05309, 2010 WL 2652510, at *3 (D.N.J. June 25, 2010) *aff'd sub nom. Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527 (3d Cir. 2012) ("Allegations of overarching policies are generally insufficient to establish that individual workers are similarly situated.").

As already discussed in detail in ThedaCare's FLSA Decertification Brief at 9-23, there are significant variations in localized lunch practices.  Examples of the various mechanisms that department managers have utilized to relieve employees from duty during their lunch periods include: discussing the "game plan" at the beginning of the shift for how employees are going to receive lunches, assigning buddies to cover patients while employees take lunch, establishing phone handoff or call forwarding expectations to reduce the likelihood that an employee would be interrupted during lunch, charge nurses "rounding" their floor during the middle of the shift to check whether employees have received or are likely to receive their lunch, allowing charge nurses to be available to cover patients during lunch by assigning no specific patients to the charge nurse, modifying staffing ratios, assigning specific times for employees to take lunch periods, establishing relief shifts that start a few hours after the morning shift for the specific purpose of enabling lunch periods, posting whiteboards in the department indicating when an employee is on lunch so that others know not to interrupt them, creating lunch tracking tools where employees affirmatively represent that they received a bona fide lunch, removing call lights from department breakrooms, and constructing new breakrooms.  *Id.*

Separate and apart from measures taken by managers, there are also factors from the employee's perspective that are relevant to whether an employee took (or why he or she failed to

take) a bona fide lunch, including: whether an employee reasonably interpreted a conversation with her manager (or a prior manager) about taking bona fide lunches as a "directive" to stop using the lunch cancellation, a co-worker's willingness to make herself available to provide lunch relief for others, an employee's "trust" in whether her co-worker will effectively watch her patients, an employee's sense of whether she is a "team player" if she takes bona fide lunches, and whether an employee feels that she is needed on the floor and therefore elects to cut her lunch short even where no manager or supervisor told her to return to work in less than 30 minutes. (FLSA Decertification Brief at 16-18).

The question of whether any restriction on lunch periods results in a nurse or other employee to be "working" is inherently fluid and contextual. Plaintiffs base their contention that all employees were required to be "on duty" during their lunch periods upon boilerplate declarations from opt-in Plaintiffs in a handful of the departments at issue. Plaintiffs then assume that these individualized experiences must be the "common" experience for all 2,400+ employees. In doing so, Plaintiffs make astonishingly broad and conclusory allegations like "[e]mployees who leave their desks or eat in the break room are summoned back to their active duties during their lunch break by flashing call lights, 'zone phones,' pages over the public address system codes, or an approaching co-worker, supervisor or manager." (Plaintiffs' Certification Brief at 19, 21). These sort of conclusory allegations raise far more questions than answers, for example: Did the employee choose to remain available during her lunch? Did the employee choose to eat in a break room close to the department rather than the cafeteria or somewhere else in the hospital? How often was the employee "summoned back" to work and for what reasons? Was the nature of the work interruption significant enough to cause the entire lunch period to become compensable (i.e., was the time spent predominantly for the benefit of

the employee or ThedaCare)?  Could the employee's "buddy" have covered the work event?  Did the employee who worked through his lunch period use the lunch cancellation?  If not, why not?

These are the types of questions that matter to a liability finding.  They would be crucial questions in a single-plaintiff case, and they are no less significant in a class case.  The fact that these questions are necessarily unique to each plaintiff demonstrates that this case cannot be resolved on class-wide basis.  *See Espenscheid v. DirectSat USA*, No. 09-cv-625-bbc, 2011 WL 2009967, at *5 (W.D. Wis. May 23, 2011) (decertifying Rule 23 and FLSA Section 216(b) class of technicians alleging off-the-clock claims when "proof of plaintiffs' claims depends on how individual technicians responded to the numerous policies and practices at issue in the case" and "the evidence shows that opt-in plaintiffs and class members have different work experiences and were affected by defendants' policies in different ways").

Plaintiffs cannot take the experiences, perceptions and interpretations of a few, and then indiscriminately add words like "universally," "frequently" and "routinely" in alleging broad and sweeping practices that do not exist, and which are wholly contradicted by the evidence.  (*See also*, Exhibit 1 to the Third Nickels' Declaration).  Whether some employees believed they needed to remain "on duty" during their lunch period is not evidence of a common unlawful policy implemented by ThedaCare, particularly where many others have testified to different experiences, including having taking bona fide lunch periods.  (Miller Dep. Tr. at 50-54; Auler Dep. Tr. at 50-59; Bartman Dep. Tr. 14-15, 22-23; Vanroy Dec. ¶ 11; Collar Dec. ¶ 9; Hall Dec. ¶ 9; Baranczyk Dec. ¶ 9; Kabat Dec. ¶ 9; Parker Dec. ¶ 8; Guthu Dec. ¶ 10; Tuchscherer Dec. ¶ 9-10; Turba Dec. ¶ 10; Buzzanca Dec. ¶ 7-8; Niquette Dec. ¶ 7; Cynthia Miller Dec. ¶ 7; Rohloff

Dec., Dkt. 56-1 at ¶ 9; Loughrin Dec., Dkt. 56-3 at ¶ 10; Koch Dec. ¶ 12; Mickelson Dec. ¶ 9; Blattner Dec. ¶ 11; Selwitschka Dec., ¶ 11).[7]

## II.    NAMED PLAINTIFFS ARE NOT TYPICAL OR ADEQUATE CLASS REPRESENTATIVES

Typicality is closely related to commonality and ensures that class actions are only certified where the putative class members can advance the same legal and factual arguments. *Dukes*, 564 U.S. at 349, n.5 ("the commonality and typicality requirements of Rule 23(a) tend to merge."). The typicality requirement is focused on whether the claim of the named plaintiff is based on the same legal theory and course of conduct as the claims of the proposed class. *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). Pursuant to Rule 23(a)(4), a named plaintiff must fairly and adequately protect the interest of the class.

Here, none of the named Plaintiffs -- Juelaine Miller ("Miller"), Linda Auler ("Auler") or Kathy Albers ("Albers") -- worked as nurses, yet they seek to represent a class of thousands of employees, most of whom are nurses. The named Plaintiffs' job duties vary widely from those who worked in different roles, and therefore their claims are not typical of others. *See Oshana v. Coca-Cola Co.*, 472 F.3d 506 (7th Cir. 2006) (a named plaintiff's claim is only typical if it "arises from the same event or practice or course of conduct that gives rise to the claims of other class members . . . ."). For example, unlike nurses, Auler and Albers did not even work in roles that provide direct patient care. (FLSA Decertification Brief at 15-16). Auler worked as a registrar and was responsible for greeting patients and gathering information about them to put into the computer system. (FLSA Decertification Brief at 15-16). The lunch experiences of a

---

[7] Opt-in Plaintiff Ruthan Bartman, who typically worked in the Neenah Emergency Department, testified that when she floated to the Neenah Operating Room she received a 30 minute lunch period "every day," that she was "allowed to leave the work area" during her lunch and that she was not making a claim with regard to lunch periods in the Operating Room. (Bartman Dep. Tr. 14-15). Despite this black and white admission, Plaintiffs nevertheless seek to include the Operating Room in their proposed class.

QB\46582003.1

registrar are far different from those of, for example, a nurse who is responsible for patient admissions and discharges, who provided direct patient care, and who coordinated team-based coverage for patients in a variety of hospital departments. (FLSA Decertification Brief at 15-16).

Moreover, the named Plaintiffs' experiences with just two different managers in one department (the Neenah Emergency Department where all three named Plaintiffs worked), further demonstrates how their claims cannot be "typical" of others. The named Plaintiffs all indicated that they were able to and did use the lunch cancellation procedure while supervised by the current department manager, Jen Fredriksen, but that they felt discouraged from overusing the lunch cancellation under a prior manager because that manager asked more questions about why they were not able to take a bona fide lunch. (FLSA Decertification Brief at 11-12). These are manager-specific issues and they cannot be lumped together with the experiences of thousands of other nurses and employees. These fundamental differences reveal that the named Plaintiffs' claims are not based on the same <u>course of conduct</u> as the 2,400+ employees who work in 17 different job titles in 33 departments, with dozens of different supervisors, managers and charge nurses, whom they seek to represent.

Plaintiffs also fail to establish adequacy. This litigation is more than two years old, and Plaintiffs have now proposed -- for the first time -- that the Court should allow them to pursue this matter using three arbitrarily-defined sub-classes. (ThedaCare discusses Plaintiffs' sub-class proposal in Section IV., *infra*). Plaintiffs have not identified the class representatives for any of their proposed sub-classes. Thus, ThedaCare has not taken the depositions of these yet-to-be named class representatives, and cannot opine on their adequacy.

## III.    PLAINTIFFS CANNOT ESTABLISH PREDOMINANCE UNDER RULE 23(B)(3)

Even if Plaintiffs could satisfy commonality, typicality and adequacy, they cannot satisfy the "far more demanding" burden under Rule 23(b)(3) to show: 1) that "questions of law or fact

- 21 -

common to the members of the class predominate over any questions affecting only individual members" and (2) that class litigation "is superior to other available methods for the fair and efficient adjudication of the controversy." *Messner*, 669 F.3d at 814. The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation" and assesses whether a "class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated . . ." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (citation omitted). "Predominance is not satisfied where liability determinations are individual and fact intensive." *Hawkins v. Securitas Sec. Servs. USA, LLC*, 280 F.R.D. 388, 396 (N.D. Ill. 2011).

ThedaCare's policy and practice is to pay for all reported work time, including missed or interrupted meal periods. This is confirmed by the fact that ThedaCare has, in fact, paid for thousands of missed or interrupted lunch periods. (Coenen Report at 8-10). Predominance is not satisfied where the allegations depend on individual deviations from an established policy or practice. *See Jarosz v. St. Mary Med. Ctr.*, No. 10-3330, 2014 WL 4722614, at *11 (E.D. Pa. Sept. 22, 2014) (predominance not established in a meal break class action where proof of the essential elements of the cause of action require individual treatment).

Plaintiffs claim that ThedaCare imposed "institutional pressure" on managers to unlawfully suppress lunch cancellations, and claim that whether that contention is true predominates in this matter. As explained in detail above, Plaintiffs' claim is based on baseless and unsupported speculation. Plaintiffs have not established, by a preponderance of the evidence, that any such practice or policy exists. Indeed, the record evidence squarely establishes that <u>no manager</u> experienced systematic pressure to unlawfully suppress lunch

cancellations and that <u>no manager</u> faced negative consequences where their employees used "too many" lunch cancellations. (*See* Sections I.A. and I.B., *supra*).

Again, ThedaCare's payroll records confirm there was no systematic pressure to forego recording work during meal periods. Of the 623,508 shifts analyzed by Plaintiffs' expert, employees used the lunch cancellation on 71,187 shifts. (Coenen Report at 8-10). Even assuming any such pressure existed, the individualized interpretation and implementation by managers, as well as the supervisors and charge nurses who carry out the localized lunch practices, would predominate as it relates to determining liability. For example, employees in the Neenah ED recorded missed meal periods on 46.7% of all shifts worked. (Coenen Report at 9). In contrast, employees in the Appleton Collaborative Care department recorded missed meal periods on only 3.1% of shifts worked. (Coenen Report at 8). This significant variance underscores the localized implementation of the respective lunch practices, and that individualized issues predominate. *See Epps*, 2006 WL 1460273, at *7 (decertifying collective action where, even assuming defendant had a corporate policy of discouraging overtime, proof of violation would depend on how and whether each manager implemented the policy as to each plaintiff).

Further, Plaintiffs cannot establish 23(b)(3) predominance based on speculation that ThedaCare had unrealistic expectations that required nurses and other employees to work through their lunch periods to complete work, based on the interpretations of a few individuals. Courts frequently refuse to find predominance based on such hyperbolic and unsupported assertions. *See Burkhardt-Deal v. CitiFinancial, Inc.*, No. 8-1289, 2010 WL 457122, at *4 (W.D. Pa. Feb. 4, 2010) (argument that company "culture" caused employees to work overtime did not meet predominance requirement); *Mateo v. V.F. Corp.*, No. C 08-05313 CW, 2009 WL

- 23 -

3561539, at *6 (N.D. Cal. Oct. 27, 2009) (rejecting as overgeneralized plaintiff's claim that due to lack of staffing, employees had to continue working after clocking out for meal periods); *Alonzo v. Maximus Inc.*, 275 F.R.D. 513, 522-23 (C.D. Cal. 2011) (no commonality despite pressure to work overtime off-the-clock when reasons for overtime varied among class members).

Plaintiffs also claim that whether they were "working" during their lunch periods predominates in this matter. As explained in detail above, determining whether and why employees may have worked during a lunch break and failed to use ThedaCare's lunch cancellation policy is a highly individualized inquiry that will require a fact intensive determination that is not appropriate for class certification. (*See* Sections I.C., *supra*). Notably, in *Boelk v. AT&T Teleholdings, Inc.*, No. 12-cv-40-bbc, 2013 WL 239066, at *13 (E.D. Wis. Jan. 10, 2013), this Court found that the predominance requirement was not satisfied where determining whether a meal break violation occurred depended on individualized facts. Specifically, the Court found that predominance was not satisfied because "[d]etermining whether a given employee suffered a meal break violation will depend largely on numerous highly fact-specific inquiries as to the reason why a technician worked during all or part of his meal break on a particular day, including the volume of jobs, the territory and route on that day, the number of other technicians available for work, the technicians' personal preferences, and the particular supervisor involved." *Boelk*, 2013 WL 239066 at *13.

Here, ThedaCare has established the myriad individualized, fact-specific issues that are relevant to a liability determination. (FLSA Decertification Brief at 9-23). In addition to significant factual differences stemming from the localized formulation of meal period procedures at the department level, there are many individual issues that must be decided for

each employee's claim that would predominate over any common issues, including but not limited to:

- Whether each employee's manager and supervisors had actual or constructive knowledge the employee was working during the lunch period without pay.

- Why an employee who recorded missed/interrupted meal periods on some occasions did not record them at other times.

- Whether work claimed to have been performed by each employee during any given lunch period is *de minimis* and therefore non-compensable.

- In workweeks during which each employee experienced one or more compensable meal periods, whether the additional hours in those weeks attributable to unpaid meal periods caused the employee to exceed the 40-hour threshold for overtime.

- Whether an employee unreasonably relied upon comments by co-workers.

Further, many of these issues not only require individualized determinations on an employee-by-employee basis, but also a lunch period-by-lunch period basis. The multi-faceted analysis necessary to determine liability on each employee's claim precludes a predominance finding, as courts routinely have found in other similar meal-break actions against hospital systems. *See, e.g., Aguilera v. Waukesha Mem'l Hosp.*, Inc., No. 13-C-1245, 2015 WL 3791469, at *1 (E.D. Wis. June 18, 2015); *Hinterberger v. Catholic Health Sys.*, 299 F.R.D. 22 (W.D.N.Y. 2014); *Jarosz v. St. Mary Med. Ctr.*, No. 10-3330, 2014 WL 4722614, at *11 (E.D. Pa. Sept. 22, 2014); *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339 (N.D. Ill. 2012).

## IV.   PLAINTIFFS CANNOT DEMONSTRATE THAT A CLASS ACTION IS SUPERIOR

Plaintiffs seeking to certify a class under Rule 23(b)(3) must demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Courts consider "the likely difficulties in managing a class action" in deciding whether a class action is superior. *Id.*; *see also Doster Lighting, Inc. v.*

- 25 -

*E-Conolight, LLC*, No. 12-C-0023, 2015 WL 3776491, at *8 (E.D. Wis. June 17, 2015). That consideration dooms Plaintiffs' certification bid.

The customized meal period practices in the 33 departments and varying accounts between named Plaintiffs, opt-ins, employees and their managers concerning their lunch period experiences would pose overwhelming manageability problems and result in thousands of mini-trials. Plaintiffs have provided evidence relating to just 16 departments -- and their evidence is based primarily on boilerplate, vague and unsupported declarations and some deposition testimony.

The court must at this stage consider how this case, if certified, would be tried on liability and damages. Plaintiffs offer no real trial plan to help the court with this inquiry. Absent a coherent plan to try class claims efficiently, certification of a class action is not superior and poses "an unnecessarily high risk of introducing needless and avoidable complexity into an already complex case." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1279 (11th Cir. 2009); *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770 (7th Cir. 2013) (decertifying wage-hour class action where plaintiffs' trial plan provided no feasible way of determining damages, and would have required 2,341 separate evidentiary hearings for each of the class members).

### A. THE PLAINTIFFS' "ZONE PHONE" ARGUMENT HAS NO MERIT AND HAS PREVIOUSLY BEEN REJECTED BY THIS COURT IN A SIMILAR CASE

Plaintiffs have proposed to create three sub-classes (or possibly six sub-classes assuming Plaintiffs draw the same divisions for the FLSA opt-in Plaintiffs). (Plaintiffs' Certification Brief at 35-37). The proposed sub-classes, however, are totally arbitrary and they would provide no assistance to the trier of fact in making decisions regarding liability or damages. Moreover, the proposed sub-classes, even if accepted by the Court, resolve none of the individualized inquires

relevant to determining whether an employee is "working" during her lunch period as discussed in Section I.C., *supra*.

Plaintiffs assert that employees who carry hospital-issued "zone phones" should constitute a sub-class. In conclusory fashion, Plaintiffs allege that clinical staff who carry zone phones carry them during all lunch periods, that staff are not trained how to forward the calls to other employees, that employees who do not answer their phones are "tracked down" by other employees, and that there is a "general understanding" among staff that they are expected to answer their phones at all time. (Plaintiff's Certification Brief at 14).

First, ThedaCare maintains no common policy requiring employees who use zone phones to carry them during their meal period. Plaintiffs' overbroad and conclusory allegations ignore the record evidence, which reveals <u>substantial variations</u> relating to the use of zone phones in the different departments where they are utilized (which is only a subset of all the departments in the entire proposed class). (FLSA Decertification Brief at 21-22). Indeed, many employees who are assigned zone phones and/or pagers do NOT carry them during their lunch period, DO hand them off, and DO forward calls to the person covering their patients. (Loughrin Dec. ¶ 12; Blattner Dec. ¶ 13; Parker Dec. ¶ 9; Tuchscherer Dec. ¶ 7; Turba Dec. ¶ 9; Blattner Dec. ¶ 13; Niquette Dec. ¶ 9). Other employees assigned zone phones *might choose* to carry them during their lunch, but understand that they are not required to do so. (Groehler Dep. Tr. 47; Vanroy Dec. ¶ 12; Delanty Dec. ¶ 8; Baranczyk Dec. ¶ 10; Guthu Dec. ¶ 8). An employee who chooses to carry a zone phone or to otherwise remain open to the possibility of interruption during his or her lunch period does not automatically convert the lunch period into compensable work. *See, e.g., Brand v. Comcast Corp.*, 135 F. Supp. 3d 713, 738 (N.D. Ill. 2015) ("monitoring a radio or similar device is not a substantial job duty as long as the employee can still spend his lunch break

- 27 -

primarily for his own benefit without persistent interruptions"); *Ruffin v. MotorCity Casino*, 775 F.3d 807, 812 (6th Cir.2015) (collecting cases finding that being available to respond to calls does not convert lunch break to work time). There is also substantial variability as to the frequency that any given nurse's zone phone might ring during a lunch period, and there is variability in terms of who can contact the zone phone (i.e., in some departments patients are able to contact nurses on the zone phone, while in other departments zone phones communications are limited to staff). (FLSA Decertification Brief at 21-22). Further, information conveyed over a phone or pager might not require an immediate response. *Id.*

Most tellingly, Plaintiffs simply lump whole departments into their "zone phone" sub-classes without regard to the facts. In several departments only certain employees (such as a charge nurse, but not staff nurses) carry phones while others do not, which exposes the arbitrary nature of this proposed sub-class. *Id.* Plaintiffs also entirely fail to account for the fact that an employee who carries his hospital phone during his lunch period -- and who is interrupted -- can avail himself of the lunch cancellation.

Second, this Court has already considered -- and rejected -- certifying a class of hospital employees based on use of zone phones under similar facts. In *Aguilera v. Waukesha Memorial Hosp., Inc.*, No. 13-c-1245, 2015 WL 3791469, at *4 (E.D. Wis. June 18, 2015), the Court held that the plaintiffs' proposed common question of whether carrying, monitoring, or answering communication devices during unpaid meal periods constitutes "work" within the meaning of Wisconsin law cannot be answered for the entire class in one stroke. This is because carrying and using a zone phone includes a wide range of activities, some of which might be work and some of which might not. An employee who simply carries a device during a meal period but receives no calls or ignores any calls he or she receives is not working. *Aguilera*, 2015 WL

3791469, at *4.  On the other end of the spectrum is an employee who monitors her device, is constantly interrupted by calls, and is frequently asked to leave her meal period to perform a task such as assisting a patient.  *Id.*  In between are employees whose experiences include things like receiving a call but forwarding it to another employee who is on duty, receiving a call and responding by doing nothing more than informing the caller that the employee is on break, receiving a call and answering a work-related question, and receiving a call and then performing a task -- all of which could happen with varying frequency.  *Id.*

The Court in *Aguilera* held that different practices, in the various departments, and across different shifts, militate against certification: some employees were not required to monitor their phones during meal periods or were able to forward their calls to someone who is on duty; some plaintiffs may ignore calls while on lunch or may inform the caller that he or she is on lunch; some units will schedule nurses with overlapping shifts to provide coverage for meal breaks, which minimizes calls to those who are on lunch; some nurses will notify their co-workers that they are taking a lunch period, which would tend to prevent other nurses from calling them during a lunch period.  *Id.* at *4.

All of the variations relied on by the Court in *Aguilera* are present in ThedaCare.  The factual support for these variations, and many more, are set forth in further detail in ThedaCare's FLSA Decertification Brief at pages 10-23.  Ultimately, creating sub-classes of employees who use zone phones is not a superior method of handling this matter, it does not resolve in "one swoop" the individualized inquires needed to determine whether an employee is working during her lunch, and is neither supported by the record evidence or the law of this jurisdiction.

QB\46582003.1

## B. THE "HIGH ACUITY" SUB-CLASS IS TOTALLY ARBITRARY

Plaintiffs' second proposed sub-class is based on patient acuity. Specifically, Plaintiffs allege that employees working in departments with high acuity patients[8] are uniformly working through their lunch and uniformly do not avail themselves of the lunch cancellation procedure. (Plaintiffs' Certification Brief at 17-21). Tying lunches to patient acuity is a totally arbitrary distinction, invented by Plaintiffs, which has no bearing in fact and does nothing to advance a class-wide resolution of this matter. Indeed, Plaintiffs provide no evidence as to how patient acuity *only in* ThedaCare's Birth Centers, Emergency Departments and Intensive Care Units ("ICUs") impacts employee lunch periods, or those employees' ability to use the lunch cancellation, in common ways. It also completely ignores the fact that hospital departments are staffed 24 hours a day, and that the alleged "high acuity" patients in departments like the Birth Center and the ICU might be sleeping during night shifts, or that patients can present to the Emergency Departments with low acuity issues. (Bardon Dep. Tr. 18-20).

Like Plaintiffs' other allegations, the "high acuity" sub-class is based on overbroad conclusory allegations that are not supported by the record evidence. Patient acuity can take many forms and can change at any time. There is nothing "uniform" about patient acuity, and it has no common relationship to cross-department lunch practices.

### 1. Birth Centers

In conclusory fashion, Plaintiffs assert that all Birth Center employees carry zone phones during their lunch periods, monitor patients via computers over their lunch period, and are frequently interrupted during their lunch periods. (Plaintiffs' Certification Brief at 17-18). These overbroad allegations are not supported by the record, and again, Plaintiffs completely

---

[8] Acuity is a measure of a patient's medical condition. High acuity means the patient is in a more critical condition. Low acuity means the patient is more stable. (Crandall Dep. Tr. 18-19).

QB\46582003.1

ignore the lunch cancellation, which allows employees who actually work during their lunch to cancel the automatic deduction.

From April 2012 through November 2016, employees in the Neenah Birth Center used the lunch cancellation 4,283 times (15% of all shifts worked), and employees in the Appleton Birth Center used the lunch cancellation 4,466 times (18% of all shifts worked). (Coenen Report at 8-9). Birth Center employees have therefore used the lunch cancellation on nearly one in five of all shifts worked. Whether these employees "worked" during their remaining shifts requires an individualized inquiry for each employee and for each shift, and is subject to the same individualized inquiry needed for determining whether any employee worked during his meal period, and if so, why he did not use the lunch cancellation. (*See* Section I.C., *infra*).

Plaintiffs' contention that lunch practices are uniform in the Birth Centers is also contradicted by their own testimony. For instance, opt-in Plaintiff Autumn Wood testified that she sometimes was able to take a 30-minute uninterrupted lunch while working as a nurse in the Neenah Birth Center. (Wood Dep. Tr. 27-28). In the Appleton Birth Center, however, Wood testified that she was much more likely to get a 30-minute lunch because there were large monitors that other Lead RNs would use to monitor Wood's patients while she took her lunch. (Wood Dep. Tr. 39-40). Moreover, there is no suggestion that such differences were somehow due to differences in acuity between the departments (and in fact Plaintiffs assume they are both high acuity in support of their arguments), which further highlights the fact that there are differences in even the most similar departments that cut against certification in this case.

### 2. Emergency Departments

Plaintiffs also contend that ThedaCare's Emergency Departments in its Neenah and Appleton hospitals should be included in a "high acuity" sub-class. Of course, patients in the EDs present with variable levels of acuity, thus Plaintiffs' basic assumption that all ED patients

- 31 -

have high acuity all the time, and that therefore all ED employees work through all lunch periods, is fundamentally unsupported.  (Crandall Dep. 18-20).  In support of their argument, Plaintiffs make conclusory allegations that clinic staff at both EDs carry zone phones, they must remain available during all lunch periods, and that employees rarely get an uninterrupted lunch. (Plaintiffs' Certification Brief at 19-20).

First, Plaintiffs' allegation that all ED employees carry zone phones is false: staff employees in the Neenah ED (where all three named Plaintiffs worked) do not carry zone phones, while employees in the Appleton ED do.[9]  (FLSA Decertification Brief at 15).  Of course, the varying use of phones in similar departments (e.g., ThedaCare's two Emergency Departments) merely highlights each manager's individual decision as to how to run their department.

Also undermining Plaintiffs' "high acuity" argument is the fact that two of the named Plaintiffs, Albers (Unit Resource Associate) and Auler (Registrar), work in roles that do not provide patient care.  (FLSA Decertification Brief at 15).  Whether these employees are able to take a lunch might be impacted by overall volume in the department, or whether there is another Unit Resource Associate or Registrar who is available to cover during their lunch period, but it cannot be impacted by patient acuity.  Other variations also undermine Plaintiffs' conclusory allegations.  For example, opt-in Plaintiff Ruthann Bartman, who normally worked as a nurse in the Neenah ED, testified that when she picked up shifts in the Appleton ED, the charge nurses strongly encouraged her to take a lunch.  (Bartman Dep. Tr. 22-24).

---

[9] Notably, Plaintiffs fail to explain how use of zone phones by ED employees supports a "high acuity" sub-class of ED employees, but not a "zone phone" sub-class of ED employees.

QB\46582003.1

3.    The ICUs

Patients in the ICUs generally are medically compromised and therefore typically have high acuity levels.  (Lubinsky Dep. Tr. 13-14, 24).  This requires them to be monitored at all times, and as a result, patients cannot be left unattended.  *Id.*  Contrary to Plaintiffs' assertion that this prevents nurses from taking a bona fide lunch, it actually reinforces the importance of an effective patient handoff when a nurse goes to lunch.

In the ICU, nurses must hand off their patient responsibilities when taking a 30-minute lunch because the nurse who remains on-duty is completely responsible for the patient.  (Buzzanca Dec. ¶ 7).  To make this process work, the ICU charge nurse typically rounds the floor, beginning around 11:00 a.m., to check in with nurses and to ensure they have an effective plan for taking a 30-minute lunch.  (Lubinsky Dep. Tr. 33-34; Buzzanca Dec. ¶ 6).  ICU Nurses are permitted to take their lunches anywhere, including off premises, and are encouraged to leave their zone phones at the patient's bedside.  (Lubinsky Dep. Tr. 24-26, 35-40; Buzzanca Dec. ¶ 7-8; Parker Dec. ¶ 6-8).  ICU nurses who receive interruptions have used the lunch cancellation feature, which is encouraged by their manager -- e.g., Neenah ICU nurses use the lunch cancellation on 17.8% of all shifts worked, Appleton ICU nurses use the lunch cancellation on 6.6% of all shifts worked.  (Lubinsky Dec. ¶ 4; Thelen ¶ 4; Coenen Report at 8-9).  This variance, again, suggests there are individualized differences impacting lunch periods at the two hospitals, even for similar departments that have similar patients.

As the foregoing demonstrates, creating sub-classes based on patient acuity has no relationship to whether managers have developed effective ways in these departments to effect lunch periods.  It will not aid the fact-finder in making liability determinations, it does not resolve the individualized inquiries needed to determine whether any given employee worked during her lunch periods, and it is not a superior method of handling this matter.

- 33 -

## C.    THE PROPOSED SCHEDULER CLASS IS SIMILARLY INVALID

Plaintiffs contend there should be a sub-class comprised only of employees who work as schedulers in the Staffing Resources Department.  At best, this is a tacit admission that employees who work as schedulers have no common relationship to employees who provide patient care as it relates to lunch periods.

Schedulers work in an office environment where they either prepare employee work schedules six weeks out -- which is clearly not emergency work (Rodriguez Dep. Tr. 15-17; Knox Dec. ¶ 3) -- or they answer phones and assign float employees in response to unexpected increases in patient census or employee absences.  (Rodriguez Dep. Tr. 13-15; Knox Dec. ¶ 3; Bruchert Dec. ¶ 4).  Plaintiffs' proposal to lump all of these employees together utterly fails to account for the material differences in the types of work performed by schedulers.

Contrary to Plaintiffs' conclusory allegations, schedulers in the Staffing Resources department are aware of and use the lunch cancellation on 15.5% of all shifts worked.  (Coenen Report at 10).  The record also establishes that employees are not subject to any common policy restricting them from performing work.  For example, during the day shift, when three to four schedulers are working, schedulers tend to take their 30-minute lunches in groups of two.  (Kabat Dec. ¶ 4).  When doing so, these schedulers take their lunch break and put their landline phones on "not ready," which allows a manager calling about staffing needs to leave a voice message and typically walk together to the cafeteria, eat and decompress.  *Id*.  This is not an on-duty lunch period, and the evidence cited by Plaintiffs at most reflects claims that, as fully discussed above (and in ThedaCare's FLSA Decertification Brief) their claims are not capable of class resolution.

- 34 -

**CONCLUSION**

Plaintiffs have failed to meet their burden to establish all of the requirements for Rule 23 certification, thus Plaintiffs' motion should be denied in its entirety.

Dated:  July 17, 2017                                        QUARLES & BRADY LLP

*s/ Christopher L. Nickels*
Sean M. Scullen, State Bar No. 1034221
sean.scullen@quarles.comd
Christopher L. Nickels, State Bar No. 1083481
christopher.nickels@quarles.com
411 East Wisconsin Avenue, Suite 2350
Milwaukee, WI  53202-4426
414.277.5000

Attorneys for Defendant, ThedaCare, Inc.

- 35 -

## INDEX FOR THEDACARE CITATIONS TO RECORD

### Plaintiffs' Expert Report

| Expert | Date | Docket No. |
|---|---|---|
| Report of Tracy L. Coenen | March 24, 2017 | 122-1 |

### ThedaCare Upper Management Declarations

| Name | Date | Docket No. |
|---|---|---|
| Jamie Dunham | July 14, 2017 | 136-2 |
| Brian McGinnis | July 14, 2017 | 136-3 |
| Mary Jean Schaffmeyer | July 14, 2017 | 136-4 |

### ThedaCare Department Manager Declarations

| Manager Name | Declaration Date | Docket No. |
|---|---|---|
| Tammy McGhee Augustine | July 12, 2017 | 136-5 |
| Amy Bardon | March 14, 2016 | 51 |
| Amy Bardon | July 17, 2017 | 136-6 |
| Margaret Bree | March 14, 2016 | 54 |
| Ann Younger Crandall | July 13, 2017 | 136-7 |
| Heidi Drath | July 14, 2017 | 136-8 |
| Jennifer Fredriksen | July 17, 2017 | 136-9 |
| Judy Knox | March 14, 2016 | 53 |
| Judy Knox | July 17, 2017 | 136-10 |
| Margaret Lubinsky | July 17, 2017 | 136-11 |
| Julie Martin | July 17, 2017 | 136-12 |
| Leigh McNamara | July 14, 2017 | 136-13 |
| Eileen Olson | July 17, 2017 | 136-14 |
| Lisa Reed | July 14, 2017 | 136-15 |
| Laura Schoenauer | July 17, 2017 | 136-16 |
| Alyssa Thelen | July 13, 2017 | 136-17 |
| Amanda Tripp | July 12, 2017 | 136-18 |
| Anna Wilcox | March 14, 2016 | 52 |

## ThedaCare Department Manager Depositions

| Manager Name | Deposition Date | Docket No. |
|---|---|---|
| Tammy McGhee Augustine | January 23, 2017 | 84-3 |
| Amy Bardon | January 17, 2017 | 84-4 |
| Ann Younger Crandall | January 23, 2017 | 84-5 |
| Heidi Drath | January 24, 2017 | 84-15 |
| Jennifer Fredriksen | January 20, 2017 | 84-6 |
| Karen Garvey | November 24, 2015 | 84-1 |
| Judy Knox | January 20, 2017 | 84-7 |
| Margaret Lubinsky | January 24, 2017 | 84-8 |
| Julie Martin | January 16, 2017 | 84-9 |
| Leigh McNamara | January 17, 2017 | 84-10 |
| Eileen Olson | January 16, 2017 | 84-11 |
| Lisa Reed | January 16, 2017 | 84-12 |
| Alyssa Thelen | January 20, 2017 | 84-13 |
| Amanda Tripp | January 17, 2017 | 84-14 |
| Anna Wilcox | November 24, 2015 | 84-2 |

## Named Plaintiffs' Depositions

| Named Plaintiff | Deposition Date | Docket No. |
|---|---|---|
| Kathleen Albers | November 19, 2015 | 50, Ex. C |
| Linda Auler | November 19, 2015` | 50, Ex. B |
| Juelaine Miller | October 29, 2015 | 50, Ex. A |

## Opt-In Plaintiffs' Depositions

| Opt-In Plaintiff Name | Deposition Date | Docket No. |
|---|---|---|
| Ruthann Bartman | April 25, 2017 | 122-2 |
| Katherine Doornink | May 10, 2017 | 122-3 |
| Kevin Groehler | April 28, 2017 | 122-4 |
| Kimberly Lang | May 10, 2017 | 122-5 |
| Anna Nowakowski | April 28, 2017 | 122-6 |
| Jeffrey Olson | April 25, 2017 | 122-7 |

2

| Opt-In Plaintiff Name | Deposition Date | Docket No. |
|---|---|---|
| Jeanna Rodriguez | April 24, 2017 | 122-8 |
| Vicki Wideman | April 24, 2017 | 122-9 |
| Autumn Wood | May 10, 2017 | 122-10 |

**ThedaCare Clinical Staff Declarations**

| Employee Name | Declaration Date | Docket No. |
|---|---|---|
| Bonnie Baranczyk | May 5, 2017 | 122-11 |
| Jennifer Blattner | February 2, 2016 | 56-4 |
| Heather Bruechert | May 11, 2017 | 122-2 |
| Gina Buzzanca | May 11, 2017 | 122-13 |
| Kelsey Collar | May 9, 2017 | 122-14 |
| Ashley Delanty | May 2, 2017 | 122-15 |
| Betsy Guthu | May 8, 2017 | 122-16 |
| Lori Hall | May 3, 2017 | 122-17 |
| Jan Kabat | April 28, 2017 | 122-18 |
| Kasey Koch | February 11, 2016 | 56-2 |
| Christine Loughrin | February 21, 2016 | 56-3 |
| Jackilyn Mickelson | January 28, 2016 | 56-6 |
| Cynthia Miller | May 17, 2017 | 122-19 |
| Danielle Niquette | May 11, 2017 | 122-20 |
| Jennifer Parker | May 2, 2017 | 122-21 |
| Mariya Rohloff | February 16, 2016 | 56-1 |
| Jason Selwitschka | January 28, 2016 | 56-5 |
| Marin Tuchscherer | May 2, 2017 | 122-22 |
| Nick Turba | May 8, 2017 | 122-23 |
| Katie VanRoy | May 9, 2017 | 122-24 |

QB\46863053.1