UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JUELAINE MILLER et al.,

          Plaintiffs,

      v.                             Case No. 15-C-506

THEDACARE INC.,

          Defendant.

---

**ORDER DENYING CLASS CERTIFICATION AND
DECERTIFYING THE COLLECTIVE FLSA CLASS**

---

This is a wage-and-hour collective and putative class action alleging that ThedaCare, Inc., a major health care provider in northeast Wisconsin, failed to pay hourly employees for time spent working during meal breaks. As a result of such failure, ThedaCare is alleged to have violated its employees' rights to regular and overtime pay under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.*, and the Wisconsin wage law, Wis. Stat. § 109.01, *et seq.* The court has jurisdiction over the FLSA claims pursuant to 28 U.S.C. § 1331 and over the state law claims pursuant to 28 U.S.C. § 1367.

The court previously granted Plaintiffs' motion for conditional certification of a collective class under the FLSA pursuant to 29 U.S.C. § 216(b) consisting of those individuals employed at ThedaCare's hospitals, now known as Regional Medical Centers, in Appleton and Neenah. The class is defined as:

> All persons who have been or are employed by ThedaCare at the Appleton Medical Center or Theda Clark Medical Center hospitals on an hourly basis as direct patient care providers, administrative associates, unit resource associates and employees of the Staffing Resources department at any time three years prior to the

commencement of this lawsuit to the present whose scheduled hours included an automatic deduction for unpaid meal breaks and who were denied minimum wage or overtime wages for hours for compensable "oncall" time and/or hours performing work during unpaid meal periods.

ECF No. 60 at 18. The entire class totals approximately 2,400 employees, most of whom are nurses, paramedics, certified nursing assistants ("CNAs"), and other hourly employees who provide direct patient care at its hospitals ("direct care providers"). It also includes a smaller number of employees who work as registrars/administrative associates, unit resource associates, or hourly employees within the Staffing Resources department ("staffing employees"). The case is now before the court on Plaintiffs' motion for final certification of their FLSA collective action and for certification of their state law claims under Federal Rule of Civil Procedure 23. ECF No. 83. Also before the court is ThedaCare's motion to decertify Plaintiffs' FLSA conditional collective action. ECF No. 111. For the reasons below, Plaintiffs' motion to certify the class is denied and ThedaCare's motion to decertify the conditional FLSA collective is granted.

## I. BACKGROUND

ThedaCare operates a healthcare system of seven hospitals and approximately thirty-seven medical clinics in northeast Wisconsin. In ThedaCare's hospitals, employees work in dozens of different departments (e.g., emergency medicine, surgery, oncology, behavioral health, inpatient/outpatient rehabilitation, birthing, and many more). Over the past three years, hundreds of individuals have managed and supervised those departments. ThedaCare employs approximately 3,000 nurses, paramedics, certified nursing assistants ("CNAs"), and other hourly employees who provide direct patient care at its hospitals ("direct care providers"). In addition, it employs

2

approximately 100 hourly employees who work as registrars/administrative associates, unit resource associates, or hourly employees within the Staffing Resources department ("staffing employees").

The three named plaintiffs in this case include Juelaine Miller, Kathleen Albers and Linda Auler. Miller worked as a paramedic at Theda Clark (ThedaCare's Neenah hospital) and Appleton Medical Center ("AMC") (ThedaCare's Appleton hospital). Albers worked as a Unit Resource Associate ("URA"), which required her to manage patient flow, ensure Emergency Department ("ED") patients are placed in the proper room, coordinate with physicians and nurses and place orders for medical imaging or other treatment requested by the physicians. Auler worked as a Registrar, which required her to greet patients who came to the ED, gather information about them and input that information into a computer system. In addition to these three, approximately 165 employees have consented to join as FLSA opt-ins. Most of the opt-ins are employees who work as nurses or in nurse-like roles, but some opt-ins are office workers. The named and opt-in plaintiffs all work or have worked at either AMC, Theda Clark, or both.

ThedaCare pays its non-exempt direct care providers and staffing employees on an hourly basis. During the three years prior to the filing of this lawsuit, ThedaCare employed uniform employee pay and break policies for employees across each of its hospitals. One of ThedaCare's uniform policies is entitled: "Pay: General Information And Employee Responsibilities" and is applicable at "All Locations." ECF No. 33-4 at 10. This general policy includes a "Breaks and Lunches" section, which states:

> As a general practice, employees are scheduled for a half hour lunch. Breaks are discretionary and are subject to the pressures of the daily workload. Managers and supervisors are responsible for the scheduling of breaks and lunches. See the separate policy on Breaks and Lunches for more information.

3

*Id.* at 11. The separate "Breaks and Lunches" policy referenced above also applies to "All Locations" and provides additional detail about ThedaCare's policy on lunches and breaks. Wilcox Exs. 3 & 4, ECF No. 33-5. Regarding lunches, the policy states:

> As a general practice, employees who work at least a 6 hour shift are scheduled for a half-hour unpaid lunch. This half-hour will be deducted by the time and attendance system . . . . If employees' shift length qualifies them for an unpaid lunch break that they are required to forego, employees must record a "no lunch" entry[1] in accordance with the site's timekeeping procedures. Managers or their designee are responsible for oversight and approval of "no lunch" situations.

*Id.* The policy then discusses 15 minute paid breaks, which are "discretionary and are subject to the pressures of the daily workload." *Id.* The policy specifically states that "[e]mployees may not leave the premises during a break." *Id.*

> After explaining break rules, the policy proceeds to discuss breaks and lunches generally:

> The employee should exercise discretion in taking breaks and lunches in such a way that both the needs of the employee and the needs of the organization are met. In some work areas, managers or their designees may designate breaks. However, patient load along with professional practice and team collaboration, generally determines the practicality of breaks.

*Id.* The policy proscribes combining a break with lunch, with another break, or at the beginning or close of the work day. Though the policy specifically prohibits going off the premises during breaks, it allows employees to leave the premises for lunches so long as they properly record the time away: "Generally, employees are not required to record the lunch period if they remain on the premises. However, if an employee leaves the premises, the lunch period must be recorded using the appropriate record keeping method for the site (i.e., time clock, manual timecard, etc.)." *Id.* Finally,

---

[1] The court will refer to the process of pressing the "no lunch" button to cancel the automatic deduction as the "no-lunch option" or a "no-lunch entry."

4

the policy states that conflicts regarding breaks should be brought to the employee's manager, along with any questions or concerns regarding the overall policy. *Id.*

In its order granting Plaintiffs' motion for conditional certification, the court held that ThedaCare's lunch and breaks policy was lawful on its face:

> ThedaCare's lunch and breaks policy is not unlawful on its face. As other courts have found, automatic deduction policies are legal and insufficient, standing alone, to permit a collective action. *Fengler v. Crouse Health Found., Inc.*, 595 F. Supp. 2d 189 (N.D.N.Y. 2009); *see Brabazon v. Aurora Health Care, Inc.*, 2011 WL 1131097, at *3 (E.D. Wis. Mar. 28, 2011) ("The court agrees that simple allegations of the existence and implementation of a practice of making automatic deductions for scheduled meal breaks in and of itself is not 'sufficient as a common denominator to permit a collective action.'") (quoting *Fengler*, 595 F. Supp. 2d at 195). A policy such as ThedaCare's, which allows employees to use the "no lunch" punch when they are unable to take a full 30 minute lunch break, provides a mechanism to prevent employees from having pay automatically deducted for time they were really working. Though ThedaCare managers have the right to cancel a "no lunch" punch, such a safeguard is reasonably oriented to ensuring that employees do not abuse the "no lunch" punch system and does not render the whole system unlawful. *See White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 876 (6th Cir. 2012) ("Under the FLSA, if an employer establishes a reasonable process for an employee to report uncompensated work time the employer is not liable for non-payment if the employee fails to follow the established process.").

ECF No. 60 at 8.

Notwithstanding the fact that ThedaCare's written policy may be lawful on its face, Plaintiffs contend that ThedaCare's application of the policy violates their rights under federal and state wage and hours laws. They claim that "ThedaCare, by uniform policies, failed to compensate members of the class where it required them to perform work duties during the unpaid lunch periods where they were subject to interruption during the unpaid periods, required to respond to patient and hospital needs, require[d] to remain on the employer's property during their unpaid breaks, and where they were not able to effectively cancel the automatic deduction through a procedure of 'punching 'no

5

lunch.'"" Pls.' Br. in Supp. of Final Certification, ECF No. 130 at 4. Plaintiffs contend that "ThedaCare, at its Neenah and Appleton hospital campuses, maintains a culture . . . of strongly encouraging its clinical staff and schedulers to work through their unpaid lunch breaks while, at the same time, automatically deducting a half-hour from the employees' pay." *Id.* at 5. When combined with its practice of discouraging, if not prohibiting, employees from recording a no-lunch entry in its timekeeping systems, Plaintiffs contend that ThedaCare's violations of state and federal wage and hour laws warrant relief on a collective and class-wide basis.

## II. MOTION TO CERTIFY WISCONSIN WAGE CLAIMS

Plaintiffs allege that ThedaCare's conduct violates Wisconsin wage law, specifically Wisconsin Administrative Code § DWD 272.04(1)(c), which requires employers to pay employees for "on duty" meal periods. The regulation defines an "'on duty' meal period" as "one where the employer does not provide at least 30 minutes free from work." *Id.* The regulation further provides: "Any meal period where the employee is not free to leave the employer's premises will also be considered an 'on duty' meal period." *Id.* As a result of failing to pay employees for work performed over their lunch breaks, Plaintiffs allege that ThedaCare has also violated Wisconsin Statute § 103.02, which requires an employer to pay overtime compensation to all non-exempt employees who work more than forty hours during a week. Additionally, Plaintiffs allege that ThedaCare's failure to pay for work resulted in violations of Wisconsin Statute § 104.02, which requires an employer to pay employees at least the minimum wage defined in § 274.03.

Plaintiffs move to certify their Wisconsin wage claims as a class actions under Federal Rule of Civil Procedure 23. The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01

6

(1979). In order to proceed as a class, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974)). Rule 23(a) serves as a gate-keeper to ensure that a class format is an appropriate procedure for adjudicating a particular claim. *Bell v. PNC Bank Nat. Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015). Under Rule 23(a), four requirements must be met: numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a). In addition to meeting the four requirements of Rule 23(a), the class must also meet one of the requirements of Rule 23(b). Plaintiffs seek certification under Rule 23(b)(3), which allows for certification of classes seeking monetary damages when "questions of law or fact common to the class members predominate over any questions affecting individual members" and when the "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

In conducting the Rule 23 analysis, the court should not turn the class certification proceedings into a dress rehearsal for trial on the merits of the case. *See, e.g.*, *Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010). However, on issues affecting class certification, "a court may not simply assume the truth of the matters as asserted by the plaintiff." *Messner v. Northshore Univ. HealthSystems*, 669 F.3d 802, 811 (7th Cir. 2012). "If there are material factual disputes, the court must 'receive evidence . . . and resolve the disputes before deciding whether to certify the class.'" *Id*. (citing *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001)). Plaintiffs bear the burden of showing that a proposed class meets the Rule 23 requirements by a preponderance of the evidence. *Id*. Furthermore, the court must consider the elements of the underlying complaint

7

because "[a]nalysis of predominance under Rule 23(b)(3) 'begins, of course, with the elements of the underlying cause of action.'" *Messner*, 669 F.3d at 815 (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)).

ThedaCare challenges the commonality, typicality, adequacy of representation, and predominance of Plaintiffs' class. The court finds the commonality and typicality requirements of Rule 23(a), which "tend to merge," *see General Telephone Co. v. Falcon*, 457 U.S. 147, 157 n.13 (1982), determinative, and therefore begins and ends its analysis of this issue there.

Rule 23(a)(2), known as the "commonality" requirement, requires a plaintiff seeking class certification to show that "there are questions of law or fact common to the class." Rule 23(a)(3), known as the "typicality" requirement, requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." The Supreme Court has interpreted the commonality requirement to mean that the claims of the proposed class must depend on a common contention that is "of such a nature that it is capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* (internal quotation marks omitted).

As noted above, Plaintiffs contend that ThedaCare had a de facto policy of requiring, or at least encouraging, employees who were unable to take a complete meal break from recording a no-lunch entry. They also contend that employees were also led to believe they could not leave the

8

premises during their meal break. Moreover, because ThedaCare management had at least constructive knowledge of the fact that its employees were performing work during their unpaid meal periods, Plaintiffs contend it was required to pay them compensation. *See Kellar v. Summit Seating, Inc.*, 664 F.3d 169, 177 (7th Cir. 2011) ("The FLSA imposes an obligation on the employer 'to exercise its control and see that the work is not performed if it does not want it to be performed.'" *See* 29 C.F.R. § 785.13. The employer 'cannot sit back and accept the benefits without compensating for them.'" *Id.*); *see also* Wis. Adm. Code § DWD 272.12(2) (same). Given these facts, Plaintiffs argue that Rule 23 certification should be granted.

The evidence presented does not support Plaintiffs' allegations that ThedaCare management had a de facto policy to deprive its employees of compensation to which they are entitled. This is not to say that there were not employees who worked during their meal breaks and were not compensated for it. But to the extent this occurred, it was due to the myriad of factors each employee faced over the period of time covered by this lawsuit. These factors include the department in which the employee worked, the supervisor to whom they reported, and each employee's own subjective attitude and intent. Moreover, even in those departments where employees were discouraged from recording no-lunch entries, violations only occurred on those days when a high patient count and a heavy work load caused significant interruptions during an employee's meal break. Given the variability that each of these elements may have had on each employee on any given day, Plaintiffs are unable to satisfy the commonality/typicality requirements for Rule 23 certification.

## A. De Facto Policy of Upper Management

Plaintiffs have not established a de facto uniform policy imposed by ThedaCare's upper management to prevent employees from using the no-lunch entry when they were unable to take a

9

full lunch. In particular, Plaintiffs assert that upper management instructed supervisors to discourage, prevent, or limit employee use of the no-lunch option. Their assertion that such a policy existed is based on speculation and equivocation, and disregards the unequivocal testimony of actual management personnel who were deposed or offered declarations. While the evidence presented does support the claim that some supervisors may have believed they were to discourage employee use of the no-lunch option, even if employees were interrupted or called back to work during their lunch periods, there is no evidence of a uniform practice. The evidence also supports a finding that there may have been some confusion over what management expected.

Plaintiffs try to connect their various theories of discouragement, disallowance and limitations of the no-lunch option as all arising from pressure by ThedaCare's upper management to meet productivity numbers and stay within departmental budgets. ThedaCare uses the Full Time Equivalent ("FTE") percentage metric to measure its employee hours and set departmental budgets. The FTE increases when an employee works through lunch and uses the no-lunch option, thereby increasing the number of employee hours worked and decreasing the productivity output. Plaintiffs contend upper management places pressure on supervisors to prevent employees from using the no-lunch option because recording a no-lunch entry causes departments to exceed budgets and reduces overall productivity. Upper management's concern to meet productivity and budgeting standards resulted in the creation of ThedaCare's common policy to discourage, disallow and limit employee use of the no-lunch option.

To support their claim, Plaintiffs suggest that increasing productivity and reducing the use of the no-lunch option were discussed at upper management meetings. Plaintiffs allege that Chief Operating Officer Mary Jean Schaffmeyer "told [management] that [they] cannot allow employees

10

to punch 'no lunch' and that they need to take a lunch break and whatever it takes to do it needs to be done." Luker Aff., ECF 124 at 5. Plaintiffs also allege that when management asked how they should do that when they are short-staffed, Schaffmeyer responded, "Well, you have to figure that out." *Id*. Plaintiffs allege that this brief exchange recounted by a former supervisor is evidence of unofficial pressure from upper management to discourage, disallow, or limit the use of the no-lunch option while still requiring or allowing employees to work through lunch.

Plaintiffs' argument is flawed for several reasons. First, the fact that upper management wanted supervisors to minimize employee use of the no-lunch option does not mean employees were to be forced or even allowed to work over their lunch break without compensation. As COO Schaffmeyer explained, "I never pressured or suggested to managers that they should improperly suppress use of the lunch cancellation. My goal was to encourage healthy lunch periods, and to help them understand what resources they needed to help their employees get a bona fide lunch." Schaffmeyer Dec., ECF No. 136-4 at 2. It is also entirely reasonable for management to direct supervisors and department heads to take the steps needed to ensure that employees were not unnecessarily working over their lunch periods and thereby increasing the operating costs of the hospital. In other words, upper management viewed excessive use of the no-lunch option as detrimental both to the health and productivity of individual employees and to the hospitals' overall efficiency. Some supervisors may have mistakenly believed this meant they were to prevent employees from utilizing the lunch cancellation feature even when the employee was unable to take a full lunch break, but Plaintiffs offer no evidence that this was upper management's intent.

Furthermore, Plaintiffs fail to show by a preponderance of the evidence that upper management pressured supervisors to prohibit employee use of the no-lunch option, even if the

11

employee worked through lunch. For evidence, Plaintiffs offer only the affidavit of one supervisor at Theda Clark who states that his manager—not someone from upper management—told him that "a directive came from upper management that we need to start taking 'no lunch' punches away from employees, even when the employee did not get a lunch." Luker Aff., ECF No. 124 at 5. In response, ThedaCare offered testimony from sixteen upper management members, managers, or supervisors declaring that they have never encouraged the suppression of the no-lunch option in order to improve productivity costs. Augustine Dec., ECF No. 136-5 at 2; Bardon Dec., ECF No. 136-6 at 2; Crandall Dec., ECF No. 136-7 at 2; Drath Dec., ECF No. 136-8 at 2; Dunham Dec., ECF No. 136-2 at 2; Fredriksen, ECF No. 136-9 at 2; Knox Dec., ECF No. 136-10 at 2; Lubinsky Dec., ECF No. 136-11 at 9; Martin Dec., ECF No. 136-12 at 2; McNamara Dec., ECF No. 136-13 at 2; McGinnis Dec., ECF No. 136-3 at 2; Olson Dec., ECF No. 136-14 at 2; Reed Dec., ECF No. 136-15 at 2; Schoenauer Dec., ECF No. 136-16 at 2; Thelen Dec., ECF No. 136-17 at 2; Tripp Dec., ECF No. 136-18 at 2.

Plaintiffs' argument that upper management used no-lunch entries and corresponding FTE calculations to measure department productivity also finds no support in the record. As ThedaCare explained, there is not an exclusive relationship between the use of the no-lunch option and productivity metrics or department budgets. Productivity levels can change based on a variety of things, such as patient volume, patient flow, documentation, and duties. Dunham Dec., ECF 136-2 at 2–3. Correlation does not equal causation. Because the no-lunch option, FTEs, and productivity levels do not have a fixed relationship, the correlation between them does not create an inference that the pressure from upper management to achieve productivity metrics was actually pressure from

12

upper management to make employees work through lunch without paying them, especially given that productivity levels can be affected by many sources.

Finally, Plaintiffs' contention that ThedaCare's upper management adopted a de facto policy that prevented employees from using the no-lunch option even when they were unable to take a full lunch break is undermined by the report of their own expert. Plaintiffs' expert report shows a wide variation in the use of the no-lunch option over the course of 3.5 years, including those years covering this lawsuit.[2] ECF No. 122-1. The expert report analyzed the percentage of shifts in which an employee used the no-lunch option in each department. *Id*. at 8. This percentage varied from 3.1% to 69.7% between the departments in the two hospitals. *Id*. at 8–9. No less than eleven departments[3] contained employees that used the no-lunch option during at least 10% of their shifts. *Id*. The wide variation in the percentage of shifts in which employees used the no-lunch option weighs against the allegation that ThedaCare had a common policy or practice that prevented employee use of the no-lunch option. If there was a common application of the no-lunch option, it should manifest itself through less variance in the usages between the departments.[4]

---

[2] Plaintiffs' expert studied over 2 million lines of timekeeping data from the pay period ending on April 7, 2012 through the pay period ending on November 12, 2016. *Id*. at 1–2.

[3] These include the following AMC departments: Birth Center, Emergency Services, Inpatient Operating Room, Patient Registration, and Pulmonary. *Id*. at 8. These include the following Theda Clark departments: Birth Center, Emergency Services, ICU, Surgery, Trauma. *Id*. at 9. These also include the Staffing Resources Department. *Id*. at 10.

[4] Although variances could be attributed to other factors (like patient census and staffing levels), this does not strengthen Plaintiffs' position. Rather, the variances only further support the finding that the employees in different departments are too dissimilar to proceed as a class.

Additionally, if there was a common suppression of the no-lunch option, it should have evidenced itself as similar low usage rates of the no-lunch option.

13

In sum, Plaintiffs have failed to offer persuasive evidence that ThedaCare's upper management adopted a de facto policy of denying its employees compensation for work performed over their unpaid lunch breaks. In this respect, this case differs from *Bell v. PNC Bank* on which Plaintiffs place significant weight. 800 F.3d at 365. In *Bell*, the Seventh Circuit affirmed the district court's certification of a class of employees at twenty-seven banks in Illinois based on strong evidence of an explicit official policy on the part of management to deny employees compensation for overtime. *Id*. at 381. Here, as explained above, there is no persuasive evidence of such a policy.

## B. Individualized Determination

Absent persuasive evidence of a common de facto policy to deny employee use of the no-lunch option when they were unable to take a full meal break, Plaintiff's remaining arguments asserting that ThedaCare violated its employees' rights under state and federal law require individualized inquiries dependent upon the myriad of factors noted above, including the employee, the department in which the employee worked, the supervisor to whom he or she reported, the level of work on the particular day in question, and what the supervisor may have said to the employee. First, Plaintiffs assert ThedaCare had a common policy which required employees to remain at the hospital during their lunch. It is true that most employees remained at the hospital over their thirty-minute meal break, going either to the cafeteria or, for those who brought their own lunch, to the break room located on the floor they worked. But this fact alone does not mean that ThedaCare required its employees to remain on its premises. With only thirty minutes for a meal break, employees might reasonably conclude that it would make little sense to leave the premises absent a compelling need to do so. This is especially true of those clinical staff employees handling medications who, for security reasons, were required to trade in their car keys for their work keys

14

during their shifts. For those employees, making arrangements to leave may be more trouble than it is worth. But this does not mean they could not leave, particularly in light of ThedaCare's policy which explicitly contemplates them being able to do so. The crucial question is whether management required the employees to remain on the premises over their meal period, not whether the employees found it more convenient to remain. Plaintiffs offer no evidence of a common policy requiring employees to remain on the hospital premises over their meal break, and ThedaCare has presented evidence that at least some, at times, left the premises.

In addition, the fact that employees in certain departments were required to carry communication devices, so-called "zone phones," while they were at work does not mean they were forbidden from leaving the premises. Judge Adelman addressed this issue in *Aguilera v. Waukesha Memorial Hospital, Inc.*, No. 13-C-1245, 2015 WL 3791469 (E.D. Wis. June 18, 2015). There, two Waukesha Memorial Hospital employees sought Rule 23 certification of a class action for violations of state wage and hour law on behalf of CNAs and housekeepers who were required to carry wireless phones or pagers at all times during their shifts, including during their meal periods. As in this case, the employees' half-hour uncompensated meal periods were automatically deducted from their paid time, but employees could use a "cancel lunch" function on the timekeeping system if the full meal break was not taken. Also, as in this case, the plaintiffs alleged that they were frequently interrupted during their meal periods and supervisors had instructed them that they were not to use the "cancel lunch" feature on the timekeeping system, even when they were interrupted by phone calls, required to answer their communication devices, or asked to perform work during their lunch period. *Id.* at *1. Like some of the employees who have opted in here, the named plaintiffs in *Aguilera* stated they understood this to mean that they could not leave the hospital

15

premises during their meal breaks. As a result, the plaintiff employees claimed that their meal periods should be treated as compensable time. *Id.* at *2.

Although the court in *Aguilera* had granted preliminary certification to a collective FLSA class, upon a more complete record the court denied the plaintiffs' motion for Rule 23 class certification and decertified the collective class it had preliminarily approved based on the lack of commonality in the claims. In so ruling, the court rejected the plaintiffs' contention that use of the communication devices during meal periods presented a common question:

> However, this question cannot be answered for the entire class in one stroke. The problem is that the phrase "carrying, monitoring, or answering communication devices" describes a wide spectrum of activities, some of which might be work and some of which might not. On one end of the spectrum is an employee who simply carries a device during a meal period but receives no calls or ignores any calls he or she receives; at the other end is an employee who monitors her device, is constantly interrupted by calls, and is frequently asked to leave her meal period to perform a task such as assisting a patient or making a bed. In between are employees whose experiences include things like receiving a call but forwarding it to another employee who is on duty, receiving a call and responding by doing no more than informing the caller that the employee is on break, receiving a call and answering a work-related question, and receiving a call and then performing a task—all of which could happen with varying frequency.

*Id.* at *4.

The *Aguilera* court also rejected the named plaintiffs' claim that by requiring them to carry their communication devices throughout the day, the hospital implicitly required them to remain on the premises during their lunch periods. The court first noted that the hospital's policy, like ThedaCare's policy in this case, "contemplate[s] that employees may leave the premises during meal periods so long as they swipe out." *Id.* at *5. The court also noted that "the evidence does not show that all CNAs and housekeepers were subject to the same policies and practices concerning the use of communication devices during meal periods." *Id*. at *6. One supervisor testified that employees

16

had the option of leaving their devices at work if they wanted to leave for lunch. Another said employees took the devices with them when they left. Others said that they turned the devices off or handed them off to others over their breaks. In other words, there was not a single answer to the question of whether employees were free to leave. The *Aguilera* court explained, "Individualized inquiries will be needed to identify the policies or practices that applied to each employee, and therefore 'whether CNAs and housekeepers were free to leave the premises during their meal periods' is not a common question of law or fact." *Id.*

The same variation in employee circumstances exists in this case. Some employees who are assigned wireless phones do not carry them during their lunch period or hand them off. Others carry the devices but understand they are not required to do so. Regardless, the mere fact that employees carry the communication devices during their meal break does not mean they were working during that time. Although carrying a zone phone during a meal break could result in interruptions during lunch, it does not follow that each and every lunch period was interrupted so as to render all meal periods compensable. Possession of a phone during their lunch break also does not require an employee to remain on the premises.

Plaintiffs maintain that remaining at the hospital, particularly in a break room within the department where the employee is working, could result in the employee answering any question that may arise or returning to work early because of patient needs. Yet, Plaintiffs fail to distinguish between minor brief interruptions and more significant ones. They appear to assume that any interruption, no matter how brief, turns an unpaid thirty-minute meal period into compensable work time. That assumption ignores the *de minimus* doctrine and the definition of work under both federal and state law. Both the FLSA and Wisconsin wage law define "work" as "physical or mental exertion

17

(whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Musch v. Domtar Indus.*, 587 F.3d 857, 859 (7th Cir. 2009).[5] To prevail on a claim for compensation then, each employee would need to prove that they engaged in activities that predominantly benefitted the defendant during their meal breaks. *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 873 (6th Cir. 2012) (holding that an automatic meal deduction system was lawful under the FLSA and explaining that compensation is necessary only "when an employee is required to give up a substantial measure of his time") (quotation omitted). Additionally, determining whether there a violation occurred will require a determination of whether the work performed was *de minimis*. *Id.*

Plaintiffs also argue ThedaCare violated their rights by citing to the fact that some supervisors on occasion cancelled their no-lunch entries even though their meal period was interrupted. But this issue would also require consideration of a variety factors in addition to the question of how often it occurred. Whether such a supervisor's action was lawful would depend on why the no-lunch entry was cancelled. Was it because someone simply asked an employee a question while she was on break and the interruption, if any, was *de minimis*? Was it because the employee took it upon herself to do work over her break that could have just as well have been done later? Or was it because the supervisor misunderstood management's directions to make sure employees were receiving their meal breaks? Again, no one answer applies to all of the employees on each occasion it occurred.

---

[5] Wisconsin designates what is considered "work" more broadly than the FLSA, finding that "[a]ny meal period where the employee is not free to leave the premises of the employer will also be considered an 'on duty' meal period." However, as previously explained, the court finds no evidence that employees were required to stay.

18

Individual perception also plays a role in determining whether ThedaCare violated the FLSA and Wisconsin law. Some employees testified they stopped using the no-lunch option because when they did, the supervisor asked them questions about why they did so. A supervisor's questioning is not, on its face, a prohibition or even discouragement, however. Given the interest of management in ensuring that employees could generally take a full lunch break and its interest in controlling costs, it is not surprising that a supervisor would want to know why an employee found it necessary to skip lunch, especially if it occurs repeatedly. Was the questioning by the supervisor intimidating? Plaintiffs do not explain what was said; only that some felt intimidated. No employee has claimed that they were disciplined because of their utilization of the no-lunch entry. Rather, some say they were "counseled," but there is no clear indication of what that means.

The potential class members worked in many different departments, each of which had different supervisors over the period covered by the suit. Some departments, by the nature of the care provided, were more susceptible to the kind of sudden emergencies that required immediate attention from those responsible for patient care. Moreover, different supervisors within those departments, and over time, utilized different staffing models and different departmental lunch period practices and rules in an effort to ensure that employees had enough time to take a complete meal period free from work. To be sure, ThedaCare has directed its managers and supervisors to pay more attention to the problem of employees working through their meal period since Plaintiffs commenced this action, but this only underscores the wide variation that already existed within the two hospitals where Plaintiffs worked.

There were not only variations in how employees received their lunch breaks across the different shifts, departments, and hospitals. There were also variations in when and if an employee

19

would select the no-lunch option. Some employees, who never received a lunch because they were the only employee on duty during the night shift, would select the no-lunch entry every time. Some employees who felt comfortable selecting the no-lunch option on night shift would not do so during day shift. However, this only highlights that these claims cannot be resolved on a class level. Not only are there physical variations in daily hospital work (like patient levels and staff attendance), there are also variations in the decision-making each employee made in deciding whether or not to use the no-lunch option or whether they believed their lunch was interrupted.

The evidence reflects the type of variations that preclude a finding of commonality. For example, Ruthann Bartman testified that at Theda Clark she had to work through lunch when she worked as a nurse in the Emergency Room, but always got a lunch when she worked as a nurse in the Operating Room. Bartman Dep., ECF 122-2 at 15–16. Bartman also testified that, while she often worked through lunch during both her day shift and her night shift, she would punch no-lunch on night shifts but not day shifts. *Id*. at 44. Additionally, Bartman testified that when she worked in the Emergency Room at AMC, her managers insisted she go take a lunch, which did not happen at Theda Clark. *Id*. at 59–60. Bartman's testimony alone shows the highly individualized questions that would need to be answered to determine each violation.

Evidence of the individualized factors is apparent throughout the record, not just in Bartman's testimony. Vicki Wideman, a nurse at Theda Clark, testified that she did not get an uninterrupted lunch while she worked in cardiac medicine; however, she was more likely to get one in outpatient infusion. Wideman Dep., ECF No. 122-9 at 44, 47. Katherine Doornink, a nurse in behavioral health at Theda Clark, testified that she received a 30 minute uninterrupted lunch on half the lunches she worked. Doornink Dep., ECF No. 122-3 at 49–50. Whereas Kevin Grohler, a nurse at AMC,

20

testified that he received uninterrupted lunches very rarely during day shifts but during about one-third of the time while he was on night shifts. Grohler Dep., ECF No. 122-4 at 58. Grohler testified that his interruptions could include phone calls, call lights, pages, and face-to-face interruptions. *Id*. at 43. These interruptions would vary in the time required to respond, from minimal (call lights and pages) to more time intensive (phone calls and face-to-face interruptions). *Id*. at 44–49. Autumn Wood, a nurse in the Birth Center, testified that she was more likely to get a lunch at AMC than Theda Clark. Wood Dep., ECF No. 122-10 at 40. Juliane Miller, one of the named plaintiffs who worked as a paramedic at Theda Clark, testified that she was more likely to punch no-lunch with her second manager than her first. Miller Dep., ECF No. 50-1 at 15. These are just a few of the examples of the individualized factual differences that would predominate over the determination of whether there was a common violation. And as noted above, Plaintiffs make no attempt to distinguish between significant interruptions in their break and a two-second inquiry. Given all of these variations in the multiple factors that affect whether an employee was able to take a break on any given day and whether the employee, if unable to do so, could effectively record a no-lunch entry, the required commonality for Rule 23 class certification cannot be found.

This conclusion finds substantial support in other cases in which similar policies have been challenged. *See, e.g.*, *Aguilera*, 2015 WL 3791469, at *4–6 (finding no commonality amongst class members in a hospital class action alleging violation of the FLSA because of interruptions during lunch and the use of an automatic lunch deduction procedure); *DeSilva v. N. Shore-Long Island Jewish Health Sys.*, 27 F. Supp. 3d 313, 328–30 (E.D.N.Y. 2014) ("In sum, because the question of LLJ's FLSA and NYLL liability necessarily depends on whether, on a department-by-department basis, a particular manager failed to follow LLJ's directive to approve mealtime work or knew that

21

such work was performed but did not compensate employees as required, Plaintiffs cannot meet Rule 23(b)'s commonality pre-condition, nor can it satisfy the Rule's predominance requirement."); *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 346–52 (N.D. Ill. 2012) (decertifying a similar class because "significant factual differences exist among Plaintiffs' employment locations and work settings, job duties, supervision, and meal break practices"); *see also Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 896 (7th Cir. 2012) (explaining that class certification was inappropriate under Rule 23 because supervisors at individual sites had significant hiring discretion, therefore to analyze the claim, "a court would need site-specific, perhaps worker-specific, details, and then the individual questions would dominate the common questions (if, indeed, there turned out to be any common questions)"); *Vang v. Kohler Co.*, 488 F. App'x 146, 147 (7th Cir. 2012) (explaining that a single, firm-wide policy could satisfy Rule 23 under *Wal-Mart* and *Bolden*, but that the variable circumstances of individual supervisors departing from a firm-wide policy does not present a common question); *Leahy v. City of Chicago*, 96 F.3d 228, 232 (7th Cir. 1996) (holding that a collective bargaining agreement requiring individual grievances was more appropriate than an FLSA action because "the individual inquiry facilitated by the grievance process is the most efficient way to determine whether an officer's meal period should be compensable work time" for "a police department of some 12,000 officers in different districts with different shift schedules and different exigencies arising each day that might affect officers' meal periods"); *Jonites v. Exelon Corp.*, 522 F.3d 721, 726 (7th Cir. 2008) ("The plaintiffs in this case want us to rule that because some Com Ed employees may sometimes do work at lunch, all Com Ed employees are entitled to pay during their lunch break . . . . It is that argument . . . that is preposterous.").

22

Plaintiffs seek to avoid these difficulties by proposing a set of three subclasses for employees, as opposed to one entire class. Plaintiffs propose that in the event the court does not find sufficient commonality in its proposed class to meet the requirements of Rule 23, it should certify three subclasses consisting of (1) employees with direct patient care responsibilities who use "zone phones," (2) those who monitor acute patients, and (3) schedulers with indirect patient care duties. This would not cure the essential problem: that the question of how many, if any, of the meal periods of each employee within the class over the period of time covered by the complaint were interrupted and are therefore compensable because of work performed does not lend itself to a single adjudication. While the employees who worked and yet were unpaid may have suffered the same injury, the determination of each violation for each employee within the class turns on too many variable factors to allow consideration as a class. I therefore conclude that class certification of Plaintiffs' state law claims pursuant to Rule 23 should be denied.

## III. MOTION TO DECERTIFY PLAINTIFFS' CONDITIONAL FLSA CLASS

As noted above, the court conditionally certified Plaintiffs' FLSA class action pursuant to 29 U.S.C. § 216(b) in a previous order. The FLSA permits collective actions "against any employer . . . by any one or more employees for and on behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). Employees or former employees must give their consent in writing to become a party to a collective action brought pursuant to § 216(b). Therefore, unlike a typical class action suit under Federal Rule of Civil Procedure 23, where unwilling parties must "opt out" of the class, the FLSA requires employees to "opt in" to the class. *Woods v. N.Y. Life Ins. Co.*, 686 F.2d 578, 579–80 (7th Cir. 1982). Since the class was conditionally certified, 165 individuals have consented to join the collective action.

Before the court now is Plaintiffs' motion for final certification on their FLSA collective action. ECF No. 83. Also before the court is ThedaCare's motion to decertify the FLSA collective action. ECF No. 111. FLSA collective actions differ from Rule 23 class actions in that Rule 23 sets forth a set of detailed procedural provisions that have no counterpart in the FLSA. *Epenscheid v. DirectStat USA*, *LLC*, 705 F.3d 770, 772 (7th Cir. 2013). But despite these differences between the two, "there isn't a good reason to have different standards for the certification of the two different types of action, and the case law has largely merged the standards, though with some terminological differences." *Id*. Therefore, the Seventh Circuit has indicated, albeit in dicta, that the standards for certification under the FLSA § 216 and Rule 23 should be treated as the same. *Id.* at 771–72. Treating them as the same, the court finds that the opt-in plaintiffs are not similarly situated for the reasons described in the Rule 23 analysis.

Even if the court applied the FLSA's "similarly situated" standard, as a separate, lower standard, the end result would be the same. *See Flavel v. Svedala Indus.*, 875 F. Supp. 550, 553 (E.D. Wis. 1994) (treating the "similarly situated" standard as lower than the requirements of Rule 23(a)). At the second step of a FLSA collective action, typically on a defendant's motion for decertification, courts determine whether plaintiffs who have opted in are, in fact, similarly situated. *Brabazon v. Aurora Health Care, Inc.*, No. 10-C-714, 2011 WL 1131097, at *2 (E.D. Wis. Mar. 28, 2011). At that second stage, the court assesses whether continuing as a collective action will provide efficient resolution in one proceeding of common issues of law and fact. *See Hoffmann-La Roche v. Sperling*, 493 U.S. 165, 170 (1989). On a motion to decertify the class, Plaintiffs still bear the burden of producing a record that demonstrates that maintaining class certification is appropriate. *Ellis v. Elgin Riverboat Resort*, 217 F.R.D. 415, 419 (N.D. Ill. 2003).

24

In determining whether parties are "similarly situated," the court considers factors like any disparate factual and employment settings of the individual plaintiffs, the various individualized defenses available to the defendant, and fairness and procedural considerations. *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1102–03 (10th Cir. 2001) (cited approvingly in *Espenscheid*, 705 F.3d at 771–72). As described during the Rule 23(a) discussion, there are significant differences between class members. These differences remain prevalent even when examining the narrowed class of opt-in members. There are still over 165 different employees from 33 departments across two different hospitals who reported to at least 38 managers and 55 supervisors. There are too many differences in situations for Plaintiffs to be similarly situated. All of the factors considered by the court in denying class certification under Rule 23 apply equally to Plaintiffs' collective action. There is no common policy that denies the collective class compensation for work performed over their meal periods, and the determination of which employees should have been paid for which meal periods over the last two to three years depends upon too many variables to regard each employee's claim as similarly situated. The individualized determinations the case calls for exist not only as to damages, but concern each allegedly compensable meal period. Only by denying ThedaCare the opportunity to assert individualized defenses to each meal period that each employee claims should have been compensated over the entire period can all of the claims of all of the employees be tried in a single action. While such a ruling may force ThedaCare to settle the case rather than incur the costs of interposing individualized defenses to each class member's claim for compensation for each working meal period, the means by which it would accomplish this result are inconsistent with the principles of fundamental fairness that the procedural protections of both the FLSA and Rule 23 are

25

intended to insure. The court therefore concludes that ThedaCare's motion to decertify should be granted.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiffs' motion for final certification and to certify a class (ECF No. 83) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's motion to decertify (ECF No. 111) is **GRANTED**. The collective action is **DECERTIFIED** and the claims of the opt-in plaintiffs are **DISMISSED WITHOUT PREJUDICE**. Plaintiffs' counsel is directed to notify the opt-in plaintiffs of this order decertifying the class and informing them of their ability to bring individual claims and warning them that the statute of limitations on their ability to file suit has resumed running. *See, e.g.*, *Culver v. City of Milwaukee*, 277 F.3d 908, 914 (7th Cir. 2002); *Espenscheid v. DirectSat USA, LLC*, No. 09-cv-625-bbc, 2011 WL 13209268, at *3 (W.D. Wis. July 7, 2011).

The Clerk is directed to set this matter on the court's calendar in not less than ten days for a telephone conference to address further scheduling.

Dated this   17th   day of January, 2018.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court
